**Exhibit A**
**(Bond Purchase Agreement)**

*Execution Copy*

**BOND PURCHASE AND LOAN AGREEMENT**

among

**SOUTH CAROLINA JOBS-ECONOMIC DEVELOPMENT AUTHORITY**

and

**THE MUFFIN MAM, INC.**

and

**PINNACLE BANK**

Dated as of March 1, 2019

Not to exceed $10,000,000
South Carolina Jobs-Economic Development Authority
Industrial Revenue Bond
(The Muffin Mam, Inc. Project)
Series 2019

# TABLE OF CONTENTS

**Page**

Section 1.    Definitions.................................................................................................1
Section 2.    Representations and Findings by Issuer...............................................6
Section 3.    Representations and Warranties by the Borrower................................7
Section 4.    Issuance of 2019 Bond; Sale and Purchase of 2019 Bond; Limitation of Liability of Issuer; Commitment of the Bondholder..............................................8
Section 5.    Conditions Precedent to Delivery of 2019 Bond...............................9
Section 6.    Advance of Bond Proceeds. ..............................................................10
Section 7.    Process for Making Bond Advances; Establishment of Completion Date.................10
Section 8.    [Reserved]. .......................................................................................11
Section 9.    Loan by the Issuer; Assignment of Rights to the Bondholder. .........11
Section 10.   Repayment of Loan; Terms of 2019 Bond.........................................11
Section 11.   Matters Pertaining to Tax Exemption. ..............................................13
Section 12.   [Reserved]. .......................................................................................14
Section 13.   Events of Default...............................................................................14
Section 14.   Remedies............................................................................................14
Section 15.   Payments After Default; No Waiver. .................................................15
Section 16.   Limitation of Issuer's Liability. ........................................................15
Section 17.   Release and Indemnification by the Borrower. ..................................17
Section 18.   Extent of Covenants of the Issuer; No Personal Liability. ................18
Section 19.   Registration of the 2019 Bond. .........................................................19
Section 20.   Option to Prepay; Payments Under the Credit Agreement. ...............19
Section 21.   Benefit of Agreement. .......................................................................20
Section 22.   Notices...............................................................................................20
Section 23.   Miscellaneous....................................................................................20

EXHIBITS:

A     Form of Bond
B     Form of Disbursements Requisition

**THIS BOND PURCHASE AND LOAN AGREEMENT** dated as of March 1, 2019, among the **SOUTH CAROLINA JOBS-ECONOMIC DEVELOPMENT AUTHORITY,** a public body corporate and politic and an agency of the State of South Carolina (the *"Issuer"),* **THE MUFFIN MAM, INC.,** a South Carolina corporation (the *"Borrower"),* and **PINNACLE BANK,** a Tennessee state chartered bank, as the initial holder of the 2019 Bond (defined below), and its successors and assigns as holders of the 2019 Bond (the *"Bondholder"* or *"Bank").*

## WITNESSETH:

**WHEREAS,** Title 41, Chapter 43, Code of Laws of South Carolina 1976, as amended (the *"Act"),* authorizes the Issuer to issue revenue bonds, including notes, payable by the Issuer solely from a revenue producing source and secured by a pledge of said revenues in order to provide funds for any purpose authorized by the Act; and

**WHEREAS,** the Issuer intends to issue and sell to the Bondholder its Industrial Revenue Bond (The Muffin Mam, Inc. Project) Series 2019, in the authorized principal amount of not exceeding $10,000,000 (the *"2019 Bond"),* and to loan the proceeds received thereunder to the Borrower to defray the cost of (i) acquiring new equipment to be installed in a manufacturing facility to produce commercial bakery products to be located in the City of Laurens, South Carolina (the *"Project"*); and (ii) paying certain costs of issuance of the 2019 Bond (collectively, the *"Undertaking"*); and

**WHEREAS,** the Borrower agrees to repay such loan from the Issuer on the terms and conditions hereinafter set forth; and

**WHEREAS,** the Issuer, the Borrower and the Bondholder desire to set forth the terms and conditions with respect to this financing;

**NOW, THEREFORE,** the parties hereto agree as follows:

**Section 1.**     **Definitions.**

Defined Terms.  In addition to other terms defined above or elsewhere in this Agreement, the following terms shall have the following meanings in this Agreement unless the context otherwise requires:

*"2019 Bond"* shall mean the Industrial Revenue Bond (The Muffin Mam, Inc.) Series 2019, of the Issuer in the form of **Exhibit A** attached hereto, issued pursuant to this Agreement in the principal amount of not to exceed $10,000,000, and dated the date of its issuance.

*"Act"* shall mean Title 41, Chapter 43, Code of Laws of South Carolina 1976, as amended, and all future acts supplemental thereto and amendatory thereof.

*"Agreement"* shall mean this Bond Purchase and Loan Agreement, including any amendments or supplements hereto.

*"Bank"* shall mean Pinnacle Bank, a Tennessee state chartered bank and its successors and assigns.

*"Bank Rate"* shall mean 3.48% per annum multiplied by the Margin Rate Factor.

*"Bond Advance"* shall mean each advance of a portion of the principal amount of the Series 2019 Bond made by the Bank pursuant to the terms hereof and the Credit Agreement.

*"Bond Advance Termination Date"* shall mean the earliest of (a) the date on which the sum of the aggregate Bond Advances made hereunder equals $10,000,000, (b) December 31, 2019, or (c) the Completion Date; provided the Bond Advance Termination Date may be extended to a date subsequent to December 31, 2019 if the Borrower provides an opinion of Bond Counsel to the Issuer and the Bondholder that such subsequent Bond Advance will not cause the interest on the 2019 Bond to become includable in gross income for federal income tax purposes; provided, further, the Bond Advance Termination Date shall not be later than September 30, 2020 without the prior written consent of the Bondholder.

*"Bond Counsel"* shall mean, initially, Haynsworth Sinkler Boyd, P.A., and any successor bond counsel satisfactory to the Bondholder, the Issuer and the Borrower.

*"Bondholder"* or *"Holder"* shall mean the person or entity in whose name the 2019 Bond is registered in the registration books provided for in Section 19 hereof. The initial Bondholder shall be Pinnacle Bank.

*"Bond Rate"* shall mean, unless the Default Rate or the Taxable Rate is then in effect, (i) during the Initial Rate Period, the Bank Rate, and (ii) during any Rate Period after the Initial Rate Period, the rate established pursuant to Section 10(c) hereof.

*"Bond Registrar"* shall initially mean the Borrower, and thereafter shall mean such other entity as may be selected by the Borrower to serve as the Bond Registrar.

*"Borrower"* shall mean The Muffin Mam, Inc., a South Carolina corporation, and any permitted successors and assigns.

*"Borrower Representative"* shall mean initially the Chief Executive Officer or Secretary and thereafter may be such other official or officials of the Borrower designated in a certificate signed by the Secretary of the Board of the Borrower, containing the specimen signatures of such persons, and furnished to the Bank and the Issuer.

*"Business Day"* shall mean a day other than a Saturday, Sunday, or any other day when the Bank or all Federal Reserve Banks are authorized or required by applicable law to be closed.

*"Change in Law"* shall mean the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority, or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that, notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directive thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or, pursuant to the accord commonly referred to as "Basel III" or the United States or foreign regulatory authorities, shall in each case be deemed to be a "Change in Law," regardless of the date enacted, adopted or issued.

*"Closing Date"* shall mean the date of delivery of and payment for the 2019 Bond, such being March 15, 2019.

*"Code"* shall mean the Internal Revenue Code of 1986, as amended, including applicable regulations and revenue rulings thereunder.

*"Completion Date"* shall mean, with respect to the Project, the earlier of (a) September 30, 2020 and (b) the date on which the Borrower delivers a completion certificate to the Bank pursuant to Section 7 hereof.

*"Computation Date"* means the date established by the Borrower, which is not less than seven days and not more than fourteen days prior to each Mandatory Purchase Date.

*"Costs of the Project"* shall mean all reasonable or necessary costs and expenses of the Project, including costs of issuance but excluding interest accruing on the 2019 Bond, that are permitted under the Act to be paid out of proceeds of the 2019 Bond.

*"Credit Agreement"* shall mean the Credit and Security Agreement dated as of March 15, 2019, between the Borrower and Pinnacle Bank, as such agreement may be amended, supplemented, or assigned from time to time pursuant to its terms or a subsequent credit agreement with a Bondholder other than the initial Bank.

*"Date of Taxability"* means the earliest date as of which interest on the 2019 Bond shall have been determined to be includable in the gross income of any Bondholder or prior Bondholder as a result of an Event of Taxability as such date is established pursuant to a Determination of Taxability.

*"Default Rate"* shall have the meaning assigned to such term in the Credit Agreement.

*"Determination of Taxability"* shall mean and shall be deemed to have occurred on the first to occur of the following:

        (i)        on the effective date of any Change in Law that changes the ability of the Bondholder to exclude all or a portion of the interest on the 2019 Bond from its gross income for Federal income tax purposes;

        (ii)      on that date when the Borrower or the Issuer files any statement, supplemental statement or other tax schedule, return or document which discloses that an Event of Taxability shall have in fact occurred;

        (iii)     on the date when the Bondholder or former Bondholder notifies the Borrower that it has received a written opinion by an attorney or firm of attorneys of recognized standing on the subject of tax-exempt municipal finance to the effect that an Event of Taxability shall have occurred unless, within 365 days after receipt by the Borrower of such notification from the Bondholder or any former Bondholder, the Borrower shall deliver to the Bondholder or former Bondholder, as applicable, a ruling or determination letter issued to or on behalf of the Borrower by the Commissioner or any District Director of Internal Revenue (or any other governmental official exercising the same or a substantially similar function from time to time) to the effect that, after taking into consideration such facts as form the basis for the opinion that an Event of Taxability has occurred, an Event of Taxability shall not have occurred;

        (iv)     on the date when the Issuer or the Borrower shall be advised in writing by the Commissioner or any District Director of Internal Revenue (or any other government official or agent exercising the same or a substantially similar function from time to time) that, based upon filings of the Borrower, or upon any review or audit of the Issuer or the Borrower or upon any other ground whatsoever, an Event of Taxability shall have occurred; or

(v)    on that date when the Issuer or the Borrower shall receive notice from any Bondholder or former Bondholder that the Internal Revenue Service (or any other government official or agency exercising the same or a substantially similar function from time to time) has assessed as includable in the gross income of such Bondholder or any former Bondholder the interest on such Bondholder's 2019 Bond due to the occurrence of an Event of Taxability;

provided, however, no Determination of Taxability shall occur under subparagraph (iii) or (iv) above unless the Borrower has been afforded the opportunity, at its expense, to contest any such assessment as provided in Section 10(d) hereof, and, further, no Determination of Taxability shall occur until such contest, if made, has been finally determined; provided further, however, that upon demand from the Bondholder or former Bondholder, the Borrower shall immediately reimburse such Bondholder or former Bondholder for any payments such Bondholder (or any former Bondholder) shall be obligated to make as a result of the Determination of Taxability during any such contest. The Bondholder or former Bondholder, as applicable, agrees, upon written request from the Borrower, to refund any such reimbursement made by the Borrower to the extent the Bondholder or former Bondholder, as applicable, subsequently obtains a refund of such payment Bondholder or former Bondholder, as applicable, has made as a result of a Determination of Taxability.

*"Event of Default"* shall mean any of the events set forth in Section 13 hereof.

*"Event of Taxability"* shall occur if interest paid or payable on the 2019 Bond becomes includable, in whole or in part, in the gross income of the Bondholder or any former Bondholder for federal income tax purposes as a result of a change in law or fact or the interpretation thereof, or the occurrence or existence of any fact, event or circumstance (including, without limitation, the taking of any action by the Issuer or the Borrower, or the failure to take any action by the Issuer or the Borrower, or the making by the Issuer or the Borrower of any misrepresentation herein or in any certificate required to be given in connection with the issuance, sale or delivery of the 2019 Bond).

*"Financing Instruments"* shall mean this Agreement, the 2019 Bond and the Credit Agreement.

*"Governmental Authority"* shall mean the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

*"Index Agent"* shall mean an independent financial advisor as selected by the Borrower and approved by the Bondholder, provided that the Index Agent cannot be a corporate affiliate of the Bondholder or the Borrower.

*"Initial Rate Period"* shall mean the period of time commencing on the Closing Date and ending on March 14, 2026.

*"Issuer"* shall mean the South Carolina Jobs-Economic Development Authority, a public body corporate and politic and an agency of the State of South Carolina duly organized and existing under the Constitution and laws of the State of South Carolina, including the Act, or any successor to its rights and obligations under the Act.

*"Loan"* shall mean the loan made by the Issuer to the Borrower pursuant to this Agreement.

*"Mandatory Purchase Date"* shall mean each of March 15, 2026, which is the initial mandatory

4

purchase date, and any other subsequent mandatory purchase date established in accordance with the terms of Section 10(c) hereof.

*"Margin Rate Factor"* shall mean the greater of (a) 1.0, and (b) the product of (i) one minus the Maximum Federal Corporate Tax Rate multiplied by (ii) 1.2658; provided that in all cases the Margin Rate Factor for purposes of computing a Taxable Rate or the Default Rate shall be 1.0. The effective date of any change in the Margin Rate Factor shall be the effective date of the decrease or increase (as applicable) in the Maximum Federal Corporate Tax Rate resulting in such change.

*"Material Adverse Effect"* or *"Material Adverse Change"* shall have the meaning assigned to such term in the Credit Agreement.

*"Maximum Federal Corporate Tax Rate"* shall mean the maximum rate of income taxation imposed on corporations pursuant to Section 11(b) of the Code, determined without regard to tax rate or tax benefit make-up provisions such as the last two sentences of Section 11(b)(1) of the Code, as in effect from time to time (or, if as a result of a change in the Code the rate of income taxation imposed on corporations shall not be applicable to the Bondholder, the maximum statutory rate of federal income taxation which could apply to the Bondholder). The Maximum Federal Corporate Tax Rate on the date of execution of this Agreement is 21%.

*"Other Governmental Entity"* shall mean any other agency, official or political subdivision of the State which provided consent or approval in connection with the issuance of the 2019 Bond.

*"Payment of the Bond"* shall mean payment in full of the 2019 Bond and the making in full of all other payments due and payable pursuant to this Agreement and the other Financing Instruments at the time of such payment.

*"Principal Amount"* shall mean the aggregate unpaid principal amount of all Bond Advances.

*"Project Account"* shall mean, if established, the account of the Borrower held at, and under the sole control of, the Bank into which Bond Advances may be made as provided in Sections 6 and 7 hereof.

*"Purchase Price"* shall mean the principal amount of the 2019 Bond plus all accrued but unpaid interest thereon, plus any amounts due to the Bank under the Credit Agreement with respect to the 2019 Bond.

*"Rate Period"* shall mean the Initial Rate Period and each period after the Initial Rate Period established pursuant to Section 10(c) hereof.

*"Tax Agreement"* shall mean the Tax Compliance and Non-Arbitrage Agreement by and between the Issuer and the Borrower dated the Closing Date, as such may be supplemented or amended.

*"Taxable Period"* shall mean the period of time between (a) the Date of Taxability, and (b) the maturity date of the 2019 Bond.

*"Taxable Rate"* shall mean (i) during the Initial Rate Period, 4.53% per annum, and (ii) during any Rate Period after the Initial Rate Period, the rate established pursuant to Section 10(c) hereof.

*"Unassigned Rights"* shall mean (a) the rights of the Issuer to be indemnified pursuant to Section 17 and the payment of any fees and expenses due to the Issuer hereunder; and (b) the rights of the Issuer pursuant to Sections 10, 11, 14, 16, 17, 18, 19, 21 and 23 of this Agreement; and (c) provisions of this

Agreement providing that notice, reports and other statements be given to the Issuer and that consent be obtained from the Issuer.

<u>Certain Rules of Interpretation</u>.

(i)    In this Agreement, in the computation of a period of time from a specified date to a later specified date, the word "from" means "from and including," the words "to" and "until" each mean "to but excluding," and the word "through" means "through and including."

(ii)    All accounting and financial terms not specifically defined herein shall, unless the context shall otherwise require, be construed in accordance with Generally Accepted Accounting Principles applied on a consistent basis.

(iii)    All references in this Agreement to any agreement, instrument or other document means, except as the context may otherwise require and without limiting any restrictions set forth herein with regard to the foregoing, such agreement, instrument or other document as the same may be amended, supplemented, confirmed, restated, renewed, extended, replaced or otherwise modified and in effect from time to time.

(iv)    NOTWITHSTANDING ANYTHING IN THIS AGREEMENT OR ANY OTHER FINANCING INSTRUMENTS TO THE CONTRARY, to the extent that any of the representations, warranties, covenants, events of default, remedies, releases, indemnifications, provisions for the payment of costs or the like, exculpations, or other commitments or agreements or other provisions on the part of the Borrower set forth in this Agreement, the Credit Agreement and any of the other Financing Instruments may bear upon similar matters, then in each and every such case the construction thereof (and any ambiguity or inconsistency otherwise arising relative thereto) shall be construed cumulatively to the greatest extent possible for the fullest benefit and protection of the Bondholder (and the utmost obligations on the part of the Borrower), rather than any of the foregoing being construed in any manner in derogation of the other (whether as among any of the foregoing being in the same or separate instruments or agreements).

(v)    All references herein to the Code or any particular provision or section thereof shall be deemed to refer to any successor, or successor provision or section thereof, as the case may be.

**Section 2.    <u>Representations and Findings by Issuer</u>.**

The Issuer makes the following representations and findings as the basis for its undertakings hereunder:

(a)    The Issuer is a public body corporate and politic and an agency of the State of South Carolina organized and existing under the Act and has the power to execute and deliver the Financing Instruments to which it is a party, to perform its obligations thereunder, to issue the 2019 Bond, to loan the proceeds of the 2019 Bond to the Borrower pursuant to the provisions of this Agreement and to carry out its other obligations under the 2019 Bond and this Agreement. By proper corporate action, the Issuer has duly authorized the execution and delivery of such Financing Instruments to which it is a party, the performance of its obligations thereunder and the issuance of the 2019 Bond. Simultaneously with the execution and delivery of this Agreement, the Issuer has issued and sold the 2019 Bond to the Bondholder.

THE ISSUER MAKES NO REPRESENTATION OR WARRANTY, EITHER EXPRESS OR IMPLIED, WITH RESPECT TO THE MERCHANTABILITY, CONDITION, WORKMANSHIP, OR

THE ACTUAL OR DESIGNED CAPACITY OF ANY PART OF THE PROJECT OR ITS SUITABILITY FOR THE BORROWER'S PURPOSES, OR FOR THE PURPOSES SPECIFIED IN THIS AGREEMENT, OR THE EXTENT TO WHICH PROCEEDS DERIVED FROM THE SALE OF THE 2019 BOND WILL BE SUFFICIENT TO PAY THE COSTS TO BE INCURRED IN CONNECTION WITH THE FINANCING OF THE PROJECT AND THE OTHER PURPOSES CONTEMPLATED HEREIN.

(b)    To the best knowledge of the undersigned officer of the Issuer, the execution and delivery by the Issuer of this Agreement and the 2019 Bond and the performance of its obligations hereunder and thereunder will not conflict with or result in the breach of or constitute a default under any indenture, mortgage, deed of trust, lien, lease, contract, note, order, judgment, decree or other agreement, instrument or restriction of any kind to which any of its assets are subject.

(c)    To the best of the Issuer's knowledge, no further approval, consent or withholding of objection on the part of any regulatory body, federal, state or local, is required in connection with (1) the issuance and delivery of the 2019 Bond by the Issuer, or (2) the execution or delivery of or performance by the Issuer of its obligations under the Financing Instruments to which it is a party or (3) the assignment and pledge by the Issuer pursuant to this Agreement of the loan repayments (exclusive of Unassigned Rights) to be made by the Borrower, as security for payment of the principal of and interest on the 2019 Bond (provided no representation or warranty is expressed as to any action required under federal or state securities laws or Blue Sky laws of any jurisdiction).

(d)    No litigation, inquiry or investigation of any kind in or by any judicial or administrative court or agency is pending or, to the best knowledge of the undersigned officer of the Issuer, threatened in writing against the Issuer with respect to (1) the organization and existence of the Issuer, (2) its authority to execute or deliver the Financing Instruments to which it is a party, (3) the validity or enforceability of any of such Financing Instruments to which it is a party or the performance of its obligations thereunder, (4) the title of any officer of the Issuer who executed such Financing Instruments, or (5) any authority or proceedings related to the execution and delivery of such Financing Instruments on behalf of the Issuer. No such authority or proceedings have been repealed, revoked, rescinded or amended and all are in full force and effect.

Notwithstanding anything herein to the contrary, any obligation the Issuer may incur hereunder in connection with the 2019 Bond shall not be deemed to constitute a general obligation of the Issuer but shall be a limited obligation of the Issuer payable solely from the payments received by the Issuer from the Borrower and the security therefor.

**Section 3.**    **Representations and Warranties by the Borrower**.

The Borrower makes the following representations as the basis for its undertakings hereunder:

(a)    The Borrower is a South Carolina corporation.

(b)    The Borrower is duly formed, validly existing and in good standing under the laws of the State of South Carolina, has the power to enter into the Financing Instruments to which it is a party and perform its obligations thereunder, and by proper action has duly authorized the execution and delivery of the Financing Instruments to which it is a party and the performance of its obligations thereunder.

(c)    The Borrower intends that the Project will constitute a component of a business enterprise within the meaning of the Act until the expiration or sooner termination of this Agreement.

(d)    There is no litigation at law or in equity or any proceeding before any governmental agency involving the Borrower pending or, to the knowledge of the Borrower, threatened which has not been disclosed to the Bondholder and the Issuer in which any judgment or order would have a Material Adverse Effect upon the business or assets of the Borrower, or that would have a Material Adverse Effect on its authority to do business, the validity of this Agreement or the performance of its obligations hereunder or thereunder.

(e)    The execution and delivery of the Financing Instruments to which it is a party and the performance by the Borrower of its obligations thereunder do not and will not conflict with, or constitute a breach or result in a violation of, the articles of incorporation or bylaws of the Borrower, any material agreement or other instrument to which the Borrower is a party or by which it is bound or any constitutional or statutory provision or order, rule, regulation, decree or ordinance of any court, government or governmental authority having jurisdiction over the Borrower or any of its property. The Financing Documents to which the Borrower is a party are legal, valid and binding obligations of the Borrower, enforceable against the Borrower in accordance with their terms subject to the usual exclusions.

(f)    The Borrower has obtained all consents, approvals, authorizations and orders of any governmental or regulatory authority that are required to be obtained by the Borrower as a condition precedent to execution and delivery of the Financing Instruments or are required for the performance by the Borrower of its obligations thereunder.

(g)    When executed and delivered, the Financing Instruments to which the Borrower is a party will be the valid and binding obligations or agreements of the Borrower, enforceable in accordance with their respective terms.

(h)    The Borrower has not taken any action and will not take or omit to take any action which would impair the exemption of interest on the 2019 Bond from federal or South Carolina income taxation.

**Section 4.    Issuance of 2019 Bond; Sale and Purchase of 2019 Bond; Limitation of Liability of Issuer; Commitment of the Bondholder.**

(a)    The total principal amount of the 2019 Bond is not to exceed $10,000,000. The Issuer hereby authorizes the issuance of the 2019 Bond under the terms and conditions of this Agreement for the purpose of providing funds to finance the Undertaking. Principal and interest payments due on the 2019 Bond shall be payable as provided in the 2019 Bond. Subject to adjustments as provided in this Agreement and in the 2019 Bond, including Sections 10(d) and 14 of this Agreement, principal of the 2019 Bond shall accrue interest at the Bond Rate or, if applicable, the Default Rate or the Taxable Rate.

(b)    The Issuer shall issue and sell the 2019 Bond to the Bondholder, initially the Bank, and the Bondholder shall purchase the 2019 Bond, all upon the terms and conditions set forth herein, in the 2019 Bond, and in the Credit Agreement. All Financing Instruments shall be in form satisfactory to the Bondholder.

(c)    The Bondholder by purchasing the 2019 Bond represents that it (1) is purchasing the 2019 Bond for its own account for investment and has no present intention of reselling or disposing of the 2019 Bond or engaging in any "distribution" thereof (as that term is used in the Securities Act of 1933, as amended, and the regulations of the Securities and Exchange Commission thereunder), (2) is familiar with the operations and financial condition of the Borrower based upon information furnished to the Bondholder by the Borrower and has made such inquiries as it deems appropriate in connection with the purchase of the 2019 Bond, (3) is capable of evaluating the merits and risks of the purchase of the 2019 Bond, (4) is able to bear the economic risks of holding the 2019 Bond, (5) considers its purchase of the 2019 Bond a

8

loan made in the ordinary course of its business, (6) understands that the 2019 Bond (i) is not registered under the Securities Act of 1933 (the *"1933 Act"*) and is not registered or otherwise qualified for sale under the "Blue Sky" laws and regulations of any state, (ii) is not listed on any stock or other securities exchange, and (iii) carries no rating from any rating service; and (7) agrees that it will not sell, transfer, assign or otherwise dispose of the 2019 Bond or such ownership interest therein unless (1) it obtains from the subsequent purchaser and delivers to the Issuer an agreement setting forth the representations set forth above in this paragraph (c) or (2) it obtains from the purchaser and delivers to the Issuer a written acknowledgement that such subsequent purchaser is a "qualified institutional buyer" as defined in Rule 144A promulgated under the 1933 Act, the Securities Exchange Act of 1934, as amended (the *"1934 Act"*), any rules and regulations promulgated under the 1933 Act or the 1934 Act, and the applicable securities laws of any other applicable jurisdiction, and in connection therewith, the Bondholder agrees that it shall furnish to any subsequent purchaser of the 2019 Bond all information required by applicable law to be furnished by the Bondholder in connection with such transfer. In determining to purchase the 2019 Bond, the Bondholder has not relied upon any information (including financial information) relating to the Borrower or other information, in each case provided by the Issuer, nor has it relied upon the Issuer to provide any such information.

(d)     It is specifically understood and agreed that the Issuer makes no representation, covenant or agreement as to the financial position or business condition of the Borrower and does not represent or warrant as to any statements, materials, representations or certifications furnished by the Borrower in connection with the sale of the 2019 Bond, or as to the correctness, completeness or accuracy thereof.

(e)     The Borrower represents that all information heretofore furnished by the Borrower to the Bank or Issuer for purposes of or in connection with this Agreement or any transaction contemplated hereby is, and all such information hereafter furnished by the Borrower to the Bank or Issuer will be, true, accurate and complete in every material respect or based on reasonable estimates on the date as of which such information is stated or certified. The Borrower has disclosed to the Bank and Issuer in writing any and all facts which have a Material Adverse Effect or, could reasonably be expected to affect the business, operations, prospects or condition, financial or otherwise, of the Borrower, or the ability of the Borrower to perform its obligations under this Agreement or the Credit Agreement.

**Section 5.    Conditions Precedent to Delivery of 2019 Bond.**

The Bank shall accept initial delivery of the 2019 Bond only upon receipt in form and substance satisfactory to it of the following:

(a)     Executed copies of the Financing Instruments, all in form acceptable to the Bank, and the fees and expenses of counsel for the Bank incurred in connection with the issuance of the 2019 Bond;

(b)     Evidence of the due authorization, execution and delivery of the Financing Instruments by the parties thereto and certificates covering litigation, compliance with all applicable federal, state and local laws, restrictions and requirements, and prior agreements;

(c)     An opinion or opinions of Haynsworth Sinkler Boyd, P.A., Bond Counsel, satisfactory to the Bank that (i) interest on the 2019 Bond will be excluded from gross income for federal income tax purposes; and (ii) interest on the 2019 Bond will be exempt from income taxation by the State of South Carolina;

(d)     Evidence of the completion of Internal Revenue Service Form 8038 with respect to the issuance of the 2019 Bond, together with a certification in the Tax Agreement with respect to the information contained therein;

(e)     An opinion or opinions of counsel to the Borrower and the Issuer in a form acceptable to the Bank;

(f)     The Tax Agreement in form satisfactory to the Bank;

(g)     Evidence that the requirements of Section 147(f) of the Code have been satisfied;

(h)     Certified copies as of a date acceptable to the Bank of the articles of incorporation and bylaws of the Borrower and resolutions of the governing body of the Borrower authorizing the transactions contemplated hereby;

(i)     Such other items as set forth in Section IV of the Credit Agreement; and

(j)     Such other documentation, certificates and opinions as may be reasonably required by the Bank, Bond Counsel or counsel to the Issuer.

**Section 6.     Advance of Bond Proceeds.**

The Issuer and the Borrower acknowledge and agree that prior to the Bond Advance Termination Date, the proceeds from the sale of the 2019 Bond will be advanced by the Bank from time to time to, at the discretion of the Bank, (i) into the Borrower's operating account with the Bank, (ii) to any vendor for the Project, or (iii) into the Project Account, in each case in accordance with the terms and requirements of the Credit Agreement. The date and amount of each Bond Advance shall be noted electronically on the Bank's loan system. An initial Bond Advance from the proceeds of the 2019 Bond in an amount of at least $100,000 shall be made to the Borrower on the Closing Date and expended by the Borrower on the Closing Date for Costs of the Project. The Bank shall make additional Bond Advances in accordance with the Credit Agreement and this Section 6 hereof. In no event may the aggregate amount of all Bond Advances exceed $10,000,000. Notwithstanding anything else herein contained, interest payable on the 2019 Bond shall be determined based on the outstanding Principal Amount of the 2019 Bond from time to time. Following the Bond Advance Termination Date as defined in sections (a), (b) and (c) of the definition thereof, no additional Bond Advances may be made without the delivery of an opinion of Bond Counsel that such subsequent Bond Advance or Advances after December 31, 2019 shall not cause the interest on the 2019 Bond to be includable in gross income for federal tax purposes. If on the Bond Advance Termination Date the cumulative amount of all Bond Advances is less than $10,000,000, then the difference between $10,000,000 and the cumulative amount of all Bond Advances, shall be deemed to have been redeemed automatically and shall be applied in inverse order of scheduled payments of principal installments, without any further notice or act by the parties to this Agreement, or any other person. The 2019 Bond is subject to mandatory redemption 60 days after the Completion Date from excess proceeds in the Project Account. In the case of such mandatory redemption described in this Section 6, such amounts shall be credited toward the latest maturing scheduled principal payments as set forth in the Credit Agreement.

**Section 7.     Process for Making Bond Advances; Establishment of Completion Date.**

Upon receipt of a requisition of the Borrower, in the form attached hereto as **Exhibit B,** which shall be in an amount not less than $100,000, or such lesser amount which equals the remaining availability hereunder, Bond Advances shall be made (or, if applicable, moneys on deposit in the Project Account, if any, shall be released) by the Bank to the Borrower in accordance with the Credit Agreement and shall be applied by the Borrower exclusively to payment, or to reimbursement of the Borrower for payment, of the Costs of the Project. In connection with the submission of any such requisition to the Bank, all conditions specified in the Credit Agreement for any Bond Advance or payment of a requisition shall have been met.

The Completion Date shall be the date on which the Borrower signs and delivers to the Bondholder a certificate stating that, except for amounts retained by the Borrower for Costs of the Project not then due and payable, or the liability for which the Borrower is, in good faith, contesting or disputing, (a) the Project has been completed to the satisfaction of the Borrower, and (b) all labor, services, materials and supplies used in the equipping of the Project to be paid from the proceeds of the 2019 Bond have been paid for.

Notwithstanding the foregoing, such certificate may state that it is given without prejudice to any rights against third parties which exist at the date of such certificate or which may subsequently come into being.

Section 8.    [Reserved].

Section 9.    Loan by the Issuer; Assignment of Rights to the Bondholder.

(a)    Upon the terms and conditions of this Agreement, the Issuer shall lend to the Borrower all proceeds of the 2019 Bond on the Closing Date to be applied to the Undertaking, subject to the terms and requirements of the Credit Agreement.

(b)    In order to provide security for the payment of principal of and interest on the 2019 Bond, including the Purchase Price upon a mandatory tender of the 2019 Bond, the Issuer hereby pledges, assigns, transfers and sets over to the Bondholder and its successors and assigns and any subsequent Bondholder all of the Issuer's right, title and interest (including beneficial interest) in and to all payments due and to become due from the Borrower hereunder in amounts sufficient to pay the principal and Purchase Price of and interest on the 2019 Bond and all other payments due from the Borrower under this Agreement, whether made at their respective due dates or as prepayments permitted or required by this Agreement, together with full power and authority, in the name of the Issuer or otherwise, to demand, receive, enforce, collect or receipt for any or all of the foregoing, to endorse or execute any checks or other instruments or orders, to file any claims and to take any action which the Bondholder may deem necessary or advisable in connection therewith, and the Issuer hereby irrevocably appoints the Bondholder attorney-in-fact of the Issuer for such purposes, which appointment is coupled with an interest and is irrevocable; *provided, however,* that the Issuer shall retain the Unassigned Rights. The Borrower consents to such assignment.

THE ISSUER MAKES NO REPRESENTATION OR WARRANTY, EITHER EXPRESS OR IMPLIED, WITH RESPECT TO THE MERCHANTABILITY, CONDITION, WORKMANSHIP, OR THE ACTUAL OR DESIGNED CAPACITY OF ANY PART OF THE PROJECT OR ITS SUITABILITY FOR THE BORROWER'S PURPOSES, OR FOR THE PURPOSES SPECIFIED IN THIS AGREEMENT, OR THE EXTENT TO WHICH PROCEEDS DERIVED FROM THE SALE OF THE 2019 BOND OR FROM INSURANCE WILL BE SUFFICIENT TO PAY THE UNDERTAKING CONTEMPLATED HEREIN.

Section 10.    Repayment of Loan; Terms of 2019 Bond.

(a)    The Borrower shall make all payments required under the 2019 Bond on behalf of the Issuer, as and when the same become due and shall promptly pay to the Bondholder on behalf of the Issuer, as assignee of the Issuer set forth in Section 9 hereof, all other amounts necessary to pay principal of and interest on, prepayment premium, if any, and Purchase Price of the 2019 Bond, including any other payments required by the 2019 Bond or the other Financing Instruments, as and when the same become due (whether at maturity, by acceleration or mandatory tender or otherwise). Payments shall be made in lawful money of the United States of America at the office of the Bondholder in Greenville, South Carolina (550 E. McBee Avenue, Greenville, SC 29601), or at such other place as the Bondholder may direct in writing. Any amount at any time paid to the Bondholder as the payment of principal of or interest on the

11

2019 Bond as the same become due shall be credited against the Borrower's obligation hereunder as of the date such obligation is paid (but subject to collection of any instrument, draft, check or order for payment received by the Bondholder). If such amount should be sufficient to pay at the times required the principal of and interest on and prepayment premium, if any (including any prepayment penalty, if then applicable, as provided in the Credit Agreement), of the 2019 Bond then remaining unpaid and to accrue through final Payment of the Bond, the Borrower shall not be obligated to make any further payments hereunder but only if the same constitutes Payment of the Bond.

The Issuer is required to redeem the 2019 Bond in part on the dates and in the amounts set forth in the Credit Agreement, but only from the revenue sources stated in Section 16 hereof which date and amounts may be changed with the written consent of the Bondholder, provided an opinion of Bond Counsel is furnished to the Bondholder that such change will not impair the exclusion of interest on the 2019 Bond from gross income taxation for federal income tax purposes. The obligation of the Borrower to make the payments required by this Agreement and the other Financing Instruments shall be absolute and unconditional. The Borrower shall pay all such amounts without abatement, diminution or deduction (whether for taxes or otherwise) regardless of any cause or circumstance whatsoever including, without limitation, any defense, set-off, recoupment or counterclaim that the Borrower may have or assert against the Issuer, the Bondholder or any other person or entity.

Computations of interest and of any fees or commissions hereunder shall be made by the Bondholder on the basis of a year of 360 days for the actual number of days (including the first day but excluding the last day) elapsed. Whenever any payment to be made hereunder shall be stated to be due on a day which is not a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall in such case be included in the computation of payment of interest, fee or commission, as the case may be.

(b)    The 2019 Bond shall be subject to mandatory tender for purchase on each Mandatory Purchase Date. The Borrower agrees to purchase the 2019 Bond from the Bondholder on each Mandatory Purchase Date at a price equal to the Purchase Price or optionally redeem the 2019 Bond in full as provided in paragraph (c) below.

(c)    On each Mandatory Purchase Date, the Borrower may optionally redeem the 2019 Bond without a prepayment penalty. The Borrower may, alternatively after a mandatory tender of the 2019 Bond, with an opinion of Bond Counsel stating that the election of a rate period will not result in an Event of Taxability, elect for the Bond Rate to apply during such rate period. In such event, the Borrower will provide the Index Agent with written notice specifying the duration of the proposed rate period and the proposed mandatory purchase date. The Bond Rate, the Taxable Rate, the Default Rate and any applicable prepayment premium for such rate period will be determined solely by the Index Agent by 4:00 p.m., South Carolina time, on the Computation Date. The Bond Rate shall be the rate of interest which, if borne by the 2019 Bond, would, in the judgment of the Index Agent, having due regard for the prevailing financial market conditions for revenue bonds or other securities the interest on which is excluded from gross income of the Holder thereof for federal income tax purposes that are comparable as to terms and maturity with the terms and maturity of the 2019 Bond, be the interest rate necessary, but would not exceed the interest rate necessary, to enable the 2019 Bond to be placed at a price of par (plus accrued interest, if any) on the first Business Day of such rate period, provided, that, if for any reason the Bond Rate for the rate period is not established as aforesaid by the Index Agent or the rate so established is held to be invalid or unenforceable with respect to such rate period, then the Bond Rate for such rate period shall be the Taxable Rate (based on the interest rate in effect on the Mandatory Purchase Date). For avoidance of doubt, the 2019 Bond shall be subject to mandatory tender for purchase on each Mandatory Purchase Date and thereafter, if not redeemed in full by the Borrower, may be remarketed to another Bondholder by a remarketing agent

selected by the Borrower (that shall not be an affiliate of the Bondholder or the Borrower) to a Bondholder that makes the written representations set forth in Section 4(c) of this Agreement.

(d)    From and after the Date of Taxability and for as long as the 2019 Bond remains outstanding, the interest rate on the 2019 Bond shall be adjusted to the Taxable Rate. In addition, upon a Determination of Taxability the Borrower shall pay to the Bondholder (i) an additional amount equal to the difference between (A) the amount of interest actually paid on the 2019 Bond during the Taxable Period and (B) the amount of interest that would have been paid during the Taxable Period had the 2019 Bond borne interest at the Taxable Rate, and (ii) an amount equal to any interest, penalties on overdue interest and additions to tax (as referred to in Subchapter A of Chapter 68 of the Code) owed by the Bondholder as a result of the Determination of Taxability and any other amounts determined by the Bondholder as necessary to preserve the Bondholder's after-tax economic yield on the interest of the 2019 Bond.

(e)    The Bondholder shall, if requested by the Borrower (or the Issuer on behalf of the Bondholder), have an attorney in fact, qualified to practice before the Internal Revenue Service, designated by the Bondholder (or the Issuer on behalf of the Bondholder) for the purpose of appealing or challenging any Event of Taxability; provided, however, the Borrower provides indemnity reasonably satisfactory to the Bondholder and the Issuer to indemnify them against any additional tax liability, penalties or interest that may result from any such appeal. All legal fees, costs and expenses of such appeal shall be paid by the Borrower. In the event a final judgment or order shall have been entered within 180 days of the Event of Taxability finding, as a final determination, that no Event of Taxability has indeed occurred, the Bondholder or former Bondholder, as applicable, shall reimburse to the Borrower all supplemental interest, if any, that has been paid on the 2019 Bond, and no additional supplemental interest shall be payable unless and until an Event of Taxability shall subsequently occur. Notwithstanding anything in this subsection to the contrary, the right of the Bondholder (or the Issuer on behalf of the Bondholder) to challenge any Event of Taxability shall terminate if no such final judgment or order shall have been entered within 180 days after the occurrence of the Event of Taxability, unless the Bondholder shall otherwise agree, and after the expiration of such 180-day period without the entry of a final judgment or order, the 2019 Bond shall immediately bear interest at the Taxable Rate. In addition, unless the Borrower shall otherwise provide reasonable indemnification to the Bondholder and the Issuer, the right of the Borrower to challenge any Event of Taxability shall terminate if the exercise of such right would cause any tax return of the Bondholder to be inaccurate or would delay the timely filing thereof or would in the Bondholder's opinion result in an adverse impact on its tax returns.

(f)    Reserved.

(g)    Reserved.

(h)    Notwithstanding any other provision herein, the obligations of the Borrower pursuant to this section shall survive and continue following the expiration of the term of this Agreement and the Payment of the Bond and any other event or circumstance.

**Section 11.    Matters Pertaining to Tax Exemption.**

(a)    Certificate of Information; 8038 Form. The Borrower hereby represents that the information contained in the certificates or letters of representation of the Borrower with respect to the compliance with the requirements of Section 149 of the Code, including the information in Form 8038 (excluding the issue number and the employer identification number of the Issuer), filed by the Issuer with respect to the 2019 Bond and the Project, is true and correct in all material respects.

(b)    Arbitrage and Rebate

13

(1)     The Borrower shall not (A) take or omit to take any action, or approve the investment or use of any proceeds of the 2019 Bond or any other moneys within their respective control (including, without limitation, the proceeds of any insurance or any condemnation award with respect to the Project) or the taking or omission of any other action, which would cause the 2019 Bond to be an "arbitrage bond" within the meaning of Section 148 of the Code, or (B) approve the use of any proceeds from the sale of the 2019 Bond otherwise than in accordance with the Tax Agreement delivered on the Closing Date and shall otherwise comply with the Tax Agreement.

(2)     The Borrower shall, at its sole expense, determine and pay on behalf of the Issuer the rebate amount, if any, as and when due, in accordance with the "rebate requirement" described in Section 148(f) of the Code and Treasury Regulations thereunder, including without limitation, Treasury Regulations Section 1.148-1 through 1.150-2, and retain records of all such determinations until six years after Payment of the Bond.

(c)     Tax-Exempt Status of the 2019 Bond. The Borrower hereby represents, warrants, and agrees that the Tax Agreement executed and delivered by the Borrower and the Issuer concurrently with the issuance and delivery of the 2019 Bond is true, accurate, and complete in all material respects as of the date on which it was executed and delivered.

**Section 12.      [Reserved].**

**Section 13.      Events of Default.**

Each of the following events is hereby declared an Event of Default hereunder:

(a)     Failure of the Issuer or the Borrower to make any payment to the Bondholder, under the 2019 Bond or under any other Financing Instrument, when due and payable;

(b)     Failure of the Borrower to observe and perform any of its covenants, conditions or agreements hereunder for a period of 30 days after written notice specifying such failure and requesting that it be remedied, given by the Issuer or the Bondholder to the Borrower;

(c)     The (1) entry of any decree or order for relief by a court having jurisdiction over the Borrower or its property in an involuntary case under the federal bankruptcy laws, as now or hereafter constituted, or any other applicable federal or state bankruptcy, insolvency or similar law, (2) appointment of a receiver, liquidator, assignee, trustee, custodian, sequestrator or similar official for the Borrower or any substantial part of the property, or (3) entry of any order for the termination or liquidation of the Borrower or the affairs of either;

(d)     Failure of the Borrower within 60 days after the commencement of any proceedings against it under the federal bankruptcy laws or other applicable federal or state bankruptcy, insolvency or similar law, to have such proceedings discharged; or

(e)     The occurrence of any Event of Default under any of the Financing Instruments.

**Section 14.      Remedies.**

Upon the occurrence of an Event of Default, and at any time thereafter unless and until such Event of Default has been waived by the Bondholder or cured to the satisfaction of the Bondholder, the Bondholder shall be entitled to take any of the following actions (in addition to any actions permitted

by the Credit Agreement) without prejudice to the rights of the Bondholder to enforce its claims against the Borrower.

(a)    Declare all unpaid principal and interest on the 2019 Bond and any and all other indebtedness or obligations of any and every kind owing by the Borrower to the Bondholder to be due, whereupon the same shall be immediately due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower;

(b)    Exercise any and all rights to terminate any interest rate hedge agreement (if applicable) in place between the Bondholder (or its affiliates) and the Borrower and to take any action or resort to any demand, recourse or other remedy available to the Borrower in connection therewith; or

(c)    Take whatever other action at law or in equity to enforce any and all rights and interests created and existing hereunder or under any of the other Financing Instruments and all rights of set-off.

Notwithstanding the foregoing, if a default under Section 13(c) or (d) shall occur, then all obligations, all accrued interest in respect thereof, all accrued and unpaid fees and other indebtedness or obligations owing to the Bondholder hereunder and under the 2019 Bond, shall immediately become due and payable without the giving of any notice or other action by the Bondholder.

From and after an Event of Default, interest shall accrue on the 2019 Bond at the Default Rate.

No remedy herein conferred upon or reserved to the Bondholder is intended to be exclusive of any other available remedy or remedies, but each and every such remedy shall be cumulative and shall be in addition to every other remedy given hereunder or the other Financing Documents, or now or hereafter existing at law or in equity or by statute.

Notwithstanding the foregoing, the Bondholder may not waive an Event of Default that has occurred as a result of the failure of the Borrower to observe or perform any covenant, condition, or agreement owed to the Issuer, which has not been assigned to the Bondholder hereunder, and the Issuer shall be entitled to take such actions and enforce such remedies under this Agreement at law or in equity in connection with such an Event of Default.

Except for amounts collected pursuant to the preceding paragraph, any amounts collected pursuant to action taken under Section 14 hereof shall be paid to the Bondholder and applied *first* to the payment, any costs, expenses and fees incurred by the Issuer as a result of the Bondholder taking such action and *second,* as provided in the Credit Agreement. All remaining moneys shall be paid as required by the Credit Agreement or by law.

**Section 15.    Payments After Default; No Waiver**.

Upon the occurrence and continuation of an Event of Default, the 2019 Bond shall, at the option of the Bondholder, become immediately due and payable as provided therein. The Borrower may, as directed by the Bondholder, make any payments or parts of payments after the occurrence and continuation of an Event of Default without the Bondholder thereby waiving the right to demand Payment of the Bond.

**Section 16.    Limitation of Issuer's Liability**.

No covenant, agreement or obligation contained in any Financing Instrument to which the Issuer is a party or any other document or agreement entered into by, or governing, the Issuer in connection

therewith shall be deemed to be a covenant, agreement or obligation of any past, present or future director, member, officer, employee, attorney or agent of the Issuer, or any Other Governmental Entity, or any successor entity, in his or her individual capacity, and neither the directors or members of the Issuer, or any Other Governmental Entity, or any successor entity, nor any officer, employee, attorney or agent thereof executing any Financing Instrument to which the Issuer is a party or any other document or agreement entered into by, or governing, the Issuer in connection therewith shall be liable personally on or under such Financing Instrument or such document or agreement or be subject to any personal liability or accountability by reason of the issuance, execution, or delivery thereof. No director, member, officer, employee, attorney or agent of the Issuer, or any Other Governmental Entity, or any successor or entity, shall incur any personal liability with respect to any other action taken, or not taken, by him or her pursuant to the Financing Instruments to which the Issuer is a party or any other document or agreement entered into by, or governing, the Issuer in connection therewith or the Act or any of the transactions contemplated thereby provided he or she acts in good faith and does not act with malicious intent.

THE OBLIGATIONS OF THE ISSUER UNDER THE FINANCING INSTRUMENTS TO WHICH IT IS A PARTY OR ANY OTHER DOCUMENT OR AGREEMENT ENTERED INTO BY THE ISSUER IN CONNECTION THEREWITH ARE NOT GENERAL OBLIGATIONS OF THE ISSUER OR ANY OTHER GOVERNMENTAL ENTITY BUT ARE LIMITED OBLIGATIONS PAYABLE SOLELY FROM THE REVENUES AND RECEIPTS DERIVED BY THE ISSUER FROM THE LOAN OF THE PROCEEDS PURSUANT TO THIS AGREEMENT, WHICH REVENUES AND RECEIPTS HAVE BEEN PLEDGED AND ASSIGNED TO SUCH PURPOSES AND WHICH CONSTITUTE AN INDEBTEDNESS PAYABLE ONLY FROM A REVENUE-PRODUCING PROJECT OR SPECIAL SOURCE WITHIN THE MEANING OF ARTICLE X, SECTION 13(9) OF THE CONSTITUTION OF THE STATE OF SOUTH CAROLINA, WHICH SOURCE DOES NOT INCLUDE REVENUES FROM ANY TAX OR LICENSE. THE OBLIGATIONS OF THE ISSUER UNDER THE FINANCING INSTRUMENTS TO WHICH IT IS A PARTY OR ANY OTHER DOCUMENT AGREEMENT ENTERED INTO BY, OR GOVERNING, THE ISSUER IN CONNECTION THEREWITH DO NOT AND SHALL NEVER CONSTITUTE A GENERAL OBLIGATION OR INDEBTEDNESS OF THE ISSUER, THE STATE OF SOUTH CAROLINA OR ANY OTHER GOVERNMENTAL ENTITY WITHIN THE MEANING OF ANY STATE CONSTITUTIONAL PROVISION (OTHER THAN AS DESCRIBED ABOVE) OR STATUTORY LIMITATION AND DO NOT AND SHALL NEVER CONSTITUTE OR GIVE RISE TO A PECUNIARY LIABILITY OF THE ISSUER, THE STATE OF SOUTH CAROLINA OR ANY OTHER GOVERNMENTAL ENTITY OR A CHARGE AGAINST THE GENERAL CREDIT OF THE ISSUER, THE STATE OF SOUTH CAROLINA OR ANY OTHER GOVERNMENTAL ENTITY OR AGAINST THE TAXING POWER OF THE STATE OF SOUTH CAROLINA OR ANY OTHER GOVERNMENTAL ENTITY. THE ISSUER DOES NOT HAVE TAXING POWER. THE OBLIGATIONS OF THE ISSUER HEREUNDER, UNDER THE OTHER FINANCING INSTRUMENTS TO WHICH THE ISSUER IS A PARTY OR ANY OTHER DOCUMENT AGREEMENT ENTERED INTO BY, OR GOVERNING, THE ISSUER IN CONNECTION THEREWITH SHALL NOT BE DEEMED TO CONSTITUTE A DEBT OR A PLEDGE OF THE FAITH AND CREDIT OF THE STATE OF SOUTH CAROLINA OR ANY AGENCY OR POLITICAL SUBDIVISION THEREOF, INCLUDING THE ISSUER. NEITHER THE STATE OF SOUTH CAROLINA NOR ANY AGENCY OR POLITICAL SUBDIVISION THEREOF, INCLUDING THE ISSUER, SHALL BE OBLIGATED TO PAY THE OBLIGATIONS HEREUNDER OR THEREUNDER OR OTHER COSTS INCIDENT HERETO OR THERETO EXCEPT FROM THE REVENUES, RECEIPTS AND PAYMENTS PLEDGED AND ASSIGNED THEREFOR, AND NEITHER THE FAITH AND CREDIT NOR THE TAXING POWER OF THE STATE OF SOUTH CAROLINA OR ANY AGENCY OR POLITICAL SUBDIVISION THEREOF, INCLUDING THE ISSUER, IS PLEDGED TO THE PAYMENT OF THE OBLIGATIONS HEREUNDER UNDER THE

OTHER FINANCING INSTRUMENTS TO WHICH THE ISSUER IS A PARTY OR ANY OTHER DOCUMENT AGREEMENT ENTERED INTO BY, OR GOVERNING, THE ISSUER IN CONNECTION THEREWITH.

No breach by the Issuer of any Financing Instrument to which it is a party or any other document or agreement entered into by, or governing, the Issuer in connection therewith or of any provision or condition hereof or thereof shall result in the imposition of any pecuniary liability upon the Issuer, the State of South Carolina or any Other Governmental Entity or any charge upon the general credit of the Issuer, the State of South Carolina or any Other Governmental Entity or upon the taxing power of the State of South Carolina or any Other Governmental Entity. The liability of the Issuer or any Other Governmental Entity under any Financing Instrument to which it is a party or any other document or agreement entered into by, or governing, the Issuer in connection therewith, or any provision or condition hereof or thereof, shall be limited solely and exclusively to the revenues and receipts derived by the Issuer under this Agreement. The Issuer shall not be required to execute or perform any of its duties, obligations, powers, or covenants under any Financing Instrument to which it is a party or any other document or agreement entered into by, or governing, the Issuer in connection therewith except to the extent that revenues are available therefor. The Issuer may require, as a condition to the participation by it with the Borrower in obtaining any license, permit or other approvals, a deposit by the Borrower of such amount as determined by the Issuer to be reasonable to assure the reimbursement to the Issuer of the costs incurred by it in such participation, with any amount of such deposit in excess of such costs to be returned to the Borrower.

The provisions of this Section 16 shall control every other provision of any Financing Instrument to which the Issuer is a party or any other document or agreement entered into by, or governing, the Issuer in connection therewith, anything to the contrary notwithstanding.

**Section 17.     Release and Indemnification by the Borrower.**

The Borrower hereby releases and shall indemnify and save harmless the Issuer, Other Governmental Entities and the Bondholder and their respective officers, members, directors, employees, attorneys and agents (the *"Indemnified Parties"*), from and against, and agrees that the Indemnified Parties shall not be liable for all liabilities, obligations, claims, damages, penalties, fines, losses, costs and expenses (*"Damages"*) arising from any actions contemplated by this Agreement, including without limitation:

(a)     any liability, cost, or expense in or directly or indirectly relating to the preparation, negotiation, existence, administration, performance, execution or enforcement of this Agreement or any other of the Financing Instruments, or any other instrument or agreement related hereto or thereto or the rights or obligations imposed on an Indemnified Party hereby or thereby,

(b)     any or all liability or loss, cost, or expense, including attorneys' fees, resulting from or arising out of any loss or damage to property or any injury to or death of any person occurring on or about the site of the Project or resulting from any defect in the fixtures, machinery, equipment, or other property located on the site of the Project, or arising out of, pertaining to, or having any connection with, the Project or the financing thereof (whether or not arising out of acts, omissions, or negligence of the Borrower or any of its agents, contractors, servants, employees, licensees, lessees, or assignees),

(c)     any or all liability or loss, cost, or expense of the Issuer, including attorneys' fees, arising out of or in connection with, or pertaining to the issuance, sale, or delivery of the 2019 Bond, including, but not limited to, liabilities arising under the Securities Act of 1933, as amended, the Securities Exchange Act of 1934, as amended, the Code, or any applicable state securities laws, or fees, costs, expenses or other

17

amounts expended in connection with any investigation or audit by the Securities and Exchange Commission, the Internal Revenue Service, or any similar federal or state commissions or regulatory bodies,

(d)    all amounts paid in settlement of any litigation commenced or threatened against any Indemnified Party if such settlement is effected with the written consent of the Borrower,

(e)    all expenses reasonably incurred in the investigation of, preparation for or defense of any litigation, proceeding or investigation of any nature whatsoever, commenced or threatened against the Borrower, the Project or any Indemnified Party,

(f)    any judgments, penalties, fines, damages, assessments, indemnities or contributions, and

(g)    the reasonable fees of attorneys, auditors, and consultants,

provided, however, that the Borrower shall not be required to indemnify or release a Bondholder Indemnified Party pursuant to this section for any claims, damages, losses, liabilities, costs or expenses to the extent such are determined by a court of competent jurisdiction by final and non-appealable judgment to have been caused by such Bondholder Indemnified Party's gross negligence or willful misconduct. For purposes of this paragraph, *"Bondholder Indemnified Party"* is defined as the Bondholder and its respective officers, members, directors, employees, attorneys and agents.

If any action, suit or proceeding is brought against any Indemnified Party for any loss or damage for which the Borrower is required to provide indemnification under this section, such Indemnified Party shall promptly give notice in reasonable detail to the Borrower as promptly as practicable after becoming aware of facts and circumstances under which it expects to make a claim for indemnification hereunder from the Borrower; provided that the failure of the Indemnified Party to give such notice shall not relieve the Borrower of its obligations under this section except to the extent that the Borrower has been materially prejudiced thereby. The Borrower shall have the right, upon request and at its expense, to resist and defend such action, suit or proceeding, or cause the same to be resisted and defended, by counsel designated by the Borrower and approved by such Indemnified Party, which approval shall not be unreasonably withheld; provided that such approval shall not be required in the case of defense by counsel designated by any insurance company undertaking such defense pursuant to any applicable policy of insurance. The obligations of the Borrower under this section shall survive payment in full of the 2019 Bond and termination or expiration of this Agreement or release of the Borrower from its obligations hereunder to the extent the claim for indemnification arises from circumstances occurring or existing prior to such release. The Borrower shall have full power to litigate, compromise or settle the same in its sole discretion; provided that the Borrower may not settle without the consent of the Issuer if such settlement would impose any pecuniary liability or obligatory duty on the Issuer. Notwithstanding the foregoing, in the event the Indemnified Party is the Issuer, and the Issuer reasonably believes there are defenses available to it that are not being pursued, the Issuer may, in its sole discretion, hire independent counsel to pursue its own defense, and the Borrower shall be liable to the cost of such counsel. The Issuer may require advance payment or assurance of payment for any fees, expenses, or costs incurred or expected to be incurred by it in connection with the performance of any act or thing it may be called upon to do under the terms of this Agreement.

**Section 18.    <u>Extent of Covenants of the Issuer; No Personal Liability</u>.**

To the extent permitted by law, no recourse shall be had for the enforcement of any obligation, promise or agreement of the Issuer contained in any Financing Instrument to which it is a party or any other document or agreement entered into by, or governing, the Issuer or any Other Governmental Entity in connection therewith or for any claim based hereon or thereon or otherwise in respect hereof or thereof against the Issuer, or any Other Governmental Entity, any member, director, officer, agent,

attorney or employee, as such, in his/her individual capacity, past, present or future, of the Issuer, or any Other Governmental Entity, or of any successor entity, either directly or through the Issuer, or any successor entity, whether by virtue of any constitutional provision, statute or rule of law, or by the enforcement of any assessment or penalty or otherwise. No personal liability whatsoever shall attach to, or be incurred by, any member, director, officer, agent, attorney or employee, as such, in his/her individual capacity, past, present or future, of the Issuer, or of any successor entity, either directly or through the Issuer, or any Other Governmental Entity, or any successor entity, under or by reason of any of the obligations, promises or agreements entered into between the Issuer and the Borrower and/or the Bondholder, whether contained in any Financing Instrument to which the Issuer is a party or any other document or agreement entered into by, or governing, the Issuer in connection therewith or to be implied herefrom as being supplemental hereto; and all personal liability of that character against every such member, director, officer, agent, attorney or employee is, by the execution of this Agreement and as a condition of, and as part of the consideration for, the execution of this Agreement, expressly waived and released. Notwithstanding any other provision of this Agreement, the Issuer shall not be liable to the Borrower or the Bondholder or any other person for any failure of the Issuer to take action under this Agreement unless the Issuer (a) is requested in writing by an appropriate person to take such action, (b) is assured of payment of, or reimbursement for, any reasonable expenses in such action, and (c) is afforded, under the existing circumstances, a reasonable period to take such action. In acting under this Agreement, or in refraining from acting under this Agreement, the Issuer may conclusively rely on the advice of counsel.

**Section 19.    Registration of the 2019 Bond**.

The 2019 Bond shall be issued in registered form without coupons, payable to the registered owner or registered assigns. The Bond Registrar, on behalf of the Issuer, shall keep books for the registration of transfer of the 2019 Bond. The transfer of the 2019 Bond may be registered only upon an assignment executed by the registered owner in such form as shall be satisfactory to the Borrower and the Issuer, such registration to be made on the registration books and endorsed on the 2019 Bond by the Bondholder, accompanied by an investment letter satisfactory to the Issuer. The person in whose name the 2019 Bond shall be registered shall be deemed and regarded as the absolute owner thereof for all purposes, and payment of the principal of and interest on the 2019 Bond shall be made only to or upon the order of the registered owner thereof or his legal representative. The Bond Registrar, upon request of the Issuer, shall promptly make all books, records, and reports kept in accordance with this Section available to the Issuer.

**Section 20.    Option to Prepay; Payments Under the Credit Agreement**.

The 2019 Bond may be prepaid in whole or in part at the option of the Issuer (at the written direction of the Borrower) at a redemption price of the then outstanding principal amount plus accrued interest; provided, however, that the Borrower shall pay to the Bank a prepayment penalty as provided in the Credit Agreement with respect to the occurrence of a refinancing with a purchaser not related to the Bank prior to the third anniversary of the Closing Date.

Whenever the 2019 Bond is subject to prepayment pursuant to scheduled principal installments under the Credit Agreement, the Borrower may prepay its obligations under this Agreement, without further written notice to the Issuer or the Bondholder, by paying to the Bondholder the principal installment to be prepaid, and accrued interest to the prepayment date. Any such prepayment of principal is to be applied in the inverse order of scheduled payments of principal installments unless otherwise agreed to by the Bondholder and accompanied by an opinion of Bond Counsel.

**Section 21.**    **Benefit of Agreement**.

The Borrower intends that the representations, warranties and covenants made by the Borrower in this Agreement shall be for the equal benefit of the Issuer and the Bondholder hereunder.

**Section 22.**    **Notices**.

Except as may otherwise be provided in the applicable Financing Instrument, all demands, notices, approvals, consents, requests and other communications hereunder and under the other Financing Instruments shall be in writing and shall be deemed to have been given when delivered in person or within one Business Day of being sent by overnight courier or within three Business Days of being mailed by first-class registered or certified mail, postage prepaid, addressed:

(a)    if to the **Borrower,** at 3129 N. Industrial Drive, Simpsonville, South Carolina 29681 (Attention: Chief Executive Officer); or

(b)    if to the **Issuer,** at 1201 Main Street, Suite 1600, Columbia, South Carolina 29201 (Attention: Executive Director); or

(c)    if to the **Bondholder,** at Pinnacle Bank, 550 E. McBee Avenue, Greenville, SC 29601 (Attention: Bradford M. Medcalf, Senior Vice President).

A duplicate copy of each notice, approval, consent, request or other communication given under any Financing Instrument by either of the Issuer or the Borrower to the other shall also be given to the Bondholder. The Issuer, the Borrower and the Bondholder may, by notice given hereunder, designate any further or different addresses to which subsequent notices, approvals, consents, requests, or other communications shall be sent or persons to whose attention the same shall be directed.

**Section 23.**    **Miscellaneous**.

(a)    The Borrower agrees to pay (1) the reasonable fees and expenses of the Issuer, counsel to the Issuer, the Bondholder, counsel to the Bondholder and Bond Counsel and all other costs, fees and expenses incidental to the financing hereunder, the issuance of the 2019 Bond and the costs of producing the documents referred to herein, including the expenses of any audit of the Internal Revenue Service or investigation or proceeding of the Securities and Exchange Commission or other federal or state regulatory authority after the Closing Date,(2) all taxes of any kind whatsoever lawfully assessed, levied or imposed with respect to the transactions contemplated by this Agreement, (3) all taxes of any kind whatsoever lawfully assessed, levied or imposed with respect to the filings or recordings pursuant to the Financing Instruments, and (4) all costs of collection (including reasonable counsel fees) in the event of a default in the payment of the principal of, or interest on the 2019 Bond or other charges payable under the Financing Instruments. Borrower shall pay or cause to be paid when due and payable the reasonable fees and expenses of Issuer related to issuance of the 2019 Bond or the administration of this Agreement, including without limitation, reasonable attorney's fees and expenses. Borrower further agrees to pay to Issuer when due, Issuer's Annual Fee (hereinafter defined) beginning on March 1, 2020, and on each March 1, thereafter, for so long as the 2019 Bond is outstanding. For purposes of this Section 23(a), *"Issuer's Annual Fee"* shall mean a fee paid annually to the Issuer in an amount equal to the lesser of $10,000 or an amount equal to 0.015% of the principal amount of the 2019 Bond outstanding on each March 1, for so long as the 2019 Bond is outstanding, provided however, that the amount of the Issuer's Annual Fee shall never be less than $500.

The Bondholder shall furnish to the Issuer (1) prior to August 1 of each year, a statement of the amount

of principal of the 2019 Bond outstanding and unpaid as of June 30 of such year and (2) such information in the possession of the Bondholder as may be necessary to complete the annual audit of the Issuer as required by the Act or any other law, now or hereafter in effect. Failure to provide such information to the Issuer shall not be an Event of Default.

(b)     This Agreement shall be binding upon, inure to the benefit of and be enforceable by the parties hereto and the subsequent holders of the 2019 Bond and their respective successors and assigns. The representations, covenants and agreements contained herein shall continue notwithstanding the delivery of the 2019 Bond to the Bondholder.

(c)     If any provision of this Agreement shall be held invalid by any court of competent jurisdiction, such holding shall not invalidate any other provision hereof.

(d)     This Agreement shall be governed by the applicable laws of the State of South Carolina. The Financing Instruments express the entire understanding among the parties as to the matters set forth herein and therein and none of such instruments may be modified except in writing signed by the parties. No Financing Instrument may be modified before Payment of the Bond without the consent of the Bondholder.

(e)     This Agreement may be executed in several counterparts, each of which shall be an original, and all of which together shall constitute but one and the same instrument.

(f)     UNLESS EXPRESSLY PROHIBITED BY APPLICABLE LAW, THE PARTIES HERETO HEREBY WAIVE THE RIGHT TO TRIAL BY JURY OF ANY MATTERS OR CLAIMS ARISING OUT OF THIS AGREEMENT, THE 2019 BOND, OR THE OTHER FINANCING INSTRUMENTS OR OUT OF THE CONDUCT OF THE RELATIONSHIP BETWEEN THE PARTIES HERETO. THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE BONDHOLDER TO MAKE THE LOAN EVIDENCED BY THE 2019 BOND.

(g)     Pursuant to Section 11-1-85 of the Code of Laws of South Carolina 1976, as amended, the Issuer covenants to file with a central repository for availability in the secondary bond market when requested (1) an annual independent audit, within thirty days of the Issuer's receipt of the audit, and (2) event specific information within 30 days after the Issuer's actual knowledge of an event adversely affecting more than five percent of the revenues and receipts derived by the Issuer pursuant to this Agreement. If requested pursuant to Section 11-1-85 of the Code of Laws of South Carolina 1976, as amended, the Borrower agrees to promptly notify the Issuer of such event specific information and to provide all information requested by the Issuer to comply with this Section 23(g). The only remedy for failure by the Issuer to comply with the covenants in this Section 23(g) shall be an action for specific performance of these covenants. The Issuer specifically reserves the right to amend these covenants to reflect any change in Section 11-1-85 of the Code of Laws of South Carolina 1976, as amended, without the consent of the Bondholder or the Borrower. The Borrower covenants to furnish all information required by the Issuer to comply with this Section or any other laws or regulations.

(h)     To the fullest extent not prohibited by law, this Agreement and the rights and obligations hereunder and under the 2019 Bond are all subject to waiver and jurisdiction and venue in the same manner and effect as set forth in the Credit Agreement, as among the Borrower, the Bondholder and mutatis mutandis the Issuer.

(i)     The Bondholder may file any financing statements and any continuation statements and amendments to financing statements that are or may be necessary with respect to this Agreement and the assignment of the Issuer's rights hereunder under the Uniform Commercial Code as in effect in the State.

The Borrower hereby (a) irrevocably appoints the Bondholder as its true and lawful attorney for such purpose, with full power of substitution, and (b) ratifies and confirms all that such attorney or any substitute shall lawfully do by virtue hereof. If so requested by the Bondholder, the Borrower shall ratify and confirm all proper continuation statements and amendments to financing statements as may be designated in any such request.

[Remainder of Page Intentionally Left Blank]

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed in their respective names, all as of the date first above written.

SOUTH CAROLINA JOBS-ECONOMIC
DEVELOPMENT AUTHORITY

By _____

Harry A. Huntley
Executive Director

THE MUFFIN MAM, INC.

By _____

Dewey Armstrong
Chief Executive Officer

PINNACLE BANK, as Bondholder

By _____

Bradford M. Medcalf
Senior Vice President

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed in their respective names, all as of the date first above written.

**SOUTH CAROLINA JOBS-ECONOMIC DEVELOPMENT AUTHORITY**

By_____
                    Harry A. Huntley
                    Executive Director

**THE MUFFIN MAM, INC.**

By_____
                    Dewey Armstrong
                    Chief Executive Officer

By_____
                    Marshall H. Cole III
                    Secretary

**PINNACLE BANK,** as Bondholder

By_____
                    Bradford M. Medcalf
                    Senior Vice President

23

EXHIBIT A

Exhibit A to the Bond Purchase and Loan Agreement among the South Carolina Jobs-Economic Development Authority, The Muffin Mam, Inc. and Pinnacle Bank, as initial purchaser of the 2019 Bond.

R-1                                                                    $10,000,000

## UNITED STATES OF AMERICA

## STATE OF SOUTH CAROLINA

## SOUTH CAROLINA JOBS-ECONOMIC DEVELOPMENT AUTHORITY
## INDUSTRIAL REVENUE BOND
## (THE MUFFIN MAM, INC.)
## SERIES 2019

| Maturity Date | Interest Rate | Dated Date |
|---|---|---|
| **March 1, 2034** | **As Provided Herein** | **March 15, 2019** |

The South Carolina Jobs-Economic Development Authority, a public body corporate and politic and an agency of the State of South Carolina organized and existing under Title 41, Chapter 43, Code of Laws of South Carolina 1976, as amended (the *"Issuer")*, for value received, hereby promises to pay, solely from the revenue-producing source as hereinafter provided, to the order of Pinnacle Bank, together with any successor or assign (the *"Bondholder")*, initially at its office in Greenville, South Carolina (550 E. McBee Avenue, Greenville, SC 29601), or at such other place as the holder of this Series 2019 Bond (this *"2019 Bond")* may in writing designate, in lawful money of the United States of America, the principal amount of TEN MILLION AND 00/100 DOLLARS ($10,000,000), or, if less, the aggregate unpaid principal balance of this 2019 Bond, together with interest hereon from the date hereof until payment hereof in full, at the Bond Rate, the Taxable Rate or the Default Rate, as applicable, as provided in the Agreement (as defined below), on the Maturity Date set forth above, and to the extent permitted by law, interest on any overdue installments of such interest, at the rate determined herein. All payments of principal and interest shall be made in lawful money of the United States in immediately available funds at the office of the Bondholder in Greenville, South Carolina (550 E. McBee Avenue, Greenville, SC 29601), or at such other place as the holder of this 2019 Bond may designate.

THIS 2019 BOND AND THE INTEREST HEREON ARE LIMITED OBLIGATIONS OF THE ISSUER PAYABLE SOLELY FROM THE REVENUES AND RECEIPTS DERIVED BY THE ISSUER PURSUANT TO THE AGREEMENT (AS DEFINED HEREIN), WHICH REVENUES AND RECEIPTS HAVE BEEN PLEDGED AND ASSIGNED TO SECURE PAYMENT THEREOF WHICH OBLIGATIONS CONSTITUTE AN INDEBTEDNESS PAYABLE ONLY FROM A REVENUE-PRODUCING PROJECT OR SPECIAL SOURCE WITHIN THE MEANING OF ARTICLE X, SECTION 13(9) OF THE CONSTITUTION OF THE STATE OF SOUTH CAROLINA, WHICH SOURCE DOES NOT INCLUDE REVENUES FROM ANY TAX OR LICENSE. THIS 2019 BOND AND THE INTEREST HEREON DO NOT AND SHALL NEVER CONSTITUTE A GENERAL OBLIGATION OR INDEBTEDNESS OF THE ISSUER, THE STATE OF SOUTH CAROLINA (THE *"STATE")* OR ANY AGENCY OR POLITICAL SUBDIVISION OF THE STATE WITHIN THE MEANING OF ANY STATE CONSTITUTIONAL PROVISION OR STATUTORY LIMITATION

AND DO NOT AND SHALL NEVER CONSTITUTE OR GIVE RISE TO A PECUNIARY LIABILITY OF THE ISSUER, THE STATE OR ANY AGENCY OR POLITICAL SUBDIVISION OF THE STATE OR A CHARGE AGAINST THE GENERAL CREDIT OF THE ISSUER, THE STATE OR ANY AGENCY OR POLITICAL SUBDIVISION OF THE STATE OR AGAINST THE TAXING POWER OF THE STATE. THE ISSUER DOES NOT HAVE TAXING POWER. This 2019 Bond and the interest hereon shall not be deemed to constitute a debt or a pledge of the faith and credit of the State or any agency or political subdivision thereof, including the Issuer. Neither the State nor any agency or political subdivision thereof, including the Issuer, shall be obligated to pay the principal or interest on this 2019 Bond or other costs incident thereto except from the revenues and receipts pledged and assigned therefor, and neither the faith and credit nor the taxing power of the State or agency or any political subdivision thereof, including the Issuer, is pledged to the payment of the principal or interest on this 2019 Bond or other costs incident thereto. Reference should be made to the Agreement, the terms of which are incorporated herein in their entirety as if fully set forth herein, for additional terms and provisions relating to the security for this 2019 Bond and limitations upon the rights of the holder hereof with respect to enforcement of this 2019 Bond. No covenant, agreement or obligation herein or any other document or agreement entered into by, or governing, the Issuer in connection herewith or therewith shall be deemed to be a covenant, agreement or obligation of any past, present or future director, member, officer, employee, attorney or agent of the Issuer, the State or any agency or political subdivision of the State, or any successor entity, in his or her individual capacity, and neither the directors or members of the Issuer, or any successor or entity, nor any officer, employee, attorney or agent thereof executing this 2019 Bond shall be liable personally hereunder or be subject to any personal liability or accountability by reason of the issuance, execution, or delivery thereof.

This 2019 Bond is authorized and issued pursuant to Title 41, Chapter 43, Code of Laws of South Carolina 1976, as amended, for the purpose of providing funds to defray the cost of the Undertaking.

This 2019 Bond is issued pursuant to a Bond Purchase and Loan Agreement dated as of March 1, 2019 (the *"Agreement"),* among the Issuer, The Muffin Mam, Inc. (the *"Borrower")* and Pinnacle Bank, as the initial Bondholder. All capitalized terms used herein but not defined shall have the meanings in the Agreement.

Interest shall be payable monthly, in arrears, on the fifth day of each calendar month beginning April 5, 2019. Notwithstanding anything else herein contained, interest payable on this 2019 Bond shall be determined based on the principal amount of this 2019 Bond from time to time. Subject to the following four paragraphs, this 2019 Bond shall initially bear interest at the rate of 3.48% per annum subject to adjustment in accordance with the Agreement until this 2019 Bond is paid in full. Interest hereon shall be calculated on the basis of a year of 360 days and the actual number of days (including the first day but excluding the last day) elapsed.

From and after the Date of Taxability, the Issuer (with funds solely provided by the Borrower) shall pay interest on this 2019 Bond at the Taxable Rate. Upon demand of the Bondholder or any former Bondholder, the Issuer (with funds provided by the Borrower) shall pay to this Bondholder and any former Bondholder such additional amount as shall be necessary to provide that interest shall have been payable at the Taxable Rate from the earliest date as of which interest on this 2019 Bond shall have been determined to be (or have been) includable in the gross income of this Bondholder or any former Bondholder.

Notwithstanding anything herein to the contrary, no holder of the 2019 Bond shall be entitled to make a claim pursuant to this paragraph in excess of the amount of such a claim that Pinnacle Bank would have been entitled to make had Pinnacle Bank been the owner of the 2019 Bond with respect to which the claim pursuant to this paragraph relates.

A-2

From and after an Event of Default, interest shall accrue on this 2019 Bond at the Default Rate.

In addition, the interest rate on this 2019 Bond may be adjusted effective on each Mandatory Purchase Date in accordance with Section 10 of the Agreement, subject to the requirements therein.

Notwithstanding anything herein, the Agreement or any other documents pertaining to this 2019 Bond to the contrary, this 2019 Bond shall be subject to mandatory purchase by the Borrower on March 15, 2026 and each other date as established in accordance with Section 10 of the Agreement (each, a *"Mandatory Purchase Date")* in such manner as provided in the Agreement at a purchase price equal to 100% of the outstanding principal amount of this 2019 Bond plus accrued but unpaid interest to such Mandatory Purchase Date, plus other amounts due to the Bank under the Credit Agreement with respect to the 2019 Bond. On any such Mandatory Purchase Date, the Borrower shall purchase this 2019 Bond from the Bondholder on such Mandatory Purchase Date.

If any payment of principal of or interest on this 2019 Bond is payable on a day which is not a Business Day, such payment shall be made on the next succeeding Business Day.

Installments of principal under this 2019 Bond shall be due and payable to the Bondholder on the dates and in the amount set forth in the Credit Agreement without further notice to the Bondholder and may be changed and subject to the condition of an opinion of Bond Counsel as provided therein as provided in Section 20 of the Agreement.

This 2019 Bond may also be prepaid by the Issuer (at the election of the Borrower) with 30 days' written notice to the Holder in whole or in part at any time at a price equal to the then outstanding principal amount plus accrued interest and if prior to the third anniversary of the date of this Bond the prepayment penalty, if applicable, set forth in the Credit Agreement. This 2019 Bond may also be prepaid by the Borrower in whole on any Mandatory Purchase Date at a price of the then outstanding principal amount plus accrued interest.

The Agreement provides that the Bondholder, at its option, may declare all amounts payable under this 2019 Bond to be immediately due and payable following an Event of Default thereunder, and upon such declaration all amounts hereunder shall become immediately due and payable.

This 2019 Bond is registered in the name of the holder hereof on the registration books kept by the Bond Registrar, which registration has been made in said registration books and endorsed hereon by the Bondholder, and no registration of transfer hereof shall be valid unless made on said registration books at the written request of the Bondholder as provided in the Agreement.

This 2019 Bond is governed by the internal laws of the State of South Carolina.

All acts, conditions and things required to happen, exist or to be performed precedent to and in the issuance of this 2019 Bond have happened, exist and have been performed.

UNLESS EXPRESSLY PROHIBITED BY APPLICABLE LAW, THE UNDERSIGNED HEREBY WAIVES THE RIGHT TO TRIAL BY JURY OF ANY MATTERS OR CLAIMS ARISING OUT OF ANY MATTERS OR CLAIMS ARISING OUT OF THIS 2019 BOND OR ANY OTHER FINANCING INSTRUMENT EXECUTED IN CONNECTION HEREWITH OR OUT OF THE CONDUCT OF THE RELATIONSHIP BETWEEN THE UNDERSIGNED AND BONDHOLDER. THIS PROVISION IS A MATERIAL INDUCEMENT FOR BONDHOLDER TO MAKE THE LOAN EVIDENCED BY THIS 2019 BOND. FURTHER, THE UNDERSIGNED HEREBY CERTIFY THAT NO REPRESENTATIVE OR AGENT OF BONDHOLDER, NOR BONDHOLDER'S COUNSEL,

HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT BONDHOLDER WOULD NOT
SEEK TO ENFORCE THIS WAIVER OF RIGHT TO JURY TRIAL PROVISION IN THE EVENT
OF LITIGATION. NO REPRESENTATIVE OR AGENT OF BONDHOLDER, NOR
BONDHOLDER'S COUNSEL, HAS THE ISSUER TO WAIVE, CONDITION OR MODIFY THIS
PROVISION.

[Remainder of Page Intentionally Left Blank]

**IN WITNESS WHEREOF**, the South Carolina Jobs-Economic Development Authority has caused this 2019 Bond to be signed by the Executive Director of the Issuer, its seal to be affixed hereon, and this Bond to be dated March 15, 2019.

**SOUTH CAROLINA JOBS-ECONOMIC
DEVELOPMENT AUTHORITY**

(SEAL)                    By_____
                              Harry A. Huntley
                              Executive Director

## TRANSFER OF BOND

The transfer of this 2019 Bond may be registered by the Registered Owner or its duly authorized attorney or legal representative upon presentation hereof to the Bond Registrar who shall make note of such transfer in books kept by the Bond Registrar for that purpose and in the registration blank below.

| Date of Registration | Name of Registered Owner | Signature of Bond Registrar |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |

A-6

**EXHIBIT B**

FORM OF DISBURSEMENTS REQUISITION

REQUISITION NO. ___

Pinnacle Bank
550 E. McBee Avenue
Greenville, SC 29601
Attention: Bradford M. Medcalf, Senior Vice President

On behalf of **THE MUFFIN MAM, INC.**, a South Carolina corporation (the *"Borrower"*), I hereby requisition pursuant to the Bond Purchase and Loan Agreement dated as of March 1, 2019 (the *"Purchase Agreement"*), among the South Carolina Jobs-Economic Development Authority, the Borrower, and Pinnacle Bank (initially, the *"Bondholder"*), and the Credit and Security Agreement dated as of March 15, 2019 (the *"Credit Agreement"*), between the Borrower and the Bondholder, [a Bond Advance in the sum of $ _____] [the sum of $ _____ from the Project Account] to be paid to: _____ for: _____.

I hereby certify that (a) such obligation has been incurred by the Borrower in connection with the Project; (b) each item is a proper [use of proceeds of the 2019 Bond] [charge against the Project Account], and (c) such obligation has not been the basis for a prior requisition which has been paid. Evidence, including invoices, of the obligation referred to hereinabove is attached hereto. I hereby further certify that (a) such requisition contains no items representing payment on account of any retained percentages entitled to be retained at this date, (b) the payment of such requisition will not violate the prohibitions or requirements relating to the use of or advance of proceeds set forth in the Purchase Agreement, the Credit Agreement or the Tax Agreement, and (c) no Default or Event of Default has occurred and not been waived or cured. Capitalized terms used in this requisition without definition have the meanings respectively assigned to such terms in the Purchase Agreement and the Credit Agreement.

**THE MUFFIN MAM, INC.**

By:_____
         Authorized Representative

By:_____
         Authorized Representative

_____, 20___

The foregoing disbursement request is approved by the Bank; provided, however, that the Bank makes no certification, representation, or warranty with respect to any matters contained herein.

**PINNACLE BANK,**
*as the initial Bondholder*

By: _____
         Bradford M. Medcalf
         Senior Vice President

B-1

**Exhibit B**
**(Note)**

## AMENDED AND RESTATED REVOLVING CREDIT NOTE

$5,000,000.00                                                                March 15, 2019

FOR VALUE RECEIVED and intending to be legally bound, the undersigned, The Muffin Mam, Inc., a South Carolina corporation, ("Borrower"), promises to pay, in lawful money of the United States of America, to the order of Pinnacle Bank ("Lender"), at the address set forth in Section 9.8 of the Credit Agreement, the maximum aggregate principal sum of Five Million and No/100 Dollars ($5,000,000.00) or such lesser sum which represents the principal balance outstanding under the Revolving Credit established pursuant to the provisions of that certain Credit and Security Agreement dated of even date herewith, between Borrower and Lender (as it may be supplemented, restated, superseded, amended or replaced from time to time, "Credit Agreement"). The outstanding principal balance hereunder shall be payable in accordance with the terms of the Credit Agreement. The actual amount due and owing from time to time hereunder shall be evidenced by Lender's records of receipts and disbursements with respect to the Revolving Credit, which shall, in the absence of manifest error, be conclusive evidence of the amount. All capitalized terms used herein without further definition shall have the respective meanings ascribed thereto in the Credit Agreement.

Borrower further agrees to pay interest on the outstanding principal balance hereunder from time to time at the per annum rates and at the times set forth in the Credit Agreement. Interest shall be calculated on the basis of a year of 360 days but charged for the actual number of days elapsed, and shall be due and payable as set forth in the Credit Agreement.

This Revolving Credit Note is that certain Revolving Credit Note referred to in the Credit Agreement and in part, amends and restates that certain Revolving Credit Note dated July 13, 2018 executed by the Borrower in favor of the Lender.

If an Event of Default occurs and is continuing under the Credit Agreement, the unpaid principal balance of this Revolving Credit Note along with all accrued and unpaid interest and unpaid Expenses shall become, or may be declared, immediately due and payable as provided in the Credit Agreement. The obligations evidenced by this Revolving Credit Note are secured by the Collateral.

This Revolving Credit Note may be prepaid only in accordance with the terms and conditions of the Credit Agreement.

Borrower hereby waives protest, demand, notice of nonpayment and all other notices in connection with the delivery, acceptance, performance or enforcement of this Revolving Credit Note.

This Revolving Credit Note shall be governed by and construed in accordance with the substantive laws of the State of South Carolina. The provisions of this Revolving Credit Note are to be deemed severable and the invalidity or unenforceability of any provision shall not affect or impair the remaining provisions of this Revolving Credit Note which shall continue in full force and effect. No modification hereof shall be binding or enforceable against Lender unless approved in writing by Lender.

BORROWER (AND LENDER BY ITS ACCEPTANCE HEREOF) HEREBY WAIVES TO THE FULLEST EXTENT ALLOWABLE BY LAW ANY AND ALL RIGHTS IT MAY HAVE TO A JURY TRIAL IN CONNECTION WITH ANY LITIGATION, PROCEEDING OR COUNTERCLAIM ARISING WITH RESPECT TO RIGHTS AND OBLIGATIONS OF THE PARTIES HERETO OR UNDER THE LOAN DOCUMENTS OR WITH RESPECT TO ANY CLAIMS ARISING OUT OF ANY DISCUSSIONS, NEGOTIATIONS OR COMMUNICATIONS INVOLVING OR RELATED TO ANY PROPOSED RENEWAL, EXTENSION, AMENDMENT, MODIFICATION, RESTRUCTURE, FORBEARANCE, WORKOUT, OR ENFORCEMENT OF THE TRANSACTIONS CONTEMPLATED HEREUNDER OR UNDER THE LOAN DOCUMENTS.

IN WITNESS WHEREOF, and intending to be legally bound hereby, Borrower has executed these presents the day and year first above written.

THE MUFFIN MAM, INC.

By _____
Dewey T. Armstrong, Jr.
Chief Executive Officer

By _____
Marshall H. Cole, III
Chief Executive Officer

2

## CREDIT AND SECURITY AGREEMENT

This Credit and Security Agreement ("Agreement") is dated this 15th day of March, 2019, by and between The Muffin Mam, Inc., a South Carolina corporation ("Borrower") and Pinnacle Bank ("Lender").

### BACKGROUND

A.    Borrower desires to establish and continue financing arrangements with Lender and Lender is willing to make or to continue to make loans and extensions of credit to Borrower under the terms and provisions hereinafter set forth.

B.    The parties desire to define the terms and conditions of their relationship in writing.

C.    This Agreement, in part, amends and restates that certain Loan and Security Agreement dated July 13, 2018 between the Borrower and the Lender.

NOW, THEREFORE, the parties hereto, intending to be legally bound, hereby agree as follows:

### SECTION 1. DEFINITIONS AND INTERPRETATION

Terms Defined: As used in this Agreement, the following terms have the following respective meanings:

Account - All of the "accounts" (as that term is defined in the UCC) of Borrower, whether now existing or hereafter arising.

Acquired Business -Means the assets acquired by Borrower on or before the Closing Date pursuant to the Closing Date Acquisition Agreement.

Acquisition Documentation Rights - Collectively, all of Borrower's rights, title and interest in, to and under the Closing Date Acquisition Documents, including (i) all rights and remedies relating to monetary damages, including indemnification rights and remedies, and claims for damages or other relief pursuant to or in respect of the Closing Date Acquisition Documents, (ii) all rights and remedies relating to monetary damages, including indemnification rights and remedies, and claims for monetary damages under or in respect of the agreements, documents and instruments referred to in the Closing Date Acquisition Documents or related thereto and (iii) all proceeds, collections, recoveries and rights of subrogation with respect to the foregoing.

Adjusted LIBOR Rate – For the LIBOR Interest Period for each LIBOR Rate Loan comprising part of the same borrowing (including conversions, extensions and renewals), a per annum interest rate determined pursuant to the following formula:

$$\text{Adjusted LIBOR Rate} = \frac{\text{London Interbank Offered Rate}}{1 - \text{LIBOR Reserve Percentage}}$$

Advance(s) – Revolving Credit Advance(s), Bond Advance(s) and Project Account Disbursement(s).

Affiliate - With respect to any Person, (a) any Person which, directly or indirectly through one or more intermediaries controls, or is controlled by, or is under common control with, such Person, or (b) any Person who is a director or officer (i) of such Person, (ii) of any Subsidiary of such Person, or (iii) any person described in clause (a) above. For purposes of this definition, control of a Person shall mean the power, direct or indirect, (x) to vote 5% or more of the Capital Stock having ordinary voting power for the election of directors (or comparable equivalent) of such Person, or (y) to direct or cause the direction of the management and policies of such Person whether by contract or otherwise. Control may be by ownership, contract, or otherwise.

1

and permits of, and agreements with, any Governmental Authority, in each case whether or not having the force of law.

Restricted Payment –

a.     Cash dividends or other cash distributions (including Distributions) on any now or hereafter outstanding Capital Stock of Borrower;

b.     The redemption, repurchase, defeasance or acquisition of such Capital Stock or of warrants, rights or other options to purchase such Capital Stock; provided, however, that Borrower shall be entitled to terminate any options or restricted stock awards issued under the Incentive Stock Plan to the extent permitted under the terms of the Incentive Stock Plan, with the shares of Capital Stock represented thereby being returned to the pool of shares of Capital Stock available for issuance thereunder; and

c.     Any loans or advances (other than salaries), to any shareholder(s), partner(s) or member(s) of Borrower.

Revolving Credit – Section 2.1(a).

Revolving Credit Advance(s) – Any monies advanced or credit extended to Borrower by Lender under the Revolving Credit, including without limitation, cash advances and the issuance of Letters of Credit.

Revolving Credit Closing Fee – Section 2.7(a).

Revolving Credit Maturity Date – September 15, 2020.

Seller – TMMI, Inc., formerly known as The Muffin Man, Inc.

Subsidiary – With respect to any Person at any time, (i) any corporation more than fifty percent (50%) of whose voting stock is legally and beneficially owned by such Person or owned by a corporation more than fifty percent (50%) of whose voting stock is legally and beneficially owned by such Person; (ii) any trust of which a majority of the beneficial interest is at such time owned directly or indirectly, beneficially or of record, by such Person or one or more Subsidiaries of such Person; and (iii) any partnership, joint venture, limited liability company or other entity of which ownership interests having ordinary voting power to elect a majority of the board of directors or other Persons performing similar functions are at such time owned directly or indirectly, beneficially or of record, by, or which is otherwise controlled directly, indirectly or through one or more intermediaries by, such Person or one or more Subsidiaries of such Person.

Tangible Net Worth –At any time, the amount by which all of Borrower's consolidated assets (less (i) trademarks, copyrights, goodwill, covenants not to compete, and all other assets which would be classified as intangible assets under GAAP; and (ii) assets owing from Affiliates, officers, directors, shareholders and employees) exceed all of Borrower's consolidated liabilities, all as would be shown on Borrower's consolidated balance sheet prepared in accordance with GAAP.

Taxable Period – See Bond Purchase Agreement.

Taxable Rate – See Bond Purchase Agreement.

Trademarks – Shall mean, all of Borrower's right, title, and interest in and to the following (a) all trademarks (including service marks), trade names, trade dress, and trade styles and the registrations and applications for registration thereof , unregistered trademarks and service marks, logos, designs and the goodwill of the business symbolized by the foregoing; (b) all licenses of the foregoing, whether as licensee or licensor; (c) all renewals of the foregoing; (d) all income, royalties, damages, and payments now or hereafter due or payable with respect thereto, including, without limitation, damages, claims, and payments for past and future infringements thereof; (e) all rights

requested by Borrower are to be in writing. Upon receiving a request for an Advance and subject to the conditions set forth in this Agreement, Lender shall make the requested Advance available to Borrower as soon as is reasonably practicable thereafter on the day the requested Advance is to be made. At the written request of the Borrower received by Lender not later than the fifteen (15) days prior to the Bond Advance Termination Date, (i) Borrower and Lender shall establish the Project Account, and (ii) subject to the conditions set forth in this Agreement, Lender shall make a final Bond Advance in the amount requested by Borrower and shall deposit the proceeds of such Bond Advance into the Project Account on or before the Bond Advance Termination Date (such date initially being not later than December 31, 2019). To the extent Borrower desires to extend the Bond Advance Termination Date, Borrower, in addition to satisfying the requirements contained in the definition of Bond Advance Termination Date and prior to then Bond Advance Termination Date, shall (x) provide Lender prior written notice of the date to which the Bond Advance Termination shall be extended, and (y) obtain the prior written consent of Lender to extend the Bond Advance Termination Date to a date after September 30, 2020.

2.5    Interest:

a.    The unpaid principal balance of cash Revolving Credit Advances under the Revolving Credit shall bear interest, subject to the terms hereof at a per annum rate equal to, Adjusted LIBOR Rate plus 195 basis points.

b.    The unpaid principal balance of the Bond shall bear interest at a per annum rate set forth in the Bond Purchase Agreement and the Bond (initially, 3.48%), subject to adjustments as set forth in the Bond Purchase Agreement and in the Bond.

c.    After the Closing Date, interest on Loans under the Revolving Credit shall be payable monthly commencing on April 5, 2019, and continuing on the fifth (5th) day of each month thereafter with accrued and unpaid interest outstanding under the Revolving Credit shall be due and payable on the Revolving Credit Maturity Date. After the Closing Date, interest on the Bond shall be payable in monthly arrears commencing on April 5, 2019, and continuing on the fifth (5th) day of each month thereafter with accrued and unpaid interest outstanding under the Bond shall be due and payable on the maturity date of the Bond.

2.6    Additional Interest Provisions:

a.    Interest on the Loans and the Bond shall be calculated on the basis of a year of three hundred sixty (360) days but charged for the actual number of days elapsed.

13

http://tn001s230/PinnacleDocPath/1075/Boarding%20Documents/BOOKED/New%20LN%2393941768/Credit% - Internet Explorer

**Exhibit C**
**(Credit Agreement)**

## CREDIT AND SECURITY AGREEMENT

This Credit and Security Agreement ("Agreement") is dated this 15th day of March, 2019, by and between The Muffin Mam, Inc., a South Carolina corporation ("Borrower") and Pinnacle Bank ("Lender").

### BACKGROUND

A.    Borrower desires to establish and continue financing arrangements with Lender and Lender is willing to make or to continue to make loans and extensions of credit to Borrower under the terms and provisions hereinafter set forth.

B.    The parties desire to define the terms and conditions of their relationship in writing.

C.    This Agreement, in part, amends and restates that certain Loan and Security Agreement dated July 13, 2018 between the Borrower and the Lender.

NOW, THEREFORE, the parties hereto, intending to be legally bound, hereby agree as follows:

### SECTION 1. DEFINITIONS AND INTERPRETATION

Terms Defined: As used in this Agreement, the following terms have the following respective meanings:

Account - All of the "accounts" (as that term is defined in the UCC) of Borrower, whether now existing or hereafter arising.

Acquired Business -Means the assets acquired by Borrower on or before the Closing Date pursuant to the Closing Date Acquisition Agreement.

Acquisition Documentation Rights - Collectively, all of Borrower's rights, title and interest in, to and under the Closing Date Acquisition Documents, including (i) all rights and remedies relating to monetary damages, including indemnification rights and remedies, and claims for damages or other relief pursuant to or in respect of the Closing Date Acquisition Documents, (ii) all rights and remedies relating to monetary damages, including indemnification rights and remedies, and claims for monetary damages under or in respect of the agreements, documents and instruments referred to in the Closing Date Acquisition Documents or related thereto and (iii) all proceeds, collections, recoveries and rights of subrogation with respect to the foregoing.

Adjusted LIBOR Rate -- For the LIBOR Interest Period for each LIBOR Rate Loan comprising part of the same borrowing (including conversions, extensions and renewals), a per annum interest rate determined pursuant to the following formula:

$$\text{Adjusted LIBOR Rate} = \frac{\text{London Interbank Offered Rate}}{1 - \text{LIBOR Reserve Percentage}}$$

Advance(s) – Revolving Credit Advance(s), Bond Advance(s) and Project Account Disbursement(s).

Affiliate - With respect to any Person, (a) any Person which, directly or indirectly through one or more intermediaries controls, or is controlled by, or is under common control with, such Person, or (b) any Person who is a director or officer (i) of such Person, (ii) of any Subsidiary of such Person, or (iii) any person described in clause (a) above. For purposes of this definition, control of a Person shall mean the power, direct or indirect, (x) to vote 5% or more of the Capital Stock having ordinary voting power for the election of directors (or comparable equivalent) of such Person, or (y) to direct or cause the direction of the management and policies of such Person whether by contract or otherwise. Control may be by ownership, contract, or otherwise.

1

Anti-Terrorism Laws - Any statute, treaty, law (including common law), ordinance, regulation, rule, order, opinion, release, injunction, writ, decree or award of any Governmental Authority relating to terrorism or money laundering, including Executive Order No. 13224 and the USA Patriot Act.

Asset Sale - The sale, transfer, lease, license or other disposition, by Borrower or by any Subsidiary of Borrower to any Person other than Borrower of any Property now owned or hereafter acquired, of any nature whatsoever in any transaction or series of related transactions other than the sale of Inventory in the ordinary course of business. An Asset Sale includes, without limitation, a division.

Authorized Officer - Any officer (or comparable equivalent) of Borrower authorized by specific resolution of Borrower to request Advances or execute Compliance Certificates as set forth in the authorization certificate delivered to Lender substantially in the form of Exhibit "A" attached hereto.

Bank Affiliate -With respect to Lender, any Person which, directly or indirectly, is in control of, is controlled by, or is under common control with Lender. For purposes of this definition, control of a Person shall mean the power, direct or indirect, (x) to vote 25% or more of any class of Capital Stock having ordinary voting power for the election of directors of such Person or other Persons performing similar functions for any such Person, or (y) to direct or cause the direction of the management and policies of such Person whether by ownership of Capital Stock, contract or otherwise.

Bankruptcy Code – Title 11 of the United States Code entitled "Bankruptcy", as now or hereinafter in effect, or any successor statute.

Base Rate – The rate published from time to time in The Wall Street Journal as the "U.S. Prime Rate" or, in the event The Wall Street Journal ceases to be published, goes on strike, is otherwise not published or ceases publication of "Prime Rates", the base, reference or other rate then designated by Lender, in its sole discretion, for general commercial loan reference. The Base Rate is not necessarily the lowest or best rate of interest offered by Lender to any borrower or class of borrowers.

Base Rate Loans – That portion of the Loans accruing interest based on a rate determined by reference to the Base Rate.

Blocked Person- Section 5.23.

Bond – The Issuer's Industrial Revenue Bond (The Muffin Mam, Inc. Project) Series 2019, in the principal amount not to exceed the Maximum Bond Amount, as the same may be hereafter amended, restated, renewed, replaced, supplemented or otherwise modified from time to time.

Bond Advance(s) - Any monies advanced or credit extended to Borrower (or to Issuer to be loaned by Issuer to the Borrower) by Lender under the Bond.

Bond Advance Termination Date – the earliest of (i) the date on which the sum of the aggregate Bond Advances made equals $10,000,000, (ii) December 31, 2019, or (iii) the Completion Date; provided the Bond Advance Termination Date may be extended to a date subsequent to December 31, 2019 if Borrower provides an opinion of Bond Counsel to Issuer and Lender that such subsequent Bond Advance will not cause the interest on the 2019 Bond to become includable in gross income for federal income tax purposes; provided, further, the Bond Advance Termination Date shall not be later than September 30, 2020 without the prior written consent of Lender.

Bond Closing Fee – Section 2.7(b).

Bond Purchase Agreement – The Bond Purchase and Loan Agreement dated as of March 1, 2019, among Issuer, Borrower and Lender, as the same may be hereafter amended, restated, renewed, replaced, supplemented or otherwise modified from time to time.

Bond Year – The 12- month period commencing on the Closing Date and each succeeding 12-month period commencing on each anniversary date of the Closing Date.

2

Business Day – (i) A day other than Saturday or Sunday when Lender is open for business in Greenville, South Carolina or (ii) with respect to any LIBOR Rate Loan, any day other than a Saturday, Sunday or federal holiday (or a day on which commercial banks in New York are required or permitted to close) on which Lender is open and conducting its customary banking transactions.

Capital Stock - Any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all other ownership interests in a Person (other than a corporation) and any and all warrants or options to purchase any of the foregoing.

Capitalized Lease Obligations - Any Indebtedness represented by obligations under a lease that is required to be capitalized for financial reporting purposes in accordance with GAAP, consistently applied.

Change of Control - With respect to Borrower, the result caused by the occurrence of any event which results in the Original Holders owning (beneficially, legally or otherwise), in the aggregate, less than eighty percent (80%) of any class of the issued and outstanding Capital Stock of Borrower entitled to vote.

Closing - Section 4.6.

Closing Date - Section 4.6.

Closing Date Acquisition - Means the purchase by Borrower of the Acquired Business from Seller on or about July 13, 2018 pursuant to the terms of the Closing Date Acquisition Documents.

Closing Date Acquisition Agreement - Means that certain Asset Purchase Agreement, dated as of July 13, 2018, by and among Borrower, Seller and The Stephanie J. Crowley Muffin Mam, Inc. Stock Trust Dated February 18, 2015.

Closing Date Acquisition Documents - Means, collectively, the Closing Date Acquisition Agreement together with all schedules, exhibits, waivers, consents and amendments thereto and each other document, instrument, certificate and agreement executed and delivered in connection therewith.

CMLTD- Means the current scheduled principal or capital lease payments required to be paid during the following four quarters.

Code - Means the Internal Revenue Code of 1986, as amended, and, where appropriate any statutory predecessor or any successor thereto.

Collateral - All of the Property and interests in Property described in Section 3.1 of this Agreement and all other Property and interests in Property that now or hereafter secure payment of the Obligations and satisfaction by Borrower of all covenants and undertakings contained in this Agreement, the other Loan Documents, and any Hedging Agreements.

Collateral Documents – Each security agreement and such other documents executed and delivered in connection with the attachment and perfection of Lender's security interests and liens arising thereunder, including without limitation, UCC financing statement.

Completion Date - the earlier of (a) September 30, 2020 and (b) the date on which Borrower delivers a completion certificate to the Bank pursuant to Section 7 of the Bond Purchase Agreement.

Compliance Certificate - Section 6.10.

Consolidated Amortization Expense - For any period, the aggregate consolidated amount of amortization expenses of Borrower, as determined in accordance with GAAP.

3

Consolidated Depreciation Expense - For any period, the aggregate, consolidated amount of depreciation expenses of Borrower, as determined in accordance with GAAP.

Consolidated EBITDA - For any period, Borrower's Consolidated Net Income (or deficit) plus (a) Consolidated Interest Expense, plus (b) Consolidated Depreciation Expense, plus (c) Consolidated Amortization Expense, plus (d) Consolidated Tax Expense, minus (e) extraordinary gains, all as determined in accordance with GAAP.

Consolidated Interest Expense - For any period (without duplication), the aggregate, consolidated amount of interest expense required to be paid or accrued during such period on all Indebtedness of Borrower outstanding during all or any part of such period, as determined in accordance with GAAP.

Consolidated Net Income - For any period, consolidated net income after taxes of Borrower as such would appear on Borrower's consolidated statement of income, prepared in accordance with GAAP.

Consolidated Tax Expense - For any period, the aggregate consolidated amount of income tax expenses of Borrower, as determined in accordance with GAAP.

Current Assets – As of any date of determination, the total assets of Borrower and, that may properly be classified as current assets in accordance with GAAP.

Current Liabilities – As of any date of determination, the total liabilities of Borrower, that may properly be classified as current liabilities in accordance with GAAP.

Default - Any event, act, condition or occurrence which with notice, or lapse of time or both, would constitute an Event of Default hereunder.

Default Rate – Section 2.6(b).

Determination of Taxability - See Bond Purchase Agreement.

Disqualified Stock - Any Capital Stock which by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable) or upon the happening of any event (i)matures or is mandatorily redeemable for any reason, (ii) is convertible or exchangeable for Indebtedness or Capital Stock that meets the requirements of clauses (i) and (ii), or (iii) is redeemable at the option of the holder thereof, in whole or in part, in each case on or prior to the Maturity Date.

Distributions - Means any payments, distributions or transfers of cash or other assets by Borrower constituting dividends amounts for taxes (including Permitted Tax Distributions), redemptions or other repurchases of ownership interests, returns of capital, and any other payment to any holder of any Capital Stock in the payor in respect of such equity holder's Capital Stock and any other payment to any holder of any equity interest in the payor in respect of any loan made by an equity holder to Borrower, any loans, advances or similar payments to any equity holder of Borrower.

Dollar, Dollars and U.S. Dollars and the Symbol $ - Lawful money of the United States of America.

Environmental Laws - Any and all Federal, foreign, state, local or municipal laws, rules, orders, regulations, statutes, ordinances, codes, decrees and any and all common law requirements, rules and bases of liability regulating, relating to or imposing liability or standards of conduct concerning pollution, protection of the environment, or the impact of pollutants, contaminants or toxic or hazardous substances on human health or the environment, as now or may at any time hereafter be in effect from time to time.

ERISA - The Employee Retirement Income Security Act of 1974, as the same may be in effect, from time to time.

Event of Default - Section 8.1.

4

Executive Order No. 13224 - The Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, as the same may be in effect from time to time.

Expenses - Section 9.6.

GAAP -Generally accepted accounting principles as in effect on the Closing Date applied in a manner consistent with the most recent audited financial statements of Borrower furnished to Lender and described in Section 5.7 herein.

Governmental Authority -Any federal, state or local government or political subdivision, or any agency, authority, bureau, central bank, commission, department or instrumentality of either, or any court, tribunal, grand jury, or arbitration.

Guarantor - any Person who may hereafter guaranty, as surety, all of the Obligations.

Hazardous Substances - Any substances defined or designated as hazardous or toxic waste, hazardous or toxic material, hazardous or toxic substance or similar term, under any Environmental Law.

Hedging Agreement- Each ISDA Master Agreement and schedules and related confirmation any other documents, instruments, or agreements executed to further evidence or secure any Hedging Obligations as the same may be hereafter amended, restated, renewed, replaced, supplemented or otherwise modified from time to time.

Hedging Obligations -All obligations of Borrower to Lender or any Affiliate of Lender under any interest rate swap transactions, basis swaps, forward rate transactions, commodity swaps, commodity options, equity or equity index swaps, equity or equity index options, bond options, interest rate options, foreign exchange transactions, cap transactions, floor transactions, collar transactions, forward transactions, currency swap transactions, cross-currency rate swap transactions, currency options.

Incentive Stock Plan - shall mean such Incentive Stock Plan of Borrower (which shall be a compensatory employee equity incentive plan) as may be adopted by the Board of Directors of Borrower, as the same may be amended from time to time with the consent of the Board of Directors of Borrower, provided that no more than ten percent (10%) of the Capital Stock of Borrower outstanding on July 13, 2018 may be issued or reserved for issuance pursuant to Incentive Stock Plan.

Indebtedness - Of any Person at any date, without duplication, (i) all indebtedness of such Person for borrowed money (including with respect to Borrower, the Obligations) or for the deferred purchase price of property or services (other than current trade liabilities incurred in the ordinary course of business and payable in accordance with customary practices), (ii) any other indebtedness of such Person which is evidenced by a note, bond, debenture or similar instrument, (iii) all Capitalized Lease Obligations of such Person, (iv) the face amount of all letters of credit issued for the account of such Person and all drafts drawn thereunder, (v) all obligations of other Persons which such Person has guaranteed, (vi) Disqualified Stock, (vii) all net obligations of such Person under Hedging Agreements, and (viii) all liabilities secured by any Lien on any property owned by such Person even though such Person has not assumed or otherwise become liable for the payment thereof.

Inventory -All of the "inventory" (as that term is defined in the UCC) of Borrower, whether now existing or hereafter acquired or created.

IRS - Internal Revenue Service.

Issuer - South Carolina Jobs-Economic Development Authority, a public body corporate and politic and an agency of the State of South Carolina.

Lease – (i) until terminated in accordance with its terms, the Lease Agreement dated September 30, 2010 (as amended), by and among Garrett & Garrett Warehouse, LLC, Garrett & Garrett Warehousing Co., LLC, and Borrower, which governs Borrower's lease of the real property and improvements located at 3129 North Industrial Drive,

Simpsonville, SC 29681, and (ii) the Lease dated March 4, 2019, (as amended) by and between Blue Azalea, LLC and Borrower, which governs Borrower's lease of the real property and improvements located at 830 Hunter Industrial Park , Laurens, South Carolina.

Leverage Ratio - At any time, the ratio of Borrower's (i) Indebtedness to (ii) Tangible Net Worth.

LIBOR Interest Period—As to LIBOR Rate Loans, a period of one month, pursuant to the terms of this Agreement; provided however, (i) if any LIBOR Interest Period would end on a day for which there is no numerically corresponding day in the calendar month, such LIBOR Interest Period shall end on the last Business Day of the relevant calendar month and (ii) no LIBOR Interest Period shall extend beyond the Revolving Credit Maturity Date.

LIBOR Rate Loans — That portion(s) of the Loans accruing interest based on a rate determined by reference to the Adjusted LIBOR Rate.

LIBOR Reserve Percentage—For any day, that percentage (expressed as a decimal)which is in effect from time to time under Regulation D, as such regulation may be amended from time to time or any successor regulation, as the maximum reserve requirement (including, without limitation, any basic, supplemental, emergency, special, or marginal reserves) applicable with respect to Eurocurrency liabilities as that term is defined in Regulation D (or against any other category of liabilities that includes deposits by reference to which the interest rate of LIBOR Rate Loans is determined), whether or not Lender has any Eurocurrency liabilities subject to such reserve requirement at that time. LIBOR Rate Loans shall be deemed to constitute Eurocurrency liabilities and as such shall be deemed subject to reserve requirements without benefits of credits for proration, exceptions or offsets that may be available from time to time to Lender. The Adjusted LIBOR Rate shall be adjusted automatically on and as of the effective date of any change in the LIBOR Reserve Percentage.

Lien - Any interest of any kind or nature in property securing an obligation owed to, or a claim of any kind or nature in property by, a Person other than the owner of the Property, whether such interest is based on the common law, statute, regulation or contract, and including, but not limited to, a security interest or lien arising from a mortgage, encumbrance, pledge, conditional sale or trust receipt, a lease, consignment or bailment for security purposes, a trust, or an assignment. For the purposes of this Agreement, Borrower shall be deemed to be the owner of any Property which it has acquired or holds subject to a conditional sale agreement or other arrangement pursuant to which title to the Property has been retained by or vested in some other Person for security purposes.

Loans – Collectively, the unpaid balance of cash Revolving Credit Advances under the Revolving Credit.

Loan Documents – Collectively, this Agreement, the Note, the Bond, the Bond Purchase Agreement,  the Collateral Documents, landlord's waivers and estoppels and all agreements, instruments and documents executed and/or delivered in connection therewith, all as may be supplemented, restated, superseded, amended or replaced from time to time.

London Banking Days—Any day on which commercial banks are open for general business (including dealings in foreign exchange and foreign currency deposits) in London, England

London Interbank Offered Rate—With respect to any LIBOR Rate Loan, "LIBOR" (i.e., the London Interbank Offered Rate) means the rate of interest in U.S. Dollars (rounded upwards, at the Lender's option, to the next 1/8th of one percent) equal to the Intercontinental Exchange Benchmark Administration Ltd. ("ICE", or the successor thereto if ICE is no longer making a London Interbank Offered Rate available) ("ICE LIBOR") rate for the equivalent Interest Period as published by Bloomberg (or such other commercially available source providing quotations of ICE LIBOR as designated by Lender from time to time) at approximately 11:00 A.M. (London time) two (2) London Business Days prior to the reset date; provided however, if more than one ICE LIBOR is specified, the applicable rate shall be the arithmetic mean of all such rates. If, for any reason, such rate is not available, the term London Interbank Offered Rate shall mean, with respect to any LIBOR Rate Loan for the LIBOR Interest Period applicable thereto, the rate of interest per annum (rounded upwards, at Lender's option, to the next 1/8th of one percent) determined by Lender to be the average rate of interest per annum at which deposits in Dollars are offered for such LIBOR Interest Period to major banks in London, England at approximately 11:00 A.M. (London time) 2

London Banking Days prior to the first day of such LIBOR Interest Period for a term comparable to such LIBOR Interest Period.

Mandatory Purchase Date – See Bond Purchase Agreement.

Material Adverse Effect - A material adverse effect with respect to (a) the business, assets, properties, financial condition, stockholders' equity, contingent liabilities, prospects, material agreements or results of operations of Borrower, or (b) Borrower's ability to pay the Obligations in accordance with the terms hereof, or (c) the validity or enforceability of this Agreement or any of the other Loan Documents or the rights and remedies of Lender hereunder or thereunder.

Maturity Date – The later of (a) the Revolving Credit Maturity Date, and (b) the next ensuing Mandatory Purchase Date or, if none, the maturity date of the Bond.

Maximum Bond Amount -The sum of Ten Million and No/100 Dollars ($10,000,000).

Maximum Revolving Credit Amount -The sum of Five Million and No/100 Dollars ($5,000,000).

New Facility – Means that certain approximately 100,000 square foot manufacturing and office facility to be located at 830 Hunter Industrial Park, Laurens, South Carolina to be owned initially by Blue Azalea, LLC and to be leased by Borrower.

New Facility Completion Date – October 1, 2019.

Note or Revolving Credit Note - Section 2.1(b).

Obligations -All existing and future debts, liabilities and obligations of every kind or nature at any time owing by Borrower to Lender or any other subsidiary of Lender or Bank Affiliate, whether under this Agreement, the Note, the Bond, any of the other Loan Documents, or any other existing or future instrument, document or agreement, between Borrower or Lender or any other subsidiary of Lender or Bank Affiliate, whether joint or several, related or unrelated, primary or secondary, matured or contingent, due or to become due (including debts, liabilities and obligations obtained by assignment), and whether principal, interest, fees, indemnification obligations hereunder or Expenses (specifically including interest accruing after the commencement of any bankruptcy, insolvency or similar proceeding with respect to Borrower, whether or not a claim for such post commencement interest is allowed), including, without limitation, debts, liabilities and obligations in respect of the Revolving Credit, the Bond and any extensions, modifications, substitutions, increases and renewals thereof; any Hedging Obligations; the payment of all amounts advanced by Lender or any other subsidiary of Lender or Bank Affiliate to preserve, protect and enforce rights hereunder and in the Collateral; and all Expenses incurred by Lender or any other subsidiary of Lender or Bank Affiliate. Without limiting the generality of the foregoing, Obligations shall include any other debts, liabilities or obligations owing to Lender or any other subsidiary of Lender or Bank Affiliate in connection with any lockbox, cash management, or other services (including electronic funds transfers or automated clearing house transactions) provided by Lender or any other subsidiary of Lender or Bank Affiliate to Borrower, as well as any other loan, advances or extension of credit, under any existing or future credit agreement, promissory note, Hedging Agreement or other instrument, document or agreement between Borrower and Lender or any other subsidiary of Lender or Bank Affiliate.

Original Credit Agreement - The Loan and Security Agreement dated July 13, 2018 between the Borrower and the Lender.

Original Holders – Each of The Azalea Fund IV, L.P. and Dewey T. Armstrong, Jr.

Other Interest Hedging Instrument - Any documentation evidencing any interest rate swap, interest "cap" or "collar" or any other interest rate hedging device between Borrower and a Person other than Lender (or any Affiliate of Lender).

Overadvance - Section 2.1(a)(i).

<u>PBGC</u> - The Pension Benefit Guaranty Corporation.

<u>Permitted Indebtedness</u> – (a) Indebtedness to Lender in connection with the Revolving Credit, the Bond or otherwise pursuant to the Loan Documents; (b) Indebtedness under Hedging Agreements, (c) Indebtedness under an Other Interest Rate Hedging Instrument, provided such Other Interest Rate Hedging Instrument is entered into in the ordinary course of business and not for speculative purposes and is in form and substance acceptable to Lender; (d) trade payables incurred in the ordinary course of Borrower's business; and (e) purchase money Indebtedness (including Capitalized Lease Obligations) hereafter incurred by Borrower to finance the purchase of fixed assets; provided that, (i) such Indebtedness incurred in any fiscal year shall not cause a Material Adverse Effect, (ii) such Indebtedness shall not exceed the purchase price of the assets funded and (iii) no such Indebtedness may be refinanced for a principal amount in excess of the principal amount outstanding at the time of such refinancing.

<u>Permitted Liens</u> - (a) Liens securing taxes, assessments or governmental charges or levies not delinquent; (b) Liens incurred or deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance, social security and other like laws; (c) Liens on fixed assets security purchase money Indebtedness permitted under Section 7.6; provided that, (i) such Lien attached to such assets concurrently, or within 20 days of the acquisition thereof, and only to the assets so acquired, and (ii) a description of the asset acquired is furnished to Lender; and (d) Liens in favor of Lender securing the Obligations and other Liens in favor of Lender.

<u>Permitted Tax Distributions</u> - for any taxable year of Borrower for which Borrower is a pass through entity for income tax purposes, Borrower may make Restricted Payments in the aggregate amount necessary for each holder of Borrower's Capital Stock to pay federal and state income taxes resulting solely from such holder's allocated share of Borrower's income so long as (a) no Event of Default has occurred or is continuing, or after giving effect to such Restricted Payment, an Event of Default would occur, (b) before any such Restricted Payment is made, Borrower shall have delivered to Lender a written calculation, in form and substance reasonably satisfactory to Lender, showing how the amount of such Restricted Payment was derived, and (c) in the event Borrower has a net operating loss for any taxable year, each such holder shall immediately refund to Borrower an amount equal to the lesser of: (1) the amount of refund which such partner obtained from previously paid federal or state income taxes as a result of carrying back Borrower's net operating loss, or (2) the amount by which all such Restricted Payments previously paid by Borrower to such holder exceed the amount of any previous refund made by such holder to Borrower as a result of Borrower having a net operating loss for a taxable year.

<u>Person</u> - An individual, partnership, corporation, trust, limited liability company, limited liability partnership, unincorporated association or organization, joint venture or any other entity.

<u>Project Account</u> – The deposit account of Borrower held at, and under the sole control of, Lender into which Bond Advances may be deposited as provided in this Agreement and in Sections 6 and 7 of the Bond Purchase Agreement.

<u>Project Account Disbursement-</u> Any monies disbursed by Lender to Borrower from the Project Account.

<u>Project Account Disbursement Termination Date</u> – September 30, 2020.

<u>Property -</u>Any interest of Borrower in any kind of property or asset, whether real, personal or mixed, or tangible or intangible.

<u>Purchase Price</u> – See Bond Purchase Agreement.

<u>Regulation D</u> - Regulation D of the Board of Governors of the Federal Reserve System comprising Part 204 of Title 12, Code of Federal Regulations, as amended, and any successor thereto.

<u>Requirement of Law</u> – Collectively, all international, foreign, federal, state and local laws, statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations

8

and permits of, and agreements with, any Governmental Authority, in each case whether or not having the force of law.

Restricted Payment –

     a.     Cash dividends or other cash distributions (including Distributions) on any now or hereafter outstanding Capital Stock of Borrower;

     b.     The redemption, repurchase, defeasance or acquisition of such Capital Stock or of warrants, rights or other options to purchase such Capital Stock; provided, however, that Borrower shall be entitled to terminate any options or restricted stock awards issued under the Incentive Stock Plan to the extent permitted under the terms of the Incentive Stock Plan, with the shares of Capital Stock represented thereby being returned to the pool of shares of Capital Stock available for issuance thereunder; and

     c.     Any loans or advances (other than salaries), to any shareholder(s), partner(s) or member(s) of Borrower.

Revolving Credit - Section 2.1(a).

Revolving Credit Advance(s) - Any monies advanced or credit extended to Borrower by Lender under the Revolving Credit, including without limitation, cash advances and the issuance of Letters of Credit.

Revolving Credit Closing Fee - Section 2.7(a).

Revolving Credit Maturity Date – September 15, 2020.

Seller – TMMI, Inc., formerly known as The Muffin Man, Inc.

Subsidiary - With respect to any Person at any time, (i) any corporation more than fifty percent (50%) of whose voting stock is legally and beneficially owned by such Person or owned by a corporation more than fifty percent (50%) of whose voting stock is legally and beneficially owned by such Person; (ii) any trust of which a majority of the beneficial interest is at such time owned directly or indirectly, beneficially or of record, by such Person or one or more Subsidiaries of such Person; and (iii) any partnership, joint venture, limited liability company or other entity of which ownership interests having ordinary voting power to elect a majority of the board of directors or other Persons performing similar functions are at such time owned directly or indirectly, beneficially or of record, by, or which is otherwise controlled directly, indirectly or through one or more intermediaries by, such Person or one or more Subsidiaries of such Person.

Tangible Net Worth -At any time, the amount by which all of Borrower's consolidated assets (less (i) trademarks, copyrights, goodwill, covenants not to compete, and all other assets which would be classified as intangible assets under GAAP; and (ii) assets owing from Affiliates, officers, directors, shareholders and employees) exceed all of Borrower's consolidated liabilities, all as would be shown on Borrower's consolidated balance sheet prepared in accordance with GAAP.

Taxable Period – See Bond Purchase Agreement.

Taxable Rate – See Bond Purchase Agreement.

Trademarks - Shall mean, all of Borrower's right, title, and interest in and to the following (a) all trademarks (including service marks), trade names, trade dress, and trade styles and the registrations and applications for registration thereof , unregistered trademarks and service marks, logos, designs and the goodwill of the business symbolized by the foregoing; (b) all licenses of the foregoing, whether as licensee or licensor; (c) all renewals of the foregoing; (d) all income, royalties, damages, and payments now or hereafter due or payable with respect thereto, including, without limitation, damages, claims, and payments for past and future infringements thereof; (e) all rights

to sue for past, present, and future infringements of the foregoing, including the right to settle suits involving claims and demands for royalties owing; and (f) all rights corresponding to any of the foregoing throughout the world.

UCC - The Uniform Commercial Code as adopted in the State of South Carolina, as in effect from time to time.

Any other capitalized terms used without further definition herein shall have the respective meaning set forth in the Bond Purchase Agreement and the UCC.

1.1     Accounting Principles: Where the character or amount of any asset or liability or item of income or expense is required to be determined or any consolidation or other accounting computation is required to be made for the purposes of this Agreement, this shall be done in accordance with GAAP as in effect on the Closing Date, to the extent applicable, except as otherwise expressly provided in this Agreement. If there are any changes in GAAP after the Closing Date that would affect the computation of the financial covenants in Section 6.8, such changes shall only be followed, with respect to such financial covenants, from and after the date this Agreement shall have been amended to take into account any such changes.

1.2     Construction: No doctrine of construction of ambiguities in agreements or instruments against the interests of the party controlling the drafting shall apply to any Loan Documents.

## SECTION 2. THE LOANS AND THE BOND

2.1     Revolving Credit - Description:

a.     Subject to the terms and conditions of this Agreement, Lender hereby establishes for the benefit of Borrower a revolving credit facility (collectively, the "Revolving Credit") which shall include cash Revolving Credit Advances extended by Lender to or for the benefit of Borrower from time to time hereunder. The aggregate principal amount of unpaid cash Revolving Credit Advances, shall not at any time exceed the Maximum Revolving Credit Amount. Subject to such limitation, the outstanding balance of Revolving Credit Advances under the Revolving Credit may fluctuate from time to time, to be reduced by repayments made by Borrower, to be increased by future Revolving Credit Advances which may be made by Lender, to or for the benefit of Borrower, and, subject to the provisions of Section 8 below, shall be due and payable on the Revolving Credit Maturity Date. If the aggregate principal amount of unpaid cash Revolving Credit Advances, at any time exceeds the Maximum Revolving Credit Amount (such excess referred to as "Overadvance"), Borrower shall immediately repay the Overadvance in full.

b.     At Closing, Borrower shall execute and deliver an amended and restated promissory note to Lender for the Maximum Revolving Credit Amount ("Note" or "Revolving Credit Note"). The Revolving Credit Note shall evidence Borrower's unconditional obligation to repay Lender for all Revolving Credit Advances made under the Revolving Credit, with interest as herein provided. Each Revolving Credit Advance under the Revolving Credit shall be deemed evidenced by the Revolving Credit Note, which is deemed incorporated herein by reference and made part hereof. The Revolving Credit Note shall be in form and substance satisfactory to Lender.

c.     The term of the Revolving Credit shall expire on the Revolving Credit Maturity Date. On such date, unless having been sooner accelerated by Lender pursuant to the terms hereof, and without impairing any rights under Section 3.1, all sums owing under the Revolving Credit shall be due and payable in full, and as of and after such date Borrower shall not request and Lender shall not make any further Revolving Credit Advances under the Revolving Credit.

2.2     [Intentionally Omitted].

2.3     Bond – Description:

a.     Upon the satisfaction of the conditions set forth in Section 4 hereof and based on the

10

representations, warranties and covenants of Borrower set forth in the Bond Purchase Agreement and herein, Lender hereby agrees to purchase from Issuer, and Borrower hereby agrees to cause Issuer to sell to Lender, from time to time, all, but not less than all, of the Bond at par in an aggregate principal amount not to exceed the Maximum Bond Amount. On the Closing Date, one fully registered Bond shall be issued in the name of Lender. Bond Advances and Project Account Disbursements shall be made by Lender in accordance with the terms of this Agreement and the Bond Purchase Agreement. Borrower shall repay and cause Issuer to repay principal of the Bond in consecutive equal monthly installments of principal each in the amount equal to the outstanding principal amount of the Bond on the Project Account Disbursement Termination Date (after giving effect to any prepayment of principal of the Bond on the Project Account Disbursement Termination Date from moneys on deposit in the Project Account as contemplated by Section 2.11(b)) *divided by* the lesser of (x) the final average economic life (expressed in years) of the equipment financed with proceeds of the Bond *multiplied by* 1.2 *multiplied by* 12, and (y) one hundred eighty (180), commencing on November 5, 2020 and continuing on the fifth (5th) day of each month thereafter. A final installment of all unpaid principal and all accrued and unpaid interest outstanding under the Bond shall be due and payable on the maturity date of the Bond. On or before the Project Account Disbursement Termination Date, Borrower shall provide to Lender a written certification of the final average economic life (expressed in years) of the equipment financed with proceeds of the Bond, such final average economic life to be used by Lender in the calculation of the amount of the monthly installments of principal due under the Bond in accordance with this Section 2.3(a). The formula for computing the amount of each monthly installment of principal of the Bond to be repaid as set forth in this Section shall not be amended without the delivery of a "no adverse effect opinion" of Bond Counsel to Lender with respect to the tax exempt status of the Bond as a result of any such amendment.

      b.      Borrower hereby unconditionally, irrevocably and absolutely agrees to make prompt and full payment of all payment obligations owed to Lender under the Bond, the Bond Purchase Agreement and any other Loan Documents and to pay any other Obligations owing to Lenders whether now existing or hereafter arising, irrespective of their nature, whether direct or indirect, absolute or contingent, with interest thereon at the rate or rates provided in the Bond, the Bond Purchase Agreement, this Agreement, the other Loan Documents and under such Obligations. In the event Lender has not received the Purchase Price on the Mandatory Purchase Date, Borrower shall cause the Bond to be redeemed on the Mandatory Purchase Date.

      c.      Borrower shall pay on demand:

      (i)      if an Event of Default shall have occurred, all costs and expenses of Lender in connection with the enforcement (whether by means of legal proceedings or otherwise) of any of its rights and remedies under this Agreement, the Bond, the Bond Purchase Agreement and such other documents which may be delivered in connection therewith;

      (ii)      a fee for each amendment this Agreement, the Bond, the Bond Purchase Agreement and such other documents which may be delivered in connection therewith or any consent or waiver by Lender with respect to this Agreement, the Bond, the Bond Purchase Agreement and such other documents which may be delivered in connection therewith, in each case, plus the reasonable fees and expenses of counsel to Lender;

      (iii)      the reasonable fees and out of pocket expenses for counsel or other reasonably required consultants to Lender in connection with advising Lender as to its rights, remedies and obligations under this Agreement, the Bond, the Bond Purchase Agreement and such other documents which may be delivered in connection therewith or in connection with responding to requests from Borrower for approvals, consents and waivers; and

      (iv)      any amounts advanced by or on behalf of Lender to the extent required to cure any Default, Event of Default or event of nonperformance under this Agreement, the Bond, the Bond Purchase Agreement and such other documents which may be delivered in connection therewith , together with interest at the Default Rate.

All fees payable pursuant to this Agreement shall be deemed to be fully earned when due and non-refundable when paid.

d.      In the event a Determination of Taxability occurs, to the extent not payable to Lender under the terms of the Bond Purchase Agreement and the Bond, Borrower hereby agrees to pay to Lender on demand therefor (i) an amount equal to the difference between (A) the amount of interest that would have been paid to Lender on the Bond during the period for which interest on the Bond is included in the gross income of Lender if the Bond had borne interest at the Taxable Rate, during the Taxable Period, and (B) the amount of interest actually paid to Lender during the Taxable Period, and (ii) an amount equal to any interest, penalties or charges owed by Lender as a result of interest on the Bond becoming included in the gross income of Lender, together with any and all attorneys' fees, court costs, or other out of pocket costs incurred by Lender in connection therewith;

e.      The payment obligations of Borrower under this Agreement shall be unconditional and irrevocable and shall be paid strictly in accordance with the terms of this Agreement under all circumstances, including without limitation the following:

(i)      any lack of validity or enforceability of this Agreement, the Bond, the Bond Purchase Agreement and such other documents which may be delivered in connection therewith;

(ii)      any amendment or waiver of or any consent to departure from all or any of this Agreement, the Bond, the Bond Purchase Agreement and such other documents which may be delivered in connection therewith, in each case without the prior written consent of Lender;

(iii)      the existence of any claim, set off, defense or other right which Borrower may have at any time against Lender, any other Bondholder or any other person or entity, whether in connection with this Agreement, the Bond, the Bond Purchase Agreement and such other documents which may be delivered in connection therewith, the transactions contemplated herein or therein or any unrelated transaction; or

(iv)      any other circumstance or happening whatsoever, whether or not similar to any of the foregoing.

f.      So long as Lender is the Bondholder, on or before the date one hundred twenty (120) days prior to the end of the Rate Period, Borrower may provide written notice to Lender, in the form of Exhibit "C" hereto, of its desire to change the interest rate mode of the Bond and requesting Lender to purchase such Bond in such new Rate Period. Lender will make reasonable efforts to respond to such request within sixty (60) days after receipt of all information necessary, in Lender's absolute judgment, to permit Lender to make an informed credit decision. Lender may, in its sole and absolute discretion, decide to accept or reject any such request and no consent shall become effective unless Lender shall have consented thereto in writing. In the event Lender fails to definitively respond to such request within such sixty (60) day period, Lender shall be deemed to have refused to grant such request. The consent of Lender, if granted, shall be conditioned upon the preparation, execution and delivery of documentation in form and substance satisfactory to Lender (which shall include, but not be limited to the delivery of a "no adverse effect opinion" of Bond Counsel to Lender with respect to the tax exempt status of the Bond as a result of such conversion and interest rate setting). In the event Borrower and Lender fail to document in writing their agreement of the proposed rate(s) and terms of the succeeding period(s), Borrower shall continue to be required to repurchase the Bond from the Lender on the Mandatory Purchase Date at the Purchase Price.

g.      The Bond shall not be (i) assigned a specific rating by any rating agency, (ii) registered with The Depository Trust Company or any other securities depository, (iii) issued pursuant to any type of official statement, private placement memorandum or other offering document or (iv) placed or offered by a broker-dealer in the capacity of an underwriter or a placement agent.

2.4      <u>Advances and Payments</u>:

a.     Except to the extent otherwise set forth in this Agreement (or in the case of Hedging Agreements under the applicable agreements), all payments of principal and of interest on the Revolving Credit, the Bond and all Expenses, fees, indemnification obligations and all other charges and any other Obligations of Borrower, shall be made to Lender at its banking office, at 550 East McBee Avenue, Greenville SC 29601, or such other office as Lender may designate in writing, in United States Dollars, in immediately available funds. Borrower hereby authorizes Lender to charge its operating account maintained at Lender and further agrees that Lender shall have the unconditional right and discretion (and Borrower hereby authorizes Lender) to charge any of Borrower's operating and/or deposit account(s), in any event for all of Borrower's Obligations as they become due from time to time under this Agreement including, without limitation, interest, principal, fees, indemnification obligations and reimbursement of Expenses. Alternatively, Lender may in its discretion (and Borrower hereby authorizes Lender to) make a cash Advance in a sum sufficient to pay all interest accrued and payable on the Obligations and to pay all costs, fees and Expenses owing hereunder. Borrower acknowledges that Borrower's failure to maintain sufficient funds in any checking, operating or deposit account for payment of any of the Obligations, or Lender's failure to charge any such account shall not relieve Borrower of any payment obligation under this Agreement or any other Loan Document. Any payments received prior to 2:00 p.m. Eastern time on any Business Day shall be deemed received on such Business Day. Any payments (including any payment in full of the Obligations), received after 2:00 p.m. Eastern time on any Business Day shall be deemed received on the immediately following Business Day.

b.     Cash Advances which may be made by Lender from time to time shall be made available by crediting such proceeds to Borrower's operating account with Lender; provided Lender in its sole discretion may make Bond Advances or Project Account Disbursements directly to a vendor of Borrower. All cash Advances requested by Borrower are to be in writing. Upon receiving a request for an Advance and subject to the conditions set forth in this Agreement, Lender shall make the requested Advance available to Borrower as soon as is reasonably practicable thereafter on the day the requested Advance is to be made. At the written request of the Borrower received by Lender not later than the fifteen (15) days prior to the Bond Advance Termination Date, (i) Borrower and Lender shall establish the Project Account, and (ii) subject to the conditions set forth in this Agreement, Lender shall make a final Bond Advance in the amount requested by Borrower and shall deposit the proceeds of such Bond Advance into the Project Account on or before the Bond Advance Termination Date (such date initially being not later than December 31, 2019). To the extent Borrower desires to extend the Bond Advance Termination Date, Borrower, in addition to satisfying the requirements contained in the definition of Bond Advance Termination Date and prior to then Bond Advance Termination Date , shall (x) provide Lender prior written notice of the date to which the Bond Advance Termination shall be extended, and (y) obtain the prior written consent of Lender to extend the Bond Advance Termination Date to a date after September 30, 2020.

2.5     Interest:

a.     The unpaid principal balance of cash Revolving Credit Advances under the Revolving Credit shall bear interest, subject to the terms hereof at a per annum rate equal to, Adjusted LIBOR Rate plus 195 basis points.

b.     The unpaid principal balance of the Bond shall bear interest at a per annum rate set forth in the Bond Purchase Agreement and the Bond (initially, 3.48%), subject to adjustments as set forth in the Bond Purchase Agreement and in the Bond.

c.     After the Closing Date, interest on Loans under the Revolving Credit shall be payable monthly commencing on April 5, 2019, and continuing on the fifth (5th) day of each month thereafter with accrued and unpaid interest outstanding under the Revolving Credit shall be due and payable on the Revolving Credit Maturity Date. After the Closing Date, interest on the Bond shall be payable in monthly arrears commencing on April 5, 2019, and continuing on the fifth (5th) day of each month thereafter with accrued and unpaid interest outstanding under the Bond shall be due and payable on the maturity date of the Bond.

2.6     Additional Interest Provisions:

a.     Interest on the Loans and the Bond shall be calculated on the basis of a year of three hundred sixty (360) days but charged for the actual number of days elapsed.

13

b.      After the occurrence and during the continuance of an Event of Default hereunder, the per annum effective rate of interest on all outstanding principal under the Loans and the Bond, as applicable, shall be increased by four hundred (400) basis points (the "Default Rate"). All such increases may be applied retroactively to the date of the occurrence of the Event of Default. Borrower agrees that the Default Rate payable to Lender is a reasonable estimate of Lender's damages and is not a penalty.

c.      All contractual rates of interest chargeable on outstanding principal under the Loans and the Bond shall continue to accrue and be paid even after Default, an Event of Default, maturity, acceleration, judgment, bankruptcy, insolvency proceedings of any kind or the happening of any event or occurrence similar or dissimilar.

d.      In no contingency or event whatsoever shall the aggregate of all amounts deemed interest hereunder and charged or collected pursuant to the terms of this Agreement exceed the highest rate permissible under any law which a court of competent jurisdiction shall, in a final determination, deem applicable hereto. In the event that such court determines Lender has charged or received interest hereunder in excess of the highest applicable rate, Lender shall apply, in its sole discretion, and set off such excess interest received by Lender against other Obligations due or to become due and such rate shall automatically be reduced to the maximum rate permitted by such law.

2.7     Fees and Charges:

a.      At Closing, Lender shall have fully earned and Borrower shall unconditionally pay to Lender, a non-refundable fee with respect to the Revolving Credit ("Revolving Credit Closing Fee") of Six Thousand Two Hundred Fifty and No/100 Dollars ($6,250.00), less amounts previously paid thereon.

b.      At Closing, Lender shall have fully earned and Borrower shall unconditionally pay to Lender a non-refundable fee with respect to the Bond ("Bond Loan Closing Fee") of Eighteen Thousand Seven Hundred Fifty and No/100 Dollars ($18,750.00), less amounts previously paid thereon.

c.      Borrower shall unconditionally pay to Lender a late charge equal to four percent (4%) of any and all payments of principal or interest on the Loans or the Bond that are not paid within fifteen (15) days of the due date. Such late charge shall be due and payable on any late payment on any portion of the Obligations; provided however, if Lender has accelerated the Obligations, the late fee will not be applicable to the accelerated Obligations; provided however, it would be applicable to any late payment(s) that caused such acceleration or occurred prior to such acceleration. Borrower agrees that any late fee payable to Lender is a reasonable estimate of Lender's damages and is not a penalty.

2.8     [Intentionally omitted].

2.9     Use of Proceeds: The extensions of credit under and proceeds of the Revolving Credit shall be used for working capital and general corporate purposes. The extensions of credit and proceeds of the Bond shall be use to acquire new equipment to be used by Borrower in the ordinary course of its business.

2.10    Capital Adequacy: If any present or future law, governmental rule, regulation, policy, guideline, directive or similar requirement (whether or not having the force of law) imposes, modifies, or deems applicable any capital adequacy, capital maintenance or similar requirement which affects the manner in which Lender allocates capital resources to its commitments (including any commitments hereunder), and as a result thereof, in the opinion of Lender, the rate of return on Lender's capital with regard to the Loans or the Bond is reduced to a level below that which Lender could have achieved but for such circumstances, then in such case and upon notice from Lender to Borrower, from time to time, Borrower shall pay Lender such additional amount or amounts as shall compensate Lender for such reduction in Lender's rate of return. Such notice shall contain the statement of Lender with regard to any such amount or amounts which shall, in the absence of manifest error, be binding upon Borrower. In determining such amount, Lender may use any reasonable method of averaging and attribution that it deems applicable. Any rules, regulations, policies, guidelines, directives or similar requirements adopted, promulgated or implemented in connection with (a) the Dodd-Frank Wall Street Reform and Consumer Protection Act and (b) the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or any

14

United States Governmental Authority, in each case pursuant to Basel III, shall in all events are deemed to have been imposed, introduced and adopted after the date of this Agreement.

2.11    Prepayment; Funding Indemnity: (a) Borrower may prepay the Loans in whole or in part at any time or from time to time, without penalty or premium except as provided in the remainder of this Section 2.11(a). Borrower shall indemnify Lender, and hold Lender harmless from any loss, damages, liability, or expense which Lender may sustain or incur as a consequence of the making of a prepayment of Loans on a day which is not the last day of a LIBOR Interest Period with respect thereto. With respect to such Loans, such indemnification shall equal the excess, if any, of (i) the amount of interest which would have accrued on the amount so prepaid for the period from the date of such prepayment at the applicable rate of interest for such Loans provided for herein over (ii) the amount of interest (as reasonably determined by Lender) which would have accrued to Lender on such amount by placing such amount on deposit for a comparable period with leading banks in the London interbank Eurodollar market. (b) Borrower may prepay the Bond in whole or in part at any time from time to time, without penalty or premium, except if the Bond is prepaid directly or indirectly from proceeds of Indebtedness extended by another financial institution, Borrower shall pay a prepayment penalty equal to (i) if such prepayment occurs during the first Bond Year, three percent (3%) of the principal of the Bond being prepaid, (ii) if such prepayment occurs during the second Bond Year, two percent (2%) of the principal of the Bond being prepaid, and (iii) if such prepayment occurs during the third year, one percent (1%) of the principal of the Bond being prepaid. Any moneys on deposit in the Project Account on the Project Account Disbursement Termination Date shall be applied by Lender without further authority or action by Borrower (x) so long as no Default or Event of Default exists, to the payment of interest on or the prepayment of principal outstanding under the Bond, and (y) during such time as a Default or Event of Default exists, to the payment of interest on or prepayment of principal outstanding under the Bond and, upon receipt by Lender of a "no adverse effect opinion" of Bond Counsel with respect to such application by Lender, to other Obligations then due and owing, in such order as determined by Lender in its sole discretion. Except for prepayments of principal under the Bond from amounts on deposit in the Project Account, any partial prepayments of the Bond shall be applied in inverse order of scheduled principal payments. The covenants in this Section 2.11 shall survive the termination of this Agreement, and the payment of the Obligations.

2.12    Inability to Determine Interest Rate: Notwithstanding any other provision of this Agreement, if Lender shall reasonably determine (which determination shall be conclusive and binding absent manifest error) that, (i) by reason of circumstances affecting the relevant market, reasonable and adequate means do not exist for ascertaining the Adjusted LIBOR Rate for a LIBOR Interest Period, or (ii) the Adjusted LIBOR Rate does not adequately and fairly reflect the cost to Lender of funding LIBOR Rate Loans that Borrower has requested be outstanding as a LIBOR Rate Loan during a LIBOR Interest Period, Lender shall forthwith give telephone notice of such determination, confirmed in writing, to Borrower at least two (2) Business Days prior to the first day of such LIBOR Interest Period. Unless Borrower shall have notified Lender upon receipt of such telephone notice that it wishes to rescind or modify its request regarding such LIBOR Rate Loans, any Loans that were requested to be made as LIBOR Rate Loan shall be made as Base Rate Loans and any Loans that were requested to be converted into or continued as LIBOR Rate Loans shall remain as or be converted into Base Rate Loans. Until any such notice has been withdrawn by Lender, no further Loans shall be made as, continued as, or converted into, LIBOR Rate Loans for the LIBOR Interest Periods so affected.

2.13    Illegality: Notwithstanding any other provision of this Agreement, if the adoption of or any change in any Requirement of Law or in the interpretation or application thereof to Lender by the relevant Governmental Authority shall make it unlawful for Lender to make or maintain LIBOR Rate Loans as contemplated by this Agreement, or to obtain in the interbank Eurodollar market, the funds with which to make such Loans, (a) Lender shall promptly notify Borrower thereof, (b) the commitment of Lender hereunder to make LIBOR Rate Loans or continue LIBOR Rate Loans as such shall forthwith be suspended until Lender shall give notice that the condition or situation which gave rise to the suspension shall no longer exist, and (c) Lender's Loans then outstanding as LIBOR Rate Loans, if any, shall be converted on the last day of the LIBOR Interest Period for such Loans, or within such earlier period as required by law, to Base Rate Loans. Borrower hereby agrees promptly to pay Lender, upon its demand, any additional amounts necessary to compensate Lender for actual and direct costs (but not including anticipated profits) reasonably incurred by Lender in connection with any repayment in accordance with this Section 2.13, including but not limited to, any interest or fees payable by Lender to lenders of funds obtained by it in order to make or maintain its LIBOR Rate Loans hereunder. A certificate as to any additional amounts payable pursuant to this Section 2.13 submitted by Lender, to Borrower shall be presumptive evidence of such amounts owing. Lender

agrees to use reasonable efforts to avoid or to minimize any amounts which may otherwise be payable pursuant to this Section 2.13; provided however, that such efforts shall not cause the imposition on Lender of any additional costs or legal or regulatory burdens deemed by Lender in its reasonable discretion to be material.

    2.14    Requirements of Law:

        a.    If the adoption of or any change in any Requirement of Law or in the interpretation or application thereof or compliance by Lender with any request or directive (whether or not having the force of law) from any central bank or other Governmental Authority made subsequent to the date hereof:

        i.    shall subject Lender to any tax of any kind whatsoever with respect to any LIBOR Rate Loan or the Bond made by it, or change the basis of taxation of payments to Lender in respect thereof (except for changes in the rate of tax on the overall net income of Lender);

        ii.    shall impose, modify, or hold applicable, any reserve, special deposit, compulsory loan, or similar requirement against assets held by, deposits or other liabilities in, or for the account of, advances, loans, or other extension of credit (including participations therein) by, or any other acquisition of funds by, any office of Lender which is not otherwise included in the determination of the LIBOR Rate hereunder or the rate of the Bond; or

        iii.    shall impose on such Lender any other condition; and the result of any of the foregoing is to materially increase the cost to Lender of making or maintaining LIBOR Rate Loans, or to reduce any amount receivable hereunder, or under the Note or the Bond, then, in any such case, Borrower shall promptly pay Lender, upon its demand, any additional amounts necessary to compensate Lender for such additional costs or reduced amount receivable which Lender reasonably deems to be material as determined by Lender, with respect to its LIBOR Rate Loans or the Bond. A certificate as to any additional amounts payable pursuant to this Section 2.14 submitted by Lender to Borrower shall be presumptive evidence of such amounts owing. Lender agrees to use reasonable efforts to avoid, or to minimize, any amounts which might otherwise be payable pursuant to this Section 2.14; provided however, that such efforts shall not cause the imposition on Lender of any additional costs or legal regulatory burdens deemed by Lender in good faith to be material. Any additional amounts payable with respect the Bond pursuant to this Section 2.14 shall not be deemed to be interest accruing under the Bond, unless a "no adverse effect opinion" of Bond Counsel is delivered to Lender to the effect that such additional amounts may be treated as interest accruing under the Bond.

        b.    The agreements in this Section 2.14 shall survive the termination of this Agreement and payment of the Obligations.

## SECTION 3. COLLATERAL

    3.1    Collateral: As security for the payment of the Obligations, and satisfaction by Borrower of all covenants and undertakings contained in this Agreement, the other Loan Documents and any Hedging Agreement:

        a.    Personal Property: Borrower hereby assigns and grants to Lender, for itself and as agent for any of its Affiliates counterparty to or otherwise holding any Obligations, a continuing Lien on and security interest in, upon and to all assets of Borrower, including but not limited to the following Property, all whether now owned or hereafter acquired, created or arising and wherever located:

        i.    Accounts - All Accounts;

        ii.    Chattel Paper - All Chattel Paper;

        iii.    Documents - All Documents;

        iv.    Instruments - All Instruments;

        v.    Inventory - All Inventory;

vi.    General Intangibles - All General Intangibles, including Trademarks;

vii.    Equipment - All Equipment,

viii.    Fixtures - All Fixtures;

ix.    Deposit Accounts - All Deposit Accounts, including, but not limited to, the Project Account;

x.    Goods - All Goods;

xi.    Letter of Credit Rights – All Letter of Credit Rights;

xii.    Supporting Obligations – All Supporting Obligations;

xiii.    Investment Property - All Investment Property;

xiv.    Commercial Tort Claims – All Commercial Tort Claims (as amended or supplemented from time to time);

xv.    Property in Lender's Possession -All Property of Borrower, now or hereafter in Lender's possession;

xvi.    Closing Date Acquisition Documents – All Closing Date Acquisition Documents and Acquisition Documentation Rights; and

xvii.    Proceeds -The Proceeds (including, without limitation, insurance proceeds), whether cash or non-cash, of all of the foregoing property described in clauses (i) through (xvi).

3.2    Lien Documents: At Closing and thereafter as Lender deems necessary, Borrower shall execute and/or deliver to Lender, or have executed and delivered (all in form and substance satisfactory to Lender and its counsel):

a.    Financing statements pursuant to the UCC, which Lender may file in the jurisdiction where Borrower is organized and in any other jurisdiction that Lender deems appropriate; and

b.    Any other agreements, documents, instruments and writings, including, without limitation, intellectual property security agreements, required by Lender to evidence, perfect or protect the Liens and security interests in the Collateral or as Lender may reasonably request from time to time.

3.3    Other Actions:

a.    In addition to the foregoing, Borrower shall do anything further that may be reasonably required by Lender to secure Lender and effectuate the intentions and objects of this Agreement, including, without limitation, the execution and delivery of security agreements, contracts and any other documents required hereunder and the delivery of motor titles with Lender's lien noted thereon. At Lender's reasonable request, Borrower shall also immediately deliver (with execution by Borrower of all necessary documents or forms to reflect, implement or enforce the Liens described herein), or cause to be delivered to Lender all items for which Lender must receive possession to obtain a perfected security interest, including without limitation, all notes, stock powers, letters of credit, certificates and documents of title, Chattel Paper, Warehouse Receipts, Instruments, and any other similar instruments constituting Collateral.

b.    Lender is hereby authorized to file financing statements and amendments to financing statements without Borrower's signature, in accordance with the UCC. Borrower hereby authorizes Lender to file all

such financing statements and amendments to financing statements describing the Collateral in any filing office as Lender, in its sole discretion may determine, including financing statements listing "All Assets" in the collateral description therein. Borrower agrees to comply with the requests of Lender in order for Lender to have and maintain a valid and perfected first security interest in the Collateral including, without limitation, executing and causing any other Person to execute such documents as Lender may require to obtain Control (as defined in the UCC) over all Deposit Accounts, Letter of Credit Rights and Investment Property.

    3.4    <u>Searches, Certificates</u>:

        a.    Lender shall, prior to or at Closing, and thereafter as Lender may reasonably determine from time to time, at Borrower's expense, obtain the following searches (the results of which are to be consistent with the warranties made by Borrower in this Agreement):

        i.    UCC searches with the Secretary of State and local filing office of each state where Borrower is organized, maintains its executive office, a place of business, or assets; and

        ii.    Judgment, state and federal tax lien and corporate tax lien searches, in all applicable filing offices of each state searched under subparagraph (i) above.

        b.    Borrower shall, prior to or at Closing and at its expense, obtain and deliver to Lender good standing certificates showing Borrower to be in good standing in its state of organization and in each other state in which it is doing and presently intends to do business for which qualification is required.

    3.5    <u>Landlord's and Warehouseman's Waivers</u>: Borrower will cause each owner of any premises occupied by Borrower or to be occupied by Borrower and each warehouseman of any warehouse, where, in either event Collateral is held, to execute and deliver to Lender an instrument, in form and substance satisfactory to Lender, under which such owner(s) or warehouseman subordinates its/his/their interests in and waives its/his/their right to distrain on or foreclose against the Collateral and agrees to allow Lender to remain on such premises to dispose of or deal with any Collateral located thereon.

    3.6    <u>Filing Security Agreement</u>: A carbon, photographic or other reproduction or other copy of this Agreement or of a financing statement is sufficient as and may be filed in lieu of a financing statement.

    3.7    <u>Power of Attorney</u>: Each of the officers of Lender is hereby irrevocably made, constituted and appointed the true and lawful attorney for Borrower (without requiring any of them to act as such) with full power of substitution to do the following: (a) endorse the name of Borrower upon any and all checks, drafts, money orders and other instruments for the payment of monies that are payable to Borrower and constitute collections on Borrower's Accounts or proceeds of other Collateral; (b) execute and/or file in the name of Borrower any financing statements, schedules, assignments, instruments, documents and statements that Borrower is obligated to give Lender hereunder or is necessary to perfect (or continue or evidence the perfection of such security interest or Lien) Lender's security interest or Lien in the Collateral; and (c) do such other and further acts and deeds in the name of Borrower that Lender may reasonably deem necessary or desirable to enforce any Account or other Collateral.

**SECTION 4 . CLOSING AND CONDITIONS PRECEDENT TO ADVANCES**

Closing under this Agreement is subject to the following conditions precedent (all instruments, documents and agreements to be in form and substance satisfactory to Lender and Lender's counsel):

    4.1    <u>Resolutions, Opinions, and Other Documents</u>: Borrower shall have delivered, or caused to be delivered to Lender the following:

        a.    this Agreement, the Note, the Bond, the Bond Purchase Agreement and each of the other Loan Documents all properly executed;

b.      financing statements and each of the other documents to be executed and/or delivered by Borrower or any other Person pursuant to this Agreement;

c.      certified copies of (i) resolutions of Borrower's board of directors authorizing the execution, delivery and performance of this Agreement, the Note to be issued hereunder, the Bond Purchase Agreement and each of the other Loan Documents required to be delivered by any Section hereof and (ii) Borrower's articles or certificate of incorporation and by-laws or certificate of formation and operating agreement, as applicable;

d.      an incumbency certificate for Borrower identifying all Authorized Officers, with specimen signatures;

e.      a written opinion of Borrower's independent counsel addressed to Lender and opinions of Bond Counsel, Issuer's Counsel and such other counsel as Lender deems reasonably necessary;

f.      such financial statements, reports, certifications and other operational information as Lender may reasonably require, satisfactory in all respects to Lender;

g.      payment by Borrower of all fees including, without limitation, Revolving Credit Closing Fee, the Bond Closing Fee and Expenses associated with the Loans and the Bond;

h.      Searches and certificates required under Section 3.4;

i.      Insurance certificates and policies as required under Section 6.2;

j.      certification by the president of Borrower that no event or circumstance has occurred since July 13, 2018 that has had or could reasonably expected to have Material Adverse Effect;

k.      proof of payment by Borrower of the Borrower's equity in an amount of not less than Three Million One Hundred Sixty-Four Thousand and No/100 Dollars ($3,164,000.00), of which Two Million Four Hundred Thousand and No/100 Dollars ($2,400,000.00) is used to repay and satisfy in full the Term Loan (as such term is defined in the Original Loan Agreement);

l.      copies of the Closing Date Acquisition Documents;

m.      Instruments and agreements required under Section 3.5;

n.      copies of the Lease; and

o.      such other documents reasonably required by Lender.

4.2      Absence of Certain Events: At the Closing Date, no Default or Event of Default hereunder shall have occurred and be continuing.

4.3      Warranties and Representations at Closing: The warranties and representations contained in Section 5 as well as any other Section of this Agreement shall be true and correct in all respects on the Closing Date with the same effect as though made on and as of that date. Borrower shall not have taken any action or permitted any condition to exist which would have been prohibited by any Section hereof.

4.4      Compliance with this Agreement: Borrower shall have performed and complied with all agreements, covenants and conditions contained herein including, without limitation, the provisions of Sections 6 and 7 hereof, which are required to be performed or complied with by Borrower before or at the Closing Date.

4.5      Officers' Certificate: Lender shall have received a certificate dated the Closing Date and signed by the chief financial officer of Borrower certifying that all of the conditions specified in this Section have been fulfilled.

19

4.6    Closing: Subject to the conditions of this Section, the Loans shall be made available and Lender shall make an initial Bond Advance on such date (the "Closing Date") and at such time as may be mutually agreeable to the parties contemporaneously with the execution hereof ("Closing").

4.7    Waiver of Rights: By completing the Closing hereunder, or by making Advances hereunder, Lender does not thereby waive a breach of any warranty or representation made by Borrower hereunder or under any agreement, document, or instrument delivered to Lender or otherwise referred to herein, and any claims and rights of Lender resulting from any breach or misrepresentation by Borrower are specifically reserved by Lender.

4.8    Conditions for Future Advances: The making of Advances in any form following the Closing Date is subject to the following conditions precedent (all instruments, documents and agreements to be in form and substance satisfactory to Lender and its counsel) following the Closing Date:

a.    This Agreement and each of the other Loan Documents shall be effective;

b.    No event or condition shall have occurred or become known to Borrower, or would result from the making of any requested Advance, which could have a Material Adverse Effect;

c.    No Default or Event of Default then exists or after giving effect to the making of the Advance would exist;

d.    Each Advance is within and complies with the terms and conditions of this Agreement including, without limitation, the notice provisions contained in Section 2.4 hereof;

e.    No Lien (other than a Permitted Lien) has been imposed on Borrower;

f.    Each representation and warranty set forth in Section 5 hereof and any other Loan Document in effect at such time (as amended or modified from time to time) is then true and correct in all material respects as if made on and as of such date except to the extent such representations and warranties are made only as of a specific earlier date; and

g.    With respect to Bond Advances and Project Account Disbursements, (i) (A) such Bond Advance is prior to the Bond Advance Termination Date, or (B) such Project Account Disbursement is prior to the Project Account Disbursement Termination Date, (ii) receipt by Lender of the following each in form and content acceptable to Lender: (A) Disbursement Requisition in the form attached as Exhibit B to the Bond Purchase Agreement, (B) invoices, bill of sales and such other documentation as reasonably requested by Lender, and (C) after the initial Bond Advance to pay cost of issuance of the Bond, for Advances prior to the New Facility Completion Date, evidence that the construction of the New Facility has not been abandoned and can be completed on or before the New Facility Completion Date, and (iii) such assets being financed with such Bond Advance or Project Account Disbursement are in the possession of Borrower and Lender has a perfected first priority Lien on such assets. In addition, Lender shall not be obligated to make a Bond Advance or a Project Account Disbursement more frequently than once in any calendar month or in an amount of less than One Hundred Thousand and No/100 Dollars ($100,000.00), except to the extent the amount of undisbursed proceeds of the Bond or the amount then on deposit in the Project Account, as applicable, is less than One Hundred Thousand and No/100 Dollars ($100,000.00).

**SECTION 5. REPRESENTATIONS AND WARRANTIES**

To induce Lender to complete the Closing and make the initial Revolving Credit Advances under the Revolving Credit to Borrower and to purchase the Bond and make Bond Advances and Project Account Disbursements, Borrower warrants and represents to Lender that:

5.1    Organization and Validity:

a.    Borrower (i) is a corporation, duly organized and validly existing under the laws of the state of South Carolina, (ii) has the appropriate power and authority to operate its business and to own its Property

and (iii) is duly qualified, is validly existing and in good standing and has lawful power and authority to engage in the business it conducts in each state where the nature and extent of its business requires qualification, except where the failure to so qualify does not and could not have a Material Adverse Effect. A list of all states and other jurisdictions where Borrower is qualified to do business is shown on Schedule "5.1" attached hereto and made part hereof.

        b.      The making and performance of this Agreement and the other Loan Documents will not violate any Requirement of Law, or the charter, minutes or bylaw provisions of Borrower, or violate or result in a default (immediately or with the passage of time) under any contract, agreement or instrument to which Borrower is a party, or by which Borrower is bound. Borrower is not in violation of any term of any agreement or instrument to which it is a party or by which it may be bound which violation has or could have a Material Adverse Effect, or of its charter, minutes or bylaw provisions, or of Borrower's operating agreement or partnership agreement, as applicable.

        c.      Borrower has all requisite power and authority to enter into and perform this Agreement and to incur the obligations herein provided for, and has taken all proper and necessary action to authorize the execution, delivery and performance of this Agreement, and the other Loan Documents as applicable.

        d.      This Agreement, the Note to be issued hereunder, the Bond Purchase Agreement and all of the other Loan Documents, when delivered, will be valid and binding upon Borrower, and enforceable in accordance with their respective terms except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting the enforcement of creditors' rights generally and by general equitable principles.

    5.2    <u>Places of Business</u>: The only places of business of Borrower, and the places where Borrower keeps and intends to keep its Property, are at the addresses shown on Schedule "5.2" attached hereto and made part hereof.

    5.3    <u>Pending Litigation</u>: There are no judgments or judicial or administrative orders or proceedings pending, or to the knowledge of Borrower, threatened, against Borrower in any court or before any Governmental Authority. To the knowledge of Borrower, there are no investigations (civil or criminal) pending or threatened against Borrower in any court or before any Governmental Authority. Borrower is not in default with respect to any order of any Governmental Authority. To the knowledge of Borrower, no shareholder or executive officer of Borrower has been indicted in connection with or convicted of engaging in any criminal conduct, or is currently subject to any lawsuit or proceeding or under investigation in connection with any anti-racketeering or other conduct or activity which may result in the forfeiture of any property to any Governmental Authority.

    5.4    [Intentionally Omitted].

    5.5    <u>Governmental Consent</u>: Neither the nature of Borrower or of its business or Property, nor any relationship between Borrower and any other Person, nor any circumstance affecting Borrower in connection with the issuance or delivery of this Agreement, the Note, the Bond, the Bond Purchase Agreement or any other Loan Documents is such as to require a consent, approval or authorization of, or filing, registration or qualification with, any Governmental Authority on the part of Borrower.

    5.6    <u>Taxes</u>: All tax returns required to be filed by Borrower in any jurisdiction have been filed, and all taxes, assessments, fees and other governmental charges upon Borrower, or upon any of its Property, income or franchises, which are shown to be due and payable on such returns have been paid, except for those taxes being contested in good faith with due diligence by appropriate proceedings for which appropriate reserves have been maintained under GAAP and as to which no Lien has been entered .Borrower is not aware of any proposed additional tax assessment or tax to be assessed against or applicable to Borrower.

    5.7    <u>Financial Statements</u>: The most recent company prepared balance sheet of Borrower and the related statements of profit and loss, stockholder's equity and cash flow have been prepared in accordance with sound accounting principles and present fairly the financial position of Borrower as of such dates and the results of its operations for such periods. The fiscal year for Borrower ends on December 31.

5.8    Full Disclosure: The financial statements referred to in Section 5.7 of this Agreement do not, nor does any other written statement of Borrower to Lender in connection with the negotiation of the Loans or the Bond, contain any untrue statement of a material fact. Such statements do not omit a material fact, the omission of which would make the statements contained therein misleading. There is no fact known to Borrower which has not been disclosed in writing to Lender which has or could have a Material Adverse Effect.

5.9    Subsidiaries: Borrower does not have any Subsidiaries or Affiliates (other than The Azalea Fund IV, L.P.).

5.10    Investments, Guarantees, Contracts, etc.:

a.    Borrower does not own or hold equity or long term debt investments in, or have any outstanding advances to, any other Person.

b.    Borrower has not entered into any leases for real or personal Property (whether as landlord or tenant or lessor or lessee), except as shown on Schedule "5.10(b)," attached hereto and made part hereof.

c.    Borrower is not a party to any contract or agreement, or subject to any charter or other corporate restriction, which has or could have a Material Adverse Effect.

d.    Except as otherwise specifically provided in this Agreement, Borrower has not agreed or consented to cause or permit any of its Property whether now owned or hereafter acquired to be subject in the future (upon the happening of a contingency or otherwise), to a Lien not permitted by this Agreement.

5.11    Government Regulations, etc.:

a.    The use of the proceeds of and Borrower's issuance of the Note and the use of proceeds of and the Issuer's issuance of the Bond will not directly or indirectly violate or result in a violation of Section 7 of the Securities Exchange Act of 1934, as amended, or any regulations issued pursuant thereto, including, without limitation, Regulations U, T and X of the Board of Governors of the Federal Reserve System, 12 C.F.R., Chapter II. Borrower does not own or intend to carry or purchase any "margin stock" within the meaning of said Regulation U.

b.    Borrower has obtained all licenses, permits, franchises or other governmental authorizations necessary for the ownership of its Property and for the conduct of its business.

c.    As of the date hereof, no employee benefit plan ("Pension Plan"), as defined in Section 3(2) of ERISA, maintained by Borrower or under which Borrower could have any liability under ERISA (i) has failed to meet the minimum funding standards established in Section 302 of ERISA, (ii) has failed to comply in a material respect with all applicable requirements of ERISA and of the Internal Revenue Code, including all applicable rulings and regulations thereunder, (iii) has engaged in or been involved in a prohibited transaction under Section 406 of ERISA or Section 4975 of the Internal Revenue Code which would subject Borrower to any material liability, or (iv) has been terminated if such termination would subject Borrower to any material liability. Borrower has not assumed, or received notice of a claim asserted against Borrower for, withdrawal liability (as defined in Section 4207 of ERISA) with respect to any multi employer pension plan and is not a member of any Controlled Group (as defined in ERISA). Borrower has timely made all contributions when due with respect to any multi employer pension plan in which it participates and no event has occurred triggering a claim against Borrower for withdrawal liability with respect to any multi employer pension plan in which Borrower participates. All Employee Benefit Plans and multi employer pension plans in which Borrower participates are shown on Schedule "5.11(c)" attached hereto and made part hereof.

d.    Borrower is not in violation of or receipt of written notice that it is in violation of any Requirement of Law (including, without limitation, Environmental Laws), a violation of which causes or could cause a Material Adverse Effect.

e.    Borrower is current with all reports and documents required to be filed with any state or federal securities commission or similar agency and is in full compliance in all material respects with all applicable rules and regulations of such commissions.

5.12    Business Interruptions: Within five (5) years prior to the date hereof, none of the business, Property or operations of Borrower have been materially and adversely affected in any way by any casualty, strike, lockout, combination of workers, order of the United States of America, or any state or local government, or any political subdivision or agency thereof, directed against Borrower. There are no pending or, to Borrower's knowledge, threatened labor disputes, strikes, lockouts or similar occurrences or grievances affecting Borrower. No labor contract of Borrower is scheduled to expire prior to the Maturity Date.

5.13    Names and Intellectual Property:

a.    Within five (5) years prior to the Closing Date, Borrower has not conducted business under or used any other name (whether corporate or assumed) except for the names shown on Schedule "5.13(a)" attached hereto and made part hereof. Borrower is the sole owner of all names listed on such Schedule "5.13(a)" and any and all business done and all invoices issued in such trade names are Borrower's sales, business and invoices. Each trade name of Borrower represents a division or trading style of Borrower and not a separate Subsidiary or Affiliate or independent entity.

b.    All trademarks, service marks, patents or copyrights which Borrower uses, plans to use or has a right to use are shown on Schedule "5.13(b)" attached hereto and made part hereof and Borrower is the sole owner of such Property except to the extent any other Person has claims or rights in such Property, as such claims and rights are shown on Schedule "5.13(b)". Borrower is not in violation of any rights of any other Person with respect to such Property.

c.    Except as shown on Schedule "5.13(c)" attached hereto and made part hereof, (i) Borrower does not require any copyrights, patents, trademarks or other intellectual property, or any license(s) to use any patents, trademarks or other intellectual property in order to provide services to its customers in the ordinary course of business; and (ii) Lender will not require any copyrights, patents, trademarks or other intellectual property or any licenses to use the same in order to provide such services after the occurrence of an Event of Default.

5.14    Other Associations: Borrower is not engaged and has no interest in any joint venture or partnership with any other Person except as shown on Schedule "5.14," attached hereto and made part hereof.

5.15    Environmental Matters: Except as shown on Schedule "5.15," attached hereto and made part hereof:

a.    To the best of Borrower's knowledge after due inquiry, no Property presently owned, leased or operated by Borrower contains, or has previously contained, any Hazardous Substances in amounts or concentrations which (i) constitute or constituted a violation of, or (ii) could give rise to liability under, any Environmental Law.

b.    To the best of Borrower's knowledge after due inquiry, Borrower is in compliance, and, for the duration of all applicable statutes of limitations periods, has been in compliance with all applicable Environmental Laws, and there is no contamination at, under or about any properties presently owned, leased, or operated by Borrower or violation of any Environmental Law with respect to such properties which could reasonably be expected to interfere with any of their continued operations or reasonably be expected to impair the fair saleable value thereof.

c.    Borrower has not received any notice of violation, alleged violation, non-compliance, liability or potential liability regarding environmental matters or compliance assessment with Environmental Laws and Borrower has no knowledge that any such notice will be received or is being threatened.

d.    Hazardous Substances have not been transported or disposed of in a manner or to a location which are reasonably likely to give rise to liability of Borrower under any Environmental Law.

e.    No judicial proceeding or governmental or administrative action is pending , or to the knowledge of Borrower, threatened under any Environmental Law to which Borrower is, or to Borrower's knowledge will be, named as a party, nor are there any consent decrees or other decrees, consent orders, administrative orders or other orders, or other administrative or judicial requirements outstanding, the implementation of which is reasonably likely to have a Material Adverse Effect on any natural resources or on Borrower's business, financial condition, Property or prospects under any Environmental Law.

5.16    Regulation O: No director, executive officer or principal shareholder of Borrower is a director, executive officer or principal shareholder of Lender. For the purposes hereof the terms "director" "executive officer" and "principal shareholder" (when used with reference to Lender), have the respective meanings assigned thereto in Regulation O issued by the Board of Governors of the Federal Reserve System.

5.17    Capital Stock: The authorized and outstanding Capital Stock of Borrower is as shown on Schedule "5.17" attached hereto and made part hereof. All of the Capital Stock of Borrower has been duly and validly authorized and issued and is fully paid and non-assessable and has been sold and delivered to the holders thereof in compliance with, or under valid exemption from, all Federal and state laws and the rules and regulations of all Governmental Authorities governing the sale and delivery of securities. Except for the rights and obligations shown on Schedule "5.17," there are no subscriptions, warrants, options, calls, commitments, rights or agreements by which Borrower or any of the shareholders of Borrower is bound relating to the issuance, transfer, voting or redemption of shares of its Capital Stock or any pre-emptive rights held by any Person with respect to the shares of Capital Stock of Borrower. Except as shown on Schedule "5.17," Borrower has not issued any securities convertible into or exchangeable for shares of its Capital Stock or any options, warrants or other rights to acquire such shares or securities convertible into or exchangeable for such shares. Notwithstanding the foregoing, Borrower intends to issue stock options and/or restricted stock awards with respect to its Capital Stock pursuant to the terms of the Incentive Stock Plan, provided that no more than fifteen percent (15%) of the Capital Stock of Borrower outstanding on July 13, 2018 will be issued or reserved for issuance pursuant to Incentive Stock Plan.

5.18    Solvency: After giving effect to the transactions contemplated under this Agreement, Borrower is solvent, is able to pay its debts as they become due, and has capital sufficient to carry on its business and all businesses in which it is about to engage, and now owns Property having a value both at fair valuation and at present fair salable value greater than the amount required to pay Borrower's debts. Borrower will not be rendered insolvent by the execution and delivery of this Agreement or any of the other Loan Documents executed in connection with this Agreement or by the transactions contemplated hereunder or thereunder.

5.19    Perfection and Priority: This Agreement and the other Loan Documents are effective to create in favor of Lender legal, valid and enforceable Liens in all right, title and interest of Borrower in the Collateral, and when financing statements have been filed in the offices of the Secretary of State of South Carolina under Borrower's name, Borrower will have granted to Lender, and Lender will have perfected first priority Liens in the Collateral, superior in right to any and all other Liens, existing or future.

5.20    Commercial Tort Claims: As of the Closing Date, Borrower is not a party to any Commercial Tort Claims.

5.21    Letter of Credit Rights: As of the Closing Date, Borrower has no Letter of Credit Rights.

5.22    Deposit Accounts: All Deposit Accounts of Borrower are shown on Schedule "5.22," attached hereto and made part hereof.

5.23    Anti-Terrorism Laws:

a.    General. Neither Borrower nor any Affiliate of Borrower is in violation of any Anti-Terrorism Law or engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law.

b.      Executive Order No. 13224. Neither Borrower nor any Affiliate of Borrower, or to Borrower's knowledge, any of its respective agents acting or benefiting in any capacity in connection with the Loans, Letters of Credit, the Bond or other transactions hereunder, is any of the following (each a "Blocked Person"):

i.      a Person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order No. 13224;

ii.     a Person owned or controlled by, or acting for or on behalf of, any Person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order No. 13224;

iii.    a Person with which Lender is prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Law;

iv.     a Person that commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order No. 13224;

v.      a Person that is named as a "specially designated national" on the most current list published by the U.S. Treasury Department Office of Foreign Asset Control at its official website or any replacement website or other replacement official publication of such list; or

vi.     a Person who is affiliated with a Person listed above.

vii.    a Person that commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order No. 13224;

viii.   a Person that is named as a "specially designated national" on the most current list published by the U.S. Treasury Department Office of Foreign Asset Control at its official website or any replacement website or other replacement official publication of such list; or

ix.     a Person who is affiliated with a Person listed above.

5.24    Compliance with Lease. Borrower is in full material compliance with all requirements of the Lease. To the best knowledge of Borrower, Borrower is not presently in default under any of the material terms or conditions of the Lease nor has any event occurred which with the passage of time or the giving of notice or both would constitute a default.

5.25    Tax Exempt Status. Borrower has not taken any action or omitted to take any action, and has no actual knowledge of any action taken or omitted to be taken by any other Person, which action, if taken or omitted, would adversely affect the exclusion of interest on the Bond from gross income for federal income tax purposes or the exemption of interest on the Bond from South Carolina personal income taxes

## SECTION 6. BORROWER'S AFFIRMATIVE COVENANTS

Borrower covenants that until all of the Obligations are paid and satisfied in full and the Revolving Credit and all obligations of the Lender to make Advances have been terminated, that:

6.1     Payment of Taxes and Claims: Borrower shall pay, before they become delinquent, all taxes, assessments and governmental charges, or levies imposed upon it, or upon Borrower's Property, and all claims or demands of materialmen, mechanics, carriers, warehousemen, landlords and other Persons, entitled to the benefit of statutory or common law Liens which, in any case, if unpaid, would result in the imposition of a Lien upon its Property; provided however, that Borrower shall not be required to pay any such tax, assessment, charge, levy, claimor demand if the amount, applicability or validity thereof, shall at the time, be contested in good faith and by appropriate proceedings by Borrower, and if Borrower shall have set aside on its books adequate reserves in respect thereof, if so required in accordance with GAAP; which deferment of payment is permissible so long as no Lien other than a

Permitted Lien has been entered and Borrower's title to, and its right to use, its Property are not materially adversely affected thereby.

6.2    Maintenance of Properties and Corporate Existence:

a.    Property - Borrower shall maintain its Property in good condition (normal wear and tear excepted) make all necessary renewals, replacements, additions, betterments and improvements thereto and will pay and discharge when due the cost of repairs and maintenance to its Property, and will pay all rentals when due for all real estate leased by Borrower.

b.    Property Insurance, Public and Products Liability Insurance - Borrower shall maintain insurance (i) on all insurable tangible Property against fire, flood, casualty and such other hazards (including, without limitation, extended coverage, workmen's compensation, boiler and machinery, with inflation coverage by endorsement) and (ii) against public liability, product liability and business interruption, in each case in such amounts, with such deductibles and with such insurers as are customarily used by companies operating in the same industry as Borrower. At or prior to Closing, Borrower shall furnish Lender with duplicate original policies of insurance or such other evidence of insurance as Lender may require, and any certificates of insurance shall be issued on Acord Form-27. In the event Borrower fails to procure or cause to be procured any such insurance or to timely pay or cause to be paid the premium(s) on any such insurance, Lender may do so for Borrower, but Borrower shall continue to be liable for the same. The policies of all such casualty insurance shall contain standard Lender's Loss Payable Clauses (and, with respect to liability and interruption insurance, additional insured clauses) issued in favor of Lender under which all losses thereunder shall be paid to Lender as Lender's interest may appear. Such policies shall expressly provide that the requisite insurance cannot be altered or canceled without thirty (30) days prior written notice to Lender and shall insure Lender notwithstanding the act or neglect of Borrower. Borrower hereby appoints Lender as Borrower's attorney-in-fact, exercisable at Lender's option to endorse any check which may be payable to Borrower in order to collect the proceeds of such insurance and any amount or amounts collected by Lender pursuant to the provisions of this Section may be applied by Lender, in its sole discretion, to any Obligations or to repair, reconstruct or replace the loss of or damage to Collateral as Lender in its discretion may from time to time determine. Borrower further covenants that all insurance premiums owing under its current policies have been paid. Borrower shall notify Lender, immediately, upon Borrower's receipt of a notice of termination, cancellation, or non-renewal from its insurance company of any such policy.

c.    Financial Records - Borrower shall keep current and accurate books of records and accounts in which full and correct entries will be made of all of its business transactions, and will reflect in its financial statements adequate accruals and appropriations to reserves, all in accordance with GAAP. Borrower shall not change its fiscal year end date without the prior written consent of Lender.

d.    Corporate Existence and Rights - Borrower shall do (or cause to be done) all things necessary to preserve and keep in full force and effect its existence, good standing, rights and franchises. Borrower shall obtain and maintain any and all licenses, permits, franchises or other governmental authorizations necessary to the ownership of its Property or to the conduct of its businesses.

e.    Compliance with Laws - Borrower shall be in compliance with any and all Requirements of Law to which it is subject, whether federal, state or local, (including, without limitation, Environmental Laws). Borrower shall timely satisfy all assessments, fines, costs and penalties imposed (after exhaustion of all appeals, provided a stay has been put in effect during such appeal) by any Governmental Authority against Borrower or any Property of Borrower.

6.3    Business Conducted: Borrower shall continue in the business presently operated by it using its best efforts to maintain its customers and goodwill. Borrower shall not engage, directly or indirectly, in any material respect in any line of business substantially different from the businesses conducted by Borrower immediately prior to the Closing Date. Borrower shall within five (5) days of Borrower's knowledge thereof, notify Lender of any default (or receipt of notice of any claimed default) under the Lease.

6.4    Litigation: Borrower shall give prompt notice to Lender of any litigation which may have a Material Adverse Effect.

26

6.5    Issue Taxes: Borrower shall pay all taxes (other than taxes based upon or measured by any Lender's income or revenues or any personal property tax), if any, in connection with the issuance of the Note and the Bond and the recording of any lien documents. The obligations of Borrower hereunder shall survive the payment of Borrower's Obligations hereunder and the termination of this Agreement.

6.6    Bank Accounts: Borrower shall maintain its major depository and disbursement account(s) with Lender.

6.7    Employee Benefit Plans: Borrower shall (a) fund all of its Pension Plan(s) in a manner that will satisfy the minimum funding standards of Section 302 of ERISA, (b) furnish Lender, promptly upon Lender's request, with copies of all reports or other statements filed with the United States Department of Labor, the PBGC or the IRS with respect to all Pension Plan(s), or which Borrower, or any member of a Controlled Group, may receive from the United States Department of Labor, the IRS or the PBGC, with respect to all such Pension Plan(s), and (c) promptly advise Lender of the occurrence of any reportable event (as defined in Section 4043 of ERISA, other than a reportable event for which the thirty (30) day notice requirement has been waived by the PBGC) or prohibited transaction (under Section 406 of ERISA or Section 4975 of the Internal Revenue Code) with respect to any such Pension Plan(s) and the action which Borrower proposes to take with respect thereto. Borrower will make all contributions when due with respect to any multi employer pension plan in which it participates and will promptly advise Lender upon (x) its receipt of notice of the assertion against Borrower of a claim for withdrawal liability, (y) the occurrence of any event which, to the best of Borrower's knowledge, would trigger the assertion of a claim for withdrawal liability against Borrower, and (z) upon the occurrence of any event which, to the best of Borrower's knowledge, would place Borrower in a Controlled Group as a result of which any member (including Borrower) thereof may be subject to a claim for withdrawal liability, whether liquidated or contingent.

6.8    Financial Covenants: Borrower shall maintain and comply with the following financial covenants:

a.    Leverage Ratio - Borrower shall maintain a Leverage Ratio of not more than 2.25 to 1.0, measured as of each fiscal quarter end (commencing with the receipt of the 2019 4th quarter company prepared statements).

b.    Current Ratio. Borrower shall not permit the ratio of its Current Assets to Current Liabilities to be less than 1.15 to 1.0 at the end of each fiscal quarter (commencing with the receipt of the 2019 4th quarter company prepared statements).

c.    Debt Service Coverage Ratio. Borrower shall not permit the ratio of its Consolidated EBITDA, minus taxes paid in cash to Consolidated Interest Expense plus CMLTD (and shall not include any gains or losses from the sale of assets outside the normal course of business or any other extraordinary accounting adjustments or non-recurring items of income or loss except as determined by the Bank), to be less than 1.25 to 1.0 for any fiscal year (commencing with the receipt of December 31, 2020 audit).

d.    Interest Coverage Ratio. Borrower shall not permit the ratio of its Consolidated EBITDA, minus taxes paid in cash to Consolidated Interest Expense to be less than 1.50 to 1.0 for the fiscal year ending December 31, 2019.

6.9    Financial and Business Information: Borrower shall deliver or cause to be delivered to Lender the following:

a.    Financial Statements and Collateral Reports: such data, reports, statements and information, financial or otherwise, as Lender may reasonably request, including, without limitation:

i.    within thirty (30) days after the end of each fiscal quarter, the internally prepared financial statements, in reasonable detail and certified by Borrower's chief financial officer to have been prepared from the books and records of Borrower;

27

ii.    one hundred twenty (120) days after the end of each fiscal year, a copy of the audited financial statements for such fiscal year for Borrower , in reasonable detail and reported on by independent public accountants of nationally or regionally recognized standing reasonably acceptable to Lender (without a "going concern" or like qualification, exception or explanation and without any qualification or exception as to scope of such audit) to the effect that such financial statements present fairly in all material respects the financial condition and the results of operations of Borrower for such fiscal year on a consolidated and consolidating basis in accordance with GAAP and that the examination by such accountants in connection with such consolidated financial statements has been made in accordance with generally accepted auditing standards.

b.    Notice of Event of Default - promptly upon becoming aware of the existence of any condition or event which constitutes a Default or an Event of Default under this Agreement, a written notice specifying the nature and period of existence thereof and what action Borrower is taking (and proposes to take) with respect thereto;

c.    Notice of Claimed Default - promptly upon receipt by Borrower, notice of default, oral or written, given to Borrower by any creditor for Indebtedness for borrowed money, otherwise holding long term Indebtedness of Borrower that would cause a Material Adverse Effect;

d.    Securities and Other Reports - if Borrower shall be required to file reports with the Securities and Exchange Commission pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended, promptly upon its becoming available, one copy of each financial statement, report, notice or proxy statement sent by Borrower to stockholders generally, and, a copy of each regular or periodic report, and any registration statement, or prospectus in respect thereof, filed by Borrower with any securities exchange or with federal or state securities and exchange commissions or any successor agency; and

e.    Additional Reports -Borrower shall, if requested by Lender, promptly furnish Lender with copies of all reports filed with any federal, state or local Governmental Authority.

6.10    Officers' Certificates: Along with the set of financial statements delivered to Lender at the end of each fiscal quarter pursuant to Section 6.9(a)(i) hereof and the annual financial statements delivered pursuant to Section 6.9(a)(ii) hereof, Borrower shall deliver to Lender a certificate ("Compliance Certificate") (in the form of Exhibit "B," attached hereto and made part hereof) from the chief financial officer, chief executive officer or president of Borrower (and as to certificates accompanying the annual financial statements of Borrower, also certified by Borrower's independent certified public accountant) setting forth:

a.    Event of Default - that the signer has reviewed the relevant terms of this Agreement, and has made (or caused to be made under his/her supervision) a review of the transactions and conditions of Borrower from the beginning of the accounting period covered by the financial statements being delivered therewith to the date of the certificate, and that such review has not disclosed the existence during such period of any condition or event which constitutes a Default or an Event of Default or, if any such condition or event exists, specifying the nature and period of existence thereof and what action Borrower has taken or proposes to take with respect thereto.

b.    Covenant Compliance - the information (including detailed calculations) required in order to establish that Borrower is in compliance with the requirements of Section 6.8 of this Agreement, as of the end of the period covered by the financial statements delivered.

6.11    Audits and Inspection: Borrower shall permit any of Lender's officers or other representatives to visit and inspect upon reasonable notice during business hours any of the locations of Borrower (provided that, while an Event of Default exists, Lender may make such visits and inspections at any time without prior notice), to examine and audit all of Borrower's Collateral, books of account, records, reports and other papers, to make copies and extracts therefrom and to discuss its affairs, finances and accounts with its officers, employees and independent certified public accountants all at Borrower's expense at the standard rates charged by Lender for such activities, plus Lender's reasonable out-of-pocket expenses (all of which amounts shall be Expenses); provided, however, that such audits and inspections by Lender and its representatives at the locations of Borrower shall be limited to no more than two (2) times per year except during the continuance of an Event of Default (during which there shall be no limit).

6.12    [Intentionally omitted].

6.13    <u>Information to Participant</u>: Lender may divulge to any participant, assignee or co-lender or prospective participant, assignee or co-lender it may obtain in the Revolving Credit, the Bond or any portion thereof, all information, and furnish to such Person copies of any reports, financial statements, certificates, and documents obtained under any provision of this Agreement, or related agreements and documents.

6.14    <u>Material Adverse Developments</u>: Borrower agrees that immediately upon becoming aware of any development or other information outside the ordinary course of business and excluding matters of a general economic, financial or political nature which would reasonably be expected to have a Material Adverse Effect it shall give to Lender telephonic notice specifying the nature of such development or information and such anticipated effect. In addition, such verbal communication shall be confirmed by written notice thereof to Lender on the same day such verbal communication is made or the next Business Day thereafter.

6.15    <u>Places of Business</u>: Borrower shall give thirty (30) days prior written notice to Lender of any changes in the location of any of its respective places of business, of the places where records concerning its Accounts or where its Inventory or Equipment are kept, or the establishment of any new, or the discontinuance of any existing place of business; provided that Borrower may not establish any place of business outside of the United States.

6.16    <u>Commercial Tort Claims</u>: Borrower will immediately notify Lender in writing in the event that Borrower becomes a party to or obtains any rights with respect to any Commercial Tort Claim. Such notification shall include information sufficient to describe such Commercial Tort Claim, including, but not limited to, the parties to the claim, the court in which the claim was commenced, the docket number assigned to such claim, if any, and a detailed explanation of the events that gave rise to the claim. Borrower shall execute and deliver to Lender all documents and/or agreements necessary to grant Lender a security interest in such Commercial Tort Claim to secure the Obligations. Borrower authorizes Lender to file (without Borrower's signature) initial financing statements or amendments, as Lender deems necessary to perfect its security interest in the Commercial Tort Claim.

6.17    <u>Further Assurances</u>. Promptly upon request by Lender, (a) correct any material defect or error that may be discovered in any Loan Document or in the execution, acknowledgment, filing or recordation thereof, and (b) do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, certificates, assurances and other instruments as Lender may reasonably require from time to time in order to (i) carry out more effectively the purposes of the Loan Documents, (ii) to the fullest extent permitted by applicable Requirement of Law, subject Borrower's assets, rights or interests to the Liens now or hereafter intended to be covered by any of the Loan Documents, (iii) perfect and maintain the validity, effectiveness and priority of any of the Collateral Documents and any of the Liens intended to be created thereunder and (iv) assure, convey, grant, assign, transfer, preserve, protect and confirm more effectively unto Lender the rights granted or now or hereafter intended to be granted to Lender under any Loan Document or under any other instrument executed in connection with any Loan Document to which Borrower is or is to be a party.

## SECTION 7. BORROWER'S NEGATIVE COVENANTS:

Borrower covenants that until all of the Obligations are paid and satisfied in full and the Revolving Credit and all obligations of the Lender to make Advances have been terminated, that:

7.1    <u>Merger, Consolidation, Dissolution or Liquidation</u>:

a.    Borrower shall not engage in any Asset Sale other than equipment that is replaced by other equipment of comparable or superior quality and value within ninety (90) days of such Asset Sale.

b.    Borrower shall not merge or consolidate with any other Person or engage in a division, conversion, dissolution or liquidation.

7.2    Acquisitions: Borrower shall not acquire all or a material portion of the Capital Stock or assets of any Person in any transaction or in any series of related transactions or enter into any sale and leaseback transaction.

7.3    Liens and Encumbrances: Borrower shall not: (i) execute a negative pledge agreement with any Person covering any of its Property, or (ii) cause or permit or agree or consent to cause or permit in the future (upon the happening of a contingency or otherwise), its Property (including, without limitation, the Collateral), whether now owned or hereafter acquired, to be subject to a Lien or be subject to any claim except for Permitted Liens.

7.4    Transactions With Affiliates or Subsidiaries:

a.    Borrower shall not enter into any transaction with any Subsidiary or other Affiliate, including, without limitation, the purchase, sale, or exchange of Property, or the loaning or giving of funds to any Affiliate or any Subsidiary unless: (i) such Subsidiary or Affiliate is engaged in a business substantially related to the business conducted by Borrower, is a Borrower hereunder and the transaction is in the ordinary course of and pursuant to the reasonable requirements of Borrower's business and upon terms substantially the same and no less favorable to Borrower as it would obtain in a comparable arm's length transactions with any Person not an Affiliate or a Subsidiary, and so long as such transaction is not prohibited hereunder; or (ii) such transaction is intended for incidental administrative purposes. Notwithstanding the foregoing, Borrower may enter into the Management Services Agreement with Azalea Management Company, LLC in the form made available to Lender for its review (the "MSA"), and Borrower may enter into transactions with Azalea Management Company, LLC to the extent required to perform its obligations under the MSA.

b.    Borrower shall not create or acquire any Subsidiary.

7.5    Guarantees: Excepting the endorsement in the ordinary course of business of negotiable instruments for deposit or collection, Borrower shall not become or be liable, directly or indirectly, primary or secondary, matured or contingent, in any manner, whether as guarantor, surety, accommodation maker, or otherwise, for the existing or future Indebtedness of any kind of any Person.

7.6    Restricted Payments, Bonuses and Other Indebtedness: Borrower shall not:

a.    declare or pay or make any forms of Restricted Payment to holders of Borrower's Capital Stock, other than Permitted Tax Distributions, except that commencing after December 31, 2019, so long as (x) no Event of Default has occurred or is continuing or would result therefrom and (y) after giving effect to such Distributions, the Debt Service Coverage Ratio (as set forth in Section 6.8 c.) shall not be less than 1.00:1.00, Borrower may make such Distributions;

b.    declare or pay any bonus compensation to its officers if an Event of Default exists or would result from the payment thereof;

c.    hereafter incur or become liable for any Indebtedness other than Permitted Indebtedness;

d.    make any prepayments on any existing or future Indebtedness (other than the Obligations); or

e.    make any payments on subordinated debt in violation of the subordination provisions thereof.

7.7    Loans and Investments: Borrower shall not make or have outstanding loans, advances, extensions of credit or capital contributions to, or investments in, any Person.

7.8    Use of Lender's Name: Borrower shall not use Lender's name in connection with any of its business operations. Nothing herein contained is intended to permit or authorize Borrower to make any contract on behalf of Lender.

7.9    Miscellaneous Covenants:

a.    Borrower shall not become or be a party to any contract or agreement which at the time of becoming a party to such contract or agreement materially impairs Borrower's ability to perform under this Agreement, or under any other instrument, agreement or document to which Borrower is a party or by which it is or may be bound.

b.    Borrower shall not carry or purchase any "margin stock" within the meaning of Regulations U, T or X of the Board of Governors of the Federal Reserve System, 12 C.F.R., Chapter II.

7.10    Jurisdiction of Organization: If a Registered Organization, Borrower shall not change its jurisdiction of organization.

7.11    Maintenance of Tax Exempt Status of Bond.  Borrower shall not take any action or omit to take any action which, if taken or omitted, would adversely affect the tax exempt status of the Bond.

## SECTION 8. DEFAULT

8.1    Events of Default: Each of the following events shall constitute an event of default ("Event of Default"):

a.    Payments - if Borrower fails to make any payment of principal or interest or purchase price with respect to, including any Overadvance, the Purchase Price on any Mandatory Purchase Date or amounts due under any Hedging Agreement, under the Obligations on the date such payment is due and payable; or

b.    Other Charges - if Borrower fails to pay any other charges, fees, Expenses or other monetary obligations owing to Lender arising out of or incurred in connection with this Agreement or any Hedging Agreement on the date such payment is due and payable; or

c.    Particular Covenant Defaults - if Borrower fails to perform, comply with or observe any covenant or undertaking contained in this Agreement and (other than with respect to the covenants contained in Sections 6.2(b), 6.8, 6.9, 6.10 and 6.11 and Section 7 for which no cure period shall exist), such failure continues for fifteen (15) days after the occurrence thereof; or

d.    Financial Information - if any statement, report, financial statement, or certificate made or delivered by Borrower or any of its officers, employees or agents, to Lender is not true and correct, in all material respects, when made; or

e.    Uninsured Loss - if there shall occur any uninsured damage to or loss, theft, or destruction which would cause a Material Adverse Effect in the aggregate with respect to any portion of any Property of Borrower; or

f.    Warranties or Representations - if any warranty, representation or other statement by or on behalf of Borrower contained in or pursuant to this Agreement, the other Loan Documents, any Hedging Agreement or in any document, agreement or instrument furnished in compliance with, relating to, or in reference to this Agreement, is false, erroneous, or misleading in any material respect when made; or

g.    Agreements with Others - (i) if Borrower shall default beyond any grace period in the payment of principal or interest of any Indebtedness; or (ii) if Borrower otherwise defaults under the terms of any such Indebtedness if the effect of such default is to enable the holder of such Indebtedness to accelerate the payment of Borrower's obligations, which are the subject thereof, prior to the maturity date or prior to the regularly scheduled date of payment; or

h.    Other Agreements with Lender and Affiliates - if Borrower breaches or violates the terms of, or if a default (and expiration of any applicable cure period), or an Event of Default, occurs under, any Hedging

31

Agreement or any other existing or future agreement (related or unrelated) (including, without limitation, the other Loan Documents) between Borrower and Lender; or

       i.      Judgments - if any final judgment for the payment of would cause a Material Adverse Effect (i) which is not fully and unconditionally covered by insurance or (ii) for which Borrower has not established a cash or cash equivalent reserve in the full amount of such judgment, shall be rendered by a court of record against Borrower and such judgment shall continue unsatisfied and in effect for a period of thirty (30) consecutive days without being vacated, discharged, satisfied or bonded pending appeal; or

       j.      Assignment for Benefit of Creditors, etc. - if Borrower makes or proposes in writing, an assignment for the benefit of creditors generally, offers a composition or extension to creditors, or makes or sends notice of an intended bulk sale of any business or assets now or hereafter owned or conducted by Borrower; or

       k.      Bankruptcy, Dissolution, etc. - upon the commencement of any action for the dissolution or liquidation of Borrower, or the commencement of any proceeding to avoid any transaction entered into by Borrower, or the commencement of any case or proceeding for reorganization or liquidation of Borrower's debts under the Bankruptcy Code or any other state or federal law, now or hereafter enacted for the relief of debtors, whether instituted by or against Borrower; provided however, that Borrower shall have thirty (30) days to obtain the dismissal or discharge of involuntary proceedings filed against it, it being understood that during such thirty (30) day period, Lender shall not be obligated to make Advances hereunder and Lender may seek adequate protection in any bankruptcy proceeding; or

       l.      Receiver - upon the appointment of a receiver, liquidator, custodian, trustee or similar official or fiduciary for any Borrower or for Borrower's Property; or

       m.      Execution Process, etc. - the issuance of any execution or distraint process against any Property of Borrower; or

       n.      Termination of Business - if Borrower ceases any material portion of its business operations as presently conducted; or

       o.      Pension Benefits, etc. - if Borrower fails to comply with ERISA so that proceedings are commenced to appoint a trustee under ERISA to administer Borrower's employee plans or the PBGC institutes proceedings to appoint a trustee to administer such plan(s), or a Lien is entered to secure any deficiency or claim or a "reportable event" as defined under ERISA occurs; or

       p.      Investigations - any indication or evidence received by Lender that reasonably leads it to believe Borrower may have directly or indirectly been engaged in any type of activity which, would be reasonably likely to result in the forfeiture of any material property of Borrower to any governmental entity, federal, state or local; or

       q.      Change of Control - if there shall occur a Change of Control; or

       r.      Lease -There shall occur any default under the Lease and (i) the lessor under such Lease has made a demand for the cure of such default, and (ii) such default is reasonably expected to result in the termination of such Lease; or

       s.      Liens - if any Lien in favor of Lender shall cease to be valid, enforceable and perfected and prior to all other Liens other than Permitted Liens or if Borrower or any Governmental Authority shall assert any of the foregoing; or

       t.      Material Adverse Effect – if there is any change in Borrower's financial condition which, in Lender's reasonable opinion, has or would be reasonably likely to have a Material Adverse Effect; or

u.    New Facility Completion Date:  the New Facility is not completed on or before the New Facility Completion Date; or

v.    Other Loan Documents - if any other Person (other than Lender) party to a Loan Document, breaches or violates any term, provision or condition of such Loan Document.

8.2    Cure: Nothing contained in this Agreement or the Loan Documents shall be deemed to compel Lender to accept a cure of any Event of Default hereunder.

8.3    Rights and Remedies on Default:

a.    In addition to all other rights, options and remedies granted or available to Lender under this Agreement or the Loan Documents (each of which is also then exercisable by Lender), or otherwise available at law or in equity, upon or at any time after the occurrence and during the continuance of a Default or an Event of Default, Lender may, in its discretion, withhold or cease making Advances.

b.    In addition to all other rights, options and remedies granted or available to Lender under this Agreement or the Loan Documents (each of which is also then exercisable by Lender), or otherwise available at law or in equity, upon or at any time after the occurrence and during the continuance of an Event of Default Lender may, in its discretion, terminate the Revolving Credit and declare the Obligations, immediately due and payable, all without demand, notice, presentment or protest or further action of any kind (it also being understood that the occurrence of any of the events or conditions set forth in Sections 8.1(j),(k) or (l) shall automatically cause an acceleration of the Obligations.

c.    [Intentionally omitted].

d.    In addition to all other rights, options and remedies granted or available to Lender under this Agreement or the Loan Documents (each of which is also then exercisable by Lender), or otherwise available at law or in equity, upon or at any time after the acceleration of the Obligations following the occurrence of an Event of Default (other than the rights with respect to clause (iv) below which Lender may exercise at any time after an Event of Default and regardless of whether there is an acceleration), Lender may, in its discretion, exercise all rights under the UCC and any other applicable law or in equity, and under all Loan Documents permitted to be exercised after the occurrence of an Event of Default, including the following rights and remedies (which list is given by way of example and is not intended to be an exhaustive list of all such rights and remedies):

i.    The right to take possession of, send notices regarding and collect directly the Collateral, with or without judicial process (including without limitation the right to notify the United States postal authorities to redirect mail addressed to Borrower to an address designated by Lender); or

ii.    By its own means or with judicial assistance, enter Borrower's premises and take possession of the Collateral, or render it unusable, or dispose of the Collateral on such premises in compliance with subsection (e) below, without any liability for rent, storage, utilities or other sums, and Borrower shall not resist or interfere with such action; or

iii.    Require Borrower at Borrower's expense to assemble all or any part of the Collateral (other than real estate or fixtures) and make it available to Lender at any place designated by Lender; or

iv.    The right to modify the terms and conditions upon which Lender may be willing to consider making Advances or to take reserves against the Revolving Credit or the Bond; or

v.    The right to enjoin any violation of Section 7.1, it being agreed that Lender's remedies at law are inadequate.

e.    Borrower hereby agrees that a notice received by it at least seven (7) days before the time of any intended public sale or of the time after which any private sale or other disposition of the Collateral is to be

33

made, shall be deemed to be reasonable notice of such sale or other disposition. If permitted by applicable law, any perishable inventory or Collateral which threatens to speedily decline in value or which is sold on a recognized market may be sold immediately by Lender without prior notice to Borrower. Borrower covenants and agrees not to interfere with or impose any obstacle to Lender's exercise of its rights and remedies with respect to the Collateral, after the occurrence of an Event of Default hereunder. Lender shall have no obligation to clean up or prepare the Collateral for sale. If Lender sells any of the Collateral upon credit, Borrower will only be credited with payments actually made by the purchaser thereof, that are received by Lender. Lender may, in connection with any sale of the Collateral specifically disclaim any warranties of title or the like.

8.4    Nature of Remedies: All rights and remedies granted Lender hereunder and under the Loan Documents, or otherwise available at law or in equity, shall be deemed concurrent and cumulative, and not alternative remedies, and Lender may proceed with any number of remedies at the same time until all Obligations are satisfied in full. The exercise of any one right or remedy shall not be deemed a waiver or release of any other right or remedy, and Lender, upon or at any time after the occurrence of an Event of Default, may proceed against Borrower, at any time, under any agreement, with any available remedy and in any order.

8.5    Set-Off: In addition to all other rights, options and remedies granted or available to Lender under this Agreement or the Loan Documents or any Hedging Agreement (each of which is also then exercisable by Lender or its Affiliate as applicable), upon or at any time after the occurrence and during the continuance of an Event of Default, Lender (and any participant) shall have and be deemed to have, without notice to Borrower, the immediate right of set-off against any bank account of Borrower with Lender, or of Borrower with any other subsidiary of Lender or Bank Affiliate or any participant and may apply the funds or amount thus set-off against any of Borrower's Obligations hereunder. If any bank account of Borrower with Lender, any other subsidiary of Lender or Bank Affiliate or any participant is attached or otherwise liened or levied upon by any third party, Lender (and such participant) shall have and be deemed to have, without notice to Borrower, the immediate right of set-off and may apply the funds or amount thus set-off against any of Borrower's Obligations hereunder.

## SECTION 9. MISCELLANEOUS

9.1    Governing Law: THIS AGREEMENT, AND ALL MATTERS ARISING OUT OF OR RELATING TO THIS AGREEMENT, AND ALL RELATED AGREEMENTS AND DOCUMENTS, SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE SUBSTANTIVE LAWS OF THE STATE OF SOUTH CAROLINA THE PROVISIONS OF THIS AGREEMENT AND ALL OTHER AGREEMENTS AND DOCUMENTS REFERRED TO HEREIN ARE TO BE DEEMED SEVERABLE, AND THE INVALIDITY OR UNENFORCEABILITY OF ANY PROVISION SHALL NOT AFFECT OR IMPAIR THE REMAINING PROVISIONS WHICH SHALL CONTINUE IN FULL FORCE AND EFFECT.

9.2    Integrated Agreement: The Note, the Bond, the Bond Purchase Agreement, the other Loan Documents, all related agreements, and this Agreement shall be construed as integrated and complementary of each other, and as augmenting and not restricting Lender's rights and remedies. If, after applying the foregoing, an inconsistency still exists, the provisions of this Agreement shall constitute an amendment thereto and shall control.

9.3    Waiver: No omission or delay by Lender in exercising any right or power under this Agreement or any related agreements and documents will impair such right or power or be construed to be a waiver of any Default, or Event of Default or an acquiescence therein, and any single or partial exercise of any such right or power will not preclude other or further exercise thereof or the exercise of any other right, and as to Borrower no waiver will be valid unless in writing and signed by Lender and then only to the extent specified.

9.4    Indemnity:

a.    Borrower releases and shall indemnify, defend and hold harmless Lender and its Affiliates and their respective officers, employees and agents, of and from any claims, demands, liabilities, obligations, judgments, injuries, losses, damages and costs and expenses (including, without limitation, reasonable legal fees) resulting from (i) acts or conduct of Borrower under, pursuant or related to this Agreement and the other Loan Documents and any other Hedging Agreement, (ii) Borrower's breach or violation of any representation, warranty,

34

covenant or undertaking contained in this Agreement or the other Loan Documents or any Hedging Agreements, (iii) Borrower's failure to comply with any Requirement of Law (including without limitation Environmental Laws, etc.), and (iv) any claim by any other creditor of Borrower against Lender or its Affiliates arising out of any transaction whether hereunder or in any way related to the Loan Documents or Hedging Agreements and all costs, expenses, fines, penalties or other damages resulting therefrom, unless resulting solely from acts or conduct of Lender or its Affiliates constituting willful misconduct or gross negligence.

b.      Promptly after receipt by an indemnified party under subsection (a) above of notice of the commencement of any action by a third party, such indemnified party shall, if a claim in respect thereof is to be made against the indemnifying party under such subsection, notify the indemnifying party in writing of the commencement thereof. The omission so to notify the indemnifying party shall relieve the indemnifying party from any liability which it may have to any indemnified party under such subsection only if the indemnifying party is unable to defend such actions as a result of such failure to so notify. In case any such action shall be brought against any indemnified party and it shall notify the indemnifying party of the commencement thereof, the indemnifying party shall be entitled to participate therein and, to the extent that it shall wish, jointly with any other indemnifying party similarly notified, to assume the defense thereof, with counsel satisfactory to such indemnified party (who shall not, except with the consent of the indemnified party, be counsel to the indemnified party), and, after notice from the indemnifying party to such indemnified party of its election so to assume the defense thereof, the indemnifying party shall not be liable to such indemnified party under such subsection for any legal expenses of other counsel or any other expenses, in each case subsequently incurred by such indemnified party, in connection with the defense thereof other than reasonable costs of investigation.

9.5     Time: Whenever Borrower shall be required to make any payment, or perform any act, on a day which is not a Business Day, such payment may be made, or such act may be performed, on the next succeeding Business Day. Time is of the essence in Borrower's performance under all provisions of this Agreement and all related agreements and documents.

9.6     Expenses of Lender: At Closing and from time to time thereafter, Borrower will pay upon demand of Lender all reasonable costs, fees and expenses of Lender in connection with (i) the analysis, negotiation, preparation, execution, administration, delivery and termination of this Agreement, and other Loan Documents and the documents and instruments referred to herein and therein, and any amendment, amendment and restatement, supplement, waiver or consent relating hereto or thereto, whether or not any such amendment, amendment and restatement, supplement, waiver or consent is executed or becomes effective, search costs, the reasonable fees, expenses and disbursements of counsel for Lender, any fees or expenses incurred by Lender under Section 6.11 for which Borrower is obligated thereunder, and reasonable charges of any expert consultant to Lender, (ii) the enforcement of Lender's rights hereunder, or the collection of any payments owing from, Borrower under this Agreement and/or the other Loan Documents or the protection, preservation or defense of the rights of Lender hereunder and under the other Loan Documents, and (iii) any refinancing or restructuring of the credit arrangements provided under this Agreement and other Loan Documents in the nature of a "work-out" or of any insolvency or bankruptcy proceedings, or otherwise (including the reasonable fees and disbursements of counsel for Lender and, with respect to clauses (ii) and (iii), reasonable allocated costs of internal counsel) (collectively, the "Expenses");

9.7     Brokerage: This transaction was brought about and entered into by Lender and Borrower acting as principals and without any brokers, agents or finders being the effective procuring cause hereof. Borrower represents that it has not committed Lender to the payment of any brokerage fee, commission or charge in connection with this transaction. If any such claim is made on Lender by any broker, finder or agent or other person, Borrower hereby indemnifies, defends and saves such party harmless against such claim and further will defend, with counsel satisfactory to Lender, any action or actions to recover on such claim, at Borrower's own cost and expense, including such party's reasonable counsel fees. Borrower further agrees that until any such claimor demand is adjudicated in such party's favor, the amount demanded shall be deemed an Obligation of Borrower under this Agreement.

9.8     Notices:

a.      Any notices or consents required or permitted by this Agreement shall be in writing and shall be deemed given if delivered in person to the person listed below or if sent by telecopy or by nationally recognized overnight courier, as follows, unless such address is changed by written notice hereunder:

If to Lender to:

Pinnacle Bank
550 East McBee Avenue
Greenville, SC 29601
Attention: Brad Medcalf

With copies to Lenders Counsel:

Nexsen Pruet, LLC
1230 Main Street, Suite 700
Columbia, South Carolina 29201
Attention: Alan Lipsitz

If to Borrower to:

The Muffin Mam, Inc.
55 Beattie Place, Suite 1500,
Greenville, SC 29601
Attention: Patrick A. Duncan

With copies to Borrower's Counsel:

Fox Rothschild LLP
2. W. Washington Street, STE 1100
Greenville, SC 29601
Attn: Frank Williams

b.        Any notice sent by Lender, or Borrower by any of the above methods shall be deemed to be given when so received.

c.        Lender shall be fully entitled to rely upon any telecopy transmission or other writing purported to be sent by any Authorized Officer (whether requesting an Advance or otherwise) as being genuine and authorized.

d.        Each of Lender and Borrower may change its address for notices and other communications hereunder by notice to the other party hereto.

9.9    Headings: The headings of any paragraph or Section of this Agreement are for convenience only and shall not be used to interpret any provision of this Agreement.

9.10    Survival: All warranties, representations, and covenants made by Borrower herein, or in any agreement referred to herein or on any certificate, document or other instrument delivered by it or on its behalf under this Agreement, shall be considered to have been relied upon by Lender, and shall survive the delivery to Lender of the Note and the Bond, regardless of any investigation made by Lender or on its behalf. All statements in any such certificate or other instrument prepared and/or delivered for the benefit of Lender shall constitute warranties and representations by Borrower hereunder. Except as otherwise expressly provided herein, all covenants made by Borrower hereunder or under any other agreement or instrument shall be deemed continuing until all Obligations are satisfied in full. All indemnification obligations under this Agreement, including under Section 6.5, 9.4 and 9.7, shall survive the termination of this Agreement and payment of the Obligations for a period of two (2) years.

9.11    Successors and Assigns: This Agreement shall inure to the benefit of and be binding upon the successors and assigns of each of the parties. Borrower may not transfer, assign or delegate any of its duties or obligations hereunder. Borrower acknowledges and agrees that Lender may at any time, and from time to time, (a) sell participating interests in the Loans and/or the Bond, and Lender's rights hereunder to other financial institutions, and (b) sell, transfer, or assign the Loans and the Bond and Lender's rights hereunder, to any one or more additional banks or financial institutions or other person in the business of commercial lending or holding commercial loans, subject (as to Lender's rights under this clause (b)) to Borrower's written consent, which consent shall not be unreasonably withheld; provided that, no consent under this clause (b) shall be required if an Event of Default exists at the time of such sale, transfer or assignment.

36

9.12    Duplicate Originals: Two or more duplicate originals of this Agreement may be signed by the parties, each of which shall be an original but all of which together shall constitute one and the same instrument.

9.13    Modification: No modification hereof or any agreement referred to herein shall be binding or enforceable unless in writing and signed by Borrower and Lender.

9.14    Signatories: Each individual signatory hereto represents and warrants that he is duly authorized to execute this Agreement on behalf of his principal and that he executes the Agreement in such capacity and not as a party.

9.15    Third Parties: No rights are intended to be created hereunder, or under any related agreements or documents for the benefit of any third party donee, creditor or incidental beneficiary of Borrower. Nothing contained in this Agreement shall be construed as a delegation to Lender of Borrower's duty of performance, including, without limitation, Borrower's duties under any account or contract with any other Person.

9.16    Discharge of Taxes, Borrower's Obligations, Etc.: Lender, in its sole discretion, shall have the right at any time, and from time to time, with at least ten (10) days prior notice to Borrower if Borrower fail to do so, to: (a) pay for the performance of any of Borrower's obligations hereunder, and (b) discharge taxes or Liens, at any time levied or placed on Borrower's Property in violation of this Agreement unless Borrower is in good faith with due diligence by appropriate proceedings contesting such taxes or Liens and maintaining proper reserves therefor in accordance with GAAP. Expenses and advances shall be added to the Revolving Credit, and bear interest at the rate applicable to the Revolving Credit, until reimbursed to Lender. Such payments and advances made by Lender shall not be construed as a waiver by Lender of a Default or Event of Default under this Agreement.

9.17    Withholding and Other Tax Liabilities: Lender shall have the right to refuse to make any Advances from time to time unless Borrower shall, at Lender's request, have given to Lender evidence, reasonably satisfactory to Lender, that Borrower has properly deposited or paid, as required by law, all withholding taxes and all federal, state, city, county or other taxes due up to and including the date of the requested Advance. Copies of deposit slips showing payment shall constitute satisfactory evidence for such purpose. In the event that any Lien, assessment or tax liability against Borrower shall arise in favor of any taxing authority, whether or not notice thereof shall be filed or recorded as may be required by law, Lender shall have the right (but shall not be obligated, nor shall Lender hereby assume the duty) to pay any such Lien, assessment or tax liability by virtue of which such charge shall have arisen; provided, however, that Lender shall not pay any such tax, assessment or Lien if the amount, applicability or validity thereof is being contested in good faith and by appropriate proceedings by Borrower. In order to pay any such Lien, assessment or tax liability, Lender shall not be obliged to wait until such lien, assessment or tax liability is filed before taking such action as hereinabove set forth. Any sum or sums which Lender shall have paid for the discharge of any such Lien shall be added to the Revolving Credit and shall be paid by Borrower to Lender with interest thereon at the rate applicable to the Revolving Credit, upon demand, and Lender shall be subrogated to all rights of such taxing authority against Borrower.

9.18    Consent to Jurisdiction: Borrower and Lender each hereby irrevocably consent to the nonexclusive jurisdiction of the Courts of Greenville, South Carolina or the United States District Court for the District of South Carolina in any and all actions and proceedings whether arising hereunder or under any other agreement or undertaking. Borrower waives any objection which Borrower may have based upon lack of personal jurisdiction, improper venue or forum non conveniens. Borrower irrevocably agrees to service of process by certified mail, return receipt requested to the address of the appropriate party set forth herein.

9.19    Additional Documentation: Borrower shall execute and/or re-execute, and cause any Guarantor or other Person party to any Loan Document, to execute and/or re-execute and to deliver to Lender or Lender's counsel, as may be deemed appropriate, any document or instrument signed in connection with this Agreement which was incorrectly drafted and/or signed, as well as any document or instrument which should have been signed at or prior to the Closing, but which was not so signed and delivered. Borrower agrees to comply with any written request by Lender within ten (10) days after receipt by Borrower of such request.

37

9.20    <u>Advertisement</u>: Lender, in its sole discretion, shall have the right to announce and publicize the financing established hereunder, as it deems appropriate, by means and media selected by Lender. Such publication shall include all pertinent information relating to such financing.

9.21    <u>Waiver of Jury Trial</u>: BORROWER AND LENDER EACH HEREBY WAIVE ANY AND ALL RIGHTS IT MAY HAVE TO A JURY TRIAL IN CONNECTION WITH ANY LITIGATION, PROCEEDING OR COUNTERCLAIM ARISING WITH RESPECT TO RIGHTS AND OBLIGATIONS OF THE PARTIES HERETO OR UNDER THE LOAN DOCUMENTS OR WITH RESPECT TO ANY CLAIMS ARISING OUT OF ANY DISCUSSIONS, NEGOTIATIONS OR COMMUNICATIONS INVOLVING OR RELATED TO ANY PROPOSED RENEWAL, EXTENSION, AMENDMENT, MODIFICATION, RESTRUCTURE, FORBEARANCE, WORKOUT, OR ENFORCEMENT OF THE TRANSACTIONS CONTEMPLATED BY THE LOAN DOCUMENTS.

9.22    <u>Consequential Damages</u>: Neither Lender nor agent or attorney of Lender, shall be liable for any consequential damages arising from any breach of contract, tort or other wrong relating to the establishment, administration or collection of the Obligations.

9.23    <u>Amendment and Restatement</u>: This Agreement amends and restates the Original Credit Agreement in its entirety. All references in any of the Loan Documents to the Original Credit Agreement shall mean and refer to this Agreement. All documents, instruments or agreements creating security interests or liens in favor of Lender and securing the obligations thereunder continue to secure the obligations of Borrower under this Agreement and nothing contained herein is intended to represent a novation of any type with respect to the obligations of Borrower under the Original Credit Agreement or with respect to any other Indebtedness evidenced by the Original Credit Agreement or any documents, instruments or agreements executed in connection therewith.

**[SIGNATURES TO FOLLOW ON SEPARATE PAGE]**

**WITNESS** the due execution of this Agreement as a document under seal as of the date first written above.

THE MUFFIN MAM, INC.

By_____

Dewey T. Armstrong, Jr.
Chief Executive Officer

By_____

Marshall H. Cole III
Secretary

PINNACLE BANK

By_____

Bradford M. Medcalf
Senior Vice President



**MUFFIN MAM, INC**
**3129 N. Industrial Drive**
**Simpsonville, SC 29681**
**Mailing Address: PO Box 6282**
**Greenville, SC 20606**

**Office: 864-962-0616**
**1- 800-948-4268**
**Fax: 864-962-0597**

## AUTHORIZATION CERTIFICATE

Date: March 15, 2019

Pinnacle Bank
550 East McBee Avenue
Greenville, SC 29601
Attention: Brad Medcalf

Dear Brad:

The following individuals are authorized to request loan advances against the line of credit of The Muffin Mam, Inc. ("Borrower") or against any bonds issued for the benefit of Borrower and held by Pinnacle Bank and transfer funds from any of the Borrower's accounts per written instructions received via fax:

| Authorized Person | Title | Signature |
|---|---|---|
| 1. Dewey T. Armstrong, Jr. | Chief Executive Officer | |
| 2. Marshall H. Cole III | Secretary | |

**Acknowledged and approved:**

**The Muffin Mam, Inc.,**
a South Carolina Corporation

By: _____
Dewey T. Armstrong, Jr., Chief Executive Officer

and

By: _____
Marshall H. Cole III, Secretary

91128053.v1

**EXHIBIT "B"**
**COMPLIANCE CERTIFICATE**

_____, 20__

Pinnacle Bank
550 East McBee Avenue
Greenville, SC 29601
Attention: Brad Medcalf

The undersigned, the President of The Muffin Mam Inc. ("Borrower"), gives this certificate to Pinnacle Bank ("Lender"), in accordance with the requirements of Section 6.10 of that certain Credit and Security Agreement dated March 15, 2019 by and between Borrower and Lender ("Credit Agreement"). Capitalized terms used in this Certificate, unless otherwise defined herein, shall have the meanings ascribed to them in the Credit Agreement.

1.    Based upon my review of the consolidated balance sheets and statements of income of Borrower for the fiscal period ending _____, 20___, copies of which are attached hereto, I hereby certify that:

    (a)    The Leverage Ratio is _____ to 1.0;

    (b)    The Current Ratio is _____ to 1.0; and

    (c)    The Debt Service Coverage Ratio is _____ to 1.0. [to be used commencing with fiscal year ending December 31, 2020]

    (c)    The Interest Coverage Ratio is _____ to 1.0. [to be used only for the fiscal year ending December 31, 2019]

Attached as Schedule "A" are the details underlying such financial covenant calculations.

2.    No Default exists on the date hereof, other than: _____ [if none, so state]; and

3.    No Event of Default exists on the date hereof, other than: _____ [if none, so state].

Very truly yours,

By: _____
Name: _____
Title: _____

B-1

Exhibit "C"

FORM OF
REQUEST FOR CONVERSION OF RATE PERIOD

[Date]

Pinnacle Bank
550 East McBee Avenue
Greenville, SC 29601
Attention: Brad Medcalf

South Carolina Jobs-Economic Development Authority Industrial Revenue Bond (The Muffin Mam, Inc. Project)
Series 2019, in the principal amount of not exceeding $10,000,000.00

Ladies and Gentlemen:

Reference is hereby made to that certain Bond Purchase and Loan Agreement dated as of March 1, 2019 (the "Bond Purchase Agreement"), among the South Carolina Jobs-Economic Development Authority ("Issuer"), The Muffin Mam, Inc. ("Borrower") and Pinnacle Bank ("Lender") and the Credit and Security Agreement dated as of March 15, 2019 (the "Credit Agreement") between Borrower and Lender. All capitalized terms contained herein which are not specifically defined shall have the meanings assigned to such terms in the Bond Purchase Agreement and the Credit Agreement.

Borrower hereby requests, pursuant to Section 2.3.f. of the Credit Agreement, a conversion of the interest rate mode of the Bond to a new interest rate on **[Insert Date of Proposed Conversion]** (the "Conversion Date"). Borrower further requests that the Mandatory Purchase Date for the Bond be extended to **[Insert Proposed Mandatory Purchase Date]** (the "Extended Mandatory Purchase Date"). The Bond shall bear interest at **[Insert Proposed Interest Rate]** from the Conversion Date to the Extended Mandatory Purchase Date and the Bond shall be subject to mandatory purchase at the Purchase Price thereof on such date as provided in the Bond Purchase Agreement.

In connection with such request, Borrower hereby represents and warrants that:

(a)    no Default or Event of Default has occurred and is continuing under the Credit Agreement;

(b)    no event has occurred and is continuing that could reasonably be expected to result in a Material Adverse Effect; and

(c)    all representations and warranties of Borrower in the Credit Agreement are true and correct and are deemed to be made on the date hereof.

We have enclosed along with this request the following information:

1.    The outstanding principal amount of the Bond;

2.    The nature of any and all Defaults and Events of Default; and

3.      Any other pertinent information previously requested by Lender.

Please advise if the foregoing terms are acceptable.

                                        Very truly yours,

                                        THE MUFFIN MAM, INC.


                                        By_____
                                          Name: _____
                                          Title: _____

**SCHEDULES**
**TO**
**CREDIT AND SECURITY AGREEMENT**

      Attached hereto are the Schedules (the "<u>Schedules</u>") to the Credit and Security Agreement (together with all schedules, riders and exhibits annexed thereto from time to time, the "<u>Agreement</u>") dated as of March 15, 2019, by and between Pinnacle Bank ("<u>Lender</u>"), and The Muffin Mam, Inc., a South Carolina corporation ("<u>Borrower</u>"). Capitalized terms used but not defined in the Schedules shall have the meaning ascribed to them in the Agreement.

      As used herein, all Schedule numbers and references to "Sections" shall be deemed to refer to the corresponding provisions of the Agreement, unless the context clearly requires otherwise. The headings used in the Schedules have been inserted for convenience of reference only and shall not affect the meaning or interpretation of the Agreement. The Schedules are qualified in its entirety by reference to specific provisions of the Agreement, and are not intended to constitute, and shall not constitute, representations or warranties of Borrower except as and to the extent provided in the Agreement.

**Schedule 5.1**
**Jurisdictions**

South Carolina.

**Schedule 5.2**
**Places of Business**

3129 N. Industrial Drive, Simpsonville, SC 29681.

830 Hunter Industrial Park, Laurens, South Carolina.

**Schedule 5.10(b)**
**Leases for Real or Personal Property**

1. Lease dated September 30, 2010, by and among Garrett & Garrett Warehouses, LLC, Garrett Warehousing Co., LLC and Borrower, as amended.

2. Master Lease Agreement dated June 15, 2010, by and between Southeast Industrial Equipment, Inc. and Borrower, as supplemented by Equipment Schedule No. 3 dated September 23, 2014, as amended.

3. Lease dated March 4, 2019 by and between Blue Azalea, LLC and Borrower.

**Schedule 5.11(c)**
**Employee Benefit Plans**

1. Employee Health Care Coverage through BlueCross BlueShield of South Carolina (Preferred Blue Plan of Benefits);
2. The Muffin Mam, Inc. 401(k) Profit Sharing Plan;
3. Group Term Life and Accidental Death and Dismemberment Insurance provided by Companion Life;
4. Group Dental Insurance Policy provided by Ameritas Life Insurance Corp.

**Schedule 5.13(a)**
**Corporate and Trade Names**

Corporate names: (i) Muffin Acquisition, Inc. and (ii) The Muffin Mam, Inc.

Trade names: (i) Muffin Mam, (ii) The Muffin Mam, (iii) Muffin "Mam", and (iv) the Muffin "Mam".

**Schedule 5.13(b)**
**Intellectual Property Rights**

1. Word Mark: THE MUFFIN "MAM"
   Serial Number 74618043
   Filing Date: January 5, 1995
   Registration Date March 11, 1997

2. Common law rights to the marks below:

| Mark | Registration/ Application No. | Goods/Services |
|---|---|---|
| MUFFIN MAM | Not registered | Muffins, cakes, brownies, and baked goods<br><br>Private label manufacturer<br><br>Producing baked goods for others |
|  | Not registered | Muffins, cakes, brownies, and baked goods<br><br>Private label manufacturer<br><br>Producing baked goods for others |
|  | Not registered | Muffins, cakes, brownies, and baked goods<br><br>Private label manufacturer<br><br>Producing baked goods for others |

**Schedule 5.13(c)**
**Sufficiency of Intellectual Property Rights**

See items 1 and 2 in <u>Schedule 5.13(b)</u>. Other than as set forth in items 1 and 2 <u>Schedule 5.13(b)</u>, none.

**Schedule 5.14**
**Other Associations**

None.

**Schedule 5.15**
**Environmental Matters**

Borrower discharges between 6,000 to 8,000 gallons per day of wastewater to the Renewable Water Resources (ReWa) and is classified as a Low Volume Discharger (LVD) by ReWa. Borrower is currently in violation of the discharge constituent parameters imposed by ReWa for a Low Volume Discharger. Borrower is currently paying a surcharge to ReWa for exceeding the LVD discharge constituent parameters.

**Schedule 5.17**
**Capital Stock**

1. The authorized Capital Stock of Borrower consists of 10,000 shares of common stock, of which 5,600 shares are issued and outstanding. The common stock of Borrower is owned by the following shareholders as set forth below:

| Name of Shareholder | Number of Shares |
| --- | --- |
| The Azalea Fund IV, L.P. | 5,300 |
| Dewey T. Armstrong, Jr. | 300 |

2. Borrower intends to adopt the Incentive Stock Plan after Closing, and thereafter Borrower intends to issue stock options and/or restricted stock awards with respect to its Capital Stock pursuant to the terms of the Incentive Stock Plan, provided that no more than fifteen percent (15%) of the Capital Stock of Borrower outstanding on July 13, 2018 will be issued or reserved for issuance pursuant to the Incentive Stock Plan.

**Schedule 5.22**
**Deposit Accounts**

Borrower's Deposit Account(s) with Lender more particularly described as follows:

- Account No.        2189 (operating account)
- Account No.        0216 (payroll account)
- Account No.        3566 (money market account)

**Exhibit D**
**(UCC Filings)**

# UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER** (optional)
Marian L. Bowers, Esquire

**B. E-MAIL CONTACT AT FILER** (optional)

**C. SEND ACKNOWLEDGMENT TO:** (Name and Address)

Womble Bond Dickinson (US) LLP

550 S. Main Street

Suite 400

Greenville, SC 29601

SC SECRETARY OF STATE S
180717-111359
Lapse Date: 07/17/2023

Date:       7/17/2018
Time        11:13 AM
Page Count:    1 Pg
Debtor Count:    1
Filing Fees:    $8.00
Electronic
Records Access:    $8.00

**Total:**    $16.00

**Order ID#**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. **DEBTOR'S NAME:** Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Muffin Acquisition, Inc. | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 55 Beattie Place | Suite 1500 | Greenville | SC | 29601 | US |

2. **DEBTOR'S NAME:** Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Individual Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. **SECURED PARTY'S NAME** (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Pinnacle Bank | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 550 E. McBee Avenue | Greenville | SC | 29601 | US |

4. **COLLATERAL:** This financing statement covers the following collateral:

All assets of Debtor and the proceeds thereof, including, but not limited to, all now owned or hereafter acquired, created or arising accounts, machinery, inventory, goods, furniture, fixtures, equipment, general intangibles (specifically including trademarks), chattel paper, contract rights, documents, instruments, deposit accounts, goods, letter of credit rights, supporting obligations, investment property, commercial tort claims, and all cash and non-cash proceeds thereof (including without limitation, insurance proceeds).

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
SC Secretary of State  WBD 104904.0001.1

UCC 5

## UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
Marian L. Bowers, Esquire

B. E-MAIL CONTACT AT FILER (optional)

C. SEND ACKNOWLEDGMENT TO:   (Name and Address)

Womble Bond Dickinson (US) LLP

550 S. Main Street

Suite 400

Greenville, SC 29601

SC SECRETARY OF STATE S
180718-1142248

Date:           7/18/2018
Time            11:42 AM
Page Count:     1 Pg
Debtor Count:   $8.00
Filing Fees:    $8.00
Electronic
Records Access: $16.00
**Total:**
Order ID#

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

| 1a. INITIAL FINANCING STATEMENT FILE NUMBER | 1b. |
|---|---|
| 180717-1113559 | ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13 |

2. ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. ☐ **ASSIGNMENT (full or partial):** Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

4. ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. ☒ **PARTY INFORMATION CHANGE:**

Check one of these two boxes:                    AND  Check one of these three boxes to:

This Change affects ☒ Debtor or ☐ Secured Party of record    ☒ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c   ☐ ADD name: Complete item 7a or 7b, and item 7c   ☐ DELETE name: Give record name to be deleted in item 6a or 6b

6. **CURRENT RECORD INFORMATION:**  Complete for Party Information Change - provide only one name (6a or 6b)

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| MUFFIN ACQUISITION, INC. | | | |

OR

| 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

7. **CHANGED OR ADDED INFORMATION:**  Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| The Muffin Mam, Inc. | | | |

OR

| 7b. INDIVIDUAL'S SURNAME | | | |
|---|---|---|---|
| | | | |
| INDIVIDUAL'S FIRST PERSONAL NAME | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 55 Beattie Place \| Suite 1500 | Greenville | SC | 29601 | US |

8. ☐ **COLLATERAL CHANGE:**  Also check one of these four boxes:  ☐ ADD collateral   ☐ DELETE collateral   ☐ RESTATE covered collateral   ☐ ASSIGN collateral

Indicate collateral:

9. **NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT:** Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)

If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| PINNACLE BANK | | | |

OR

| 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

10. OPTIONAL FILER REFERENCE DATA:
SC Secretary of State - 104904.0001.1

SOUTH CAROLINA SECRETARY OF STATE'S OFFICE, 1205 Pendleton Street Suite 525 Columbia, SC 29201        (Rev. 07/01/13)

UCC-1

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER** (optional)
Kathleen C McKinney, Esq          8642403200

**B. E-MAIL CONTACT AT FILER** (optional)

**C. SEND ACKNOWLEDGMENT TO:** (Name and Address)

Haynsworth Sinkler Boyd

PO Box 2048

Greenville, SC 29602 3255

_(vertical text in filing box:)_ SC SECRETARY OF STATE S   190315-0839139   Lapse Date: 03/15/2024   Date: 3/15/2019   Time: 8:39 AM   Page Count: 1 Pg   Debtor Count: 2   Filing Fees: $8.00   Electronic Records Access: $8.00   Total: $16.00   Order ID#

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

1. **DEBTOR'S NAME:** Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| South Carolina Jobs-Economic Development Authority | | | |

| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1201 Main Street, Suite 1600 | Columbia | SC | 29201 | US |

2. **DEBTOR'S NAME:** Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| The Muffin Mam, Inc. | | | |

| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 3129 N. Industrial Dive | Simpsonville | SC | 29681 | US |

3. **SECURED PARTY'S NAME** (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Pinnacle Bank | | | |

| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 550 E. McBee Avenue | Greenville | SC | 29601 | US |

4. **COLLATERAL:** This financing statement covers the following collateral:
All accounts and contract rights under the Bond Purchase and Loan Agreement dated as of March 1, 2019, among Debtor #1, Debtor #2 and Secured Party, as such may be amended or supplemented.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien  ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
34407-0003

**Exhibit E**
**(Appraisal)**



November 9, 2021

Lance Miller
Special Assets
Pinnacle Financial Partners
1420 East Third Street
Charlotte, NC 28204

Re: Appraisal for all assets related to the Muffin Mam Company located at 830
Hunter Industrial Park Laurens, SC

Intended User: Pinnacle Financial Partners and Debtors

Following the site visit of the Muffin Mam plant in Laurens, SC, I conducted an
investigation into the market conditions for these types of assets in order to prepare
this impartial report.

This evaluation is for all the equipment located on the premises of the Laurens, SC
plants. Also, I would like to note the condition of these assets are used and
assumed to be in working condition. The values reflected in this report were
obtained by using the Orderly Liquidation approach to value. The value also
reflects all assets being disassembled and removed within 30 days from the facility.
It is further known that current market conditions can fluctuate.

- **Orderly Liquidation Value** can be defined as a professional opinion of the price one
  could expect to receive in a public sale process that is professionally managed and
  advertised in a commercially reasonable manner by a seller obligated to sell over a two to
  four-month period.

**Approaches to Value:**

The appraisers recognize there are distinct levels of trade or measurable
marketplaces for personal property and each may generate its own data.  The
appraisers must analyze the asset(s) within the correct market context to produce
credible assignment results. In the appraisal industry, the appraiser must consider
all three approaches to value in an appraisal assignment when determining value,
the three approaches are:

- **The Sales Comparison Approach to Value:** A procedure to conclude an opinion of
  value for a property by comparing it with similar properties that have been sold or are for
  sale in the relevant marketplace by making adjustments to prices based on marketplace
  conditions and the property's characteristics of value.  (American Society of Appraisers).
  This involves comparison of property with similar items sold within the market
  considered most common for the asset(s).
- **The Cost Approach to Value:** A procedure to estimate the current costs to reproduce or
  create a property with another of comparable use and marketability. (American Society
  Appraisers). The Cost approach assumes the piece is readily available in the marketplace
  or an exact replica or a piece similar to the asset(s) being appraised can be done for a set
  cost.
- **The Income Approach to Value:** A procedure to conclude an option nof present value
  by calculating the anticipated monetary benefits (such as a stream of income) for an
  income-producing property. The income approach deals mostly with intangible personal
  property that produces income.

All Approaches to value were considered and the appraisers selected the most
appropriate for the appraisal assignment.

The Income Approach was considered, but not employed as the assets in the
assignment are not primarily intended to generate revenue.  The Cost Approach
was considered, but not employed, as this approach would be mostly hypothetical,
whereas the Sales Comparison approach provided more accurate and relevant data
providing credible assignment results.

The site visit was conducted on October 26th, 2021

The appraiser met with the Chief Financial Office Kaustubh Deshpande and was
given a very thorough tour of the Laurens, SC plant. Mr. Deshpande also provided
an asset list.

Effective Date: November 9, 2021
Report Date: November 9, 2021
Research Dates: November 2nd to the 5th, 2021

**Research Sources:**
- EBay
- Webstaurantstore.com
- Katom.com
- Thomas Restaurant Equipment
- Iron Horse Auction Past Sales
- Purchase price of the new equipment
- Tony Furr with Classic Auction
- Martin's Equipment Company

**Assignment Conditions:**

Onsite inspection of all equipment, there was ample lighting and the assets were easily inspected.

**Limiting Conditions:**

There are no Limiting Conditions for this appraisal report.

**Extraordinary Assumptions:**

For the purpose of these values it is assumed that all the equipment was in good working condition.

**Photos Available Upon Request**

**Orderly Liquidation Value - $2,560,000.00**

Sonny Weeks,

Appraiser, GPPA
Asset Appraisal Partners
3963 Winfield Drive
Charlotte, NC 28205

*National Auctioneers Association*

*Education Institute*

*8880 Ballentine, Overland Park, Kansas 66214*

*This certifies that*

*James Weeks*

*has successfully completed the course for*

*Graduate Personal Property Appraiser*

*at*

*The Designation Academy in Las Vegas, Nevada*

*December 1-5, 2019*

*This program represents 40 hours of continuing education credit.*

*Philip Gableman, CAI, AMM, GPPA*
*Education Institute Trustees Chair*



| Item Description | Quantity | Orderly Liquidation |
|---|---|---|
| Unifiller - Flexible Decorating Line | 1 | $125,000.00 |
| Unifiller - 2 Sheet Cake Decorating Lines | 2 | $500,000.00 |
| G&F Spiral Cooler - I | 1 | $25,000.00 |
| G&F Spiral Cooler - II | 1 | $25,000.00 |
| The Henry Group, Inc. Tunnel Oven | 1 | $200,000.00 |
| The Henry Group, Inc. Oven Loader & Unloader | 2 | $50,000.00 |
| Fedco Depanner | 1 | $10,000.00 |
| Hind Bock 6P-23A Depositor - New | 1 | $90,000.00 |
| VMI PH 150DT Planetory Bowl Mixers | 5 | $100,000.00 |
| Oaks Model 60SMV751 Slurry Mixer | 1 | $100,000.00 |
| Oaks Agitating Tank- Holding tank & Agitator | 1 | $50,000.00 |
| Oaks Continuous Mixer (Areater) , Compressor | 1 | $300,000.00 |
| BMI Decorating Conveyor System | 1 | $50,000.00 |
| BMI Packing Conveyor System | 1 | $50,000.00 |
| BMI Product Conveyor System | 1 | $20,000.00 |
| BMI Pan Cooling system | 1 | $35,000.00 |
| BMI Electrical Conveyor Controls | 1 | $20,000.00 |
| 5000 Gallon Soy Oil Tank | 1 | $5,000.00 |
| Kaeser Rotary Screw compressor CSD 75 Air Compressor and Dryer | 4 | $100,000.00 |
| Pan Washer | 2 | $50,000.00 |
| HS 500 SMI Shrink Wrapper with Tunnel - I | 3 | $45,000.00 |
| EPI 6 Head Label Machine | 2 | $50,000.00 |
| Xray Machine | 2 | $40,000.00 |

| | | |
|---|---|---|
| Food Tools Slicer | 1 | $40,000.00 |
| Taping Machine | 1 | $4,000.00 |
| Decorating Room with Refrigerantion Units from both Freezer and Decorating Room | 1 | $150,000.00 |
| Pallet Racking | 1 | $10,000.00 |
| Lantech Stretch Wrapper | 2 | $10,000.00 |
| Spiral Cooler from Simpsonville | 1 | $25,000.00 |
| Baxter OV210G-M2B Ovens | 19 | $100,000.00 |
| New Cooling Oven and Conveyor System | 1 | $50,000.00 |
| Depositors from Simpsonville, | 5 | $25,000.00 |
| VMI SPI 400 AV Mixers from Simpsonville | 4 | $40,000.00 |
| Baxter Oven Racks | 63 | $5,000.00 |
| All Sheet Pans | 1 | $50,000.00 |
| Quality Control Room | 1 | $3,000.00 |
| Contents of Quality Control Room | 1 | $10,000.00 |
| | **Total:** | **$2,562,000.00** |

**Exhibit F**
**(Prepetition A/R)**

| Customer ID | Customer | Invoice/CM # | 0 - 30 | 31 - 60 | 61 - 90 | Over 90 days | Amount Due | P.O. No | Invoice Date | |
|---|---|---|---|---|---|---|---|---|---|---|
| AssFooUT | Associated Food Stores, Inc  UT | 82118 | 58,611.09 | | | | 58,611.09 | 5556000 | 10/8/21 | |
| | Associated Food Stores, 1850 West 2100 South,  Salt Lake City, UT 84119 | | | website HQ | | | 801-973-4400 | | | |
| **AssFooUT** | **Associated Food Stores, Inc  UT** | | **58,611.09** | | | | **58,611.09** | | | |
| | | | | | | | | | | |
| Certco | Certco Inc. | 82136 | 21,723.90 | | | | 21,723.90 | 733066 | 10/18/21 | |
| | Certco Inc, 5321 Verona Rd Fitchburg, WI 53711 | | | | | | 608-271-4500 | | | |
| **Certco** | **Certco Inc.** | | **21,723.90** | | | | **21,723.90** | | | |
| | | | | | | | | | | |
| DelAmeB | Delhaize America FL-Butner | 82138 | 36,793.35 | | | | 36,793.35 | 09453656 | 10/18/21 | |
| DelAmeB | Delhaize America FL-Butner | 82139 | 14,844.55 | | | | 14,844.55 | 09435788 | 10/18/21 | |
| DelAmeB | Delhaize America FL-Butner | 82140 | 35,488.60 | | | | 35,488.60 | 09435792 | 10/18/21 | |
| DelAmeB | Delhaize America FL-Butner | 82137 | 12,783.65 | | | | 12,783.65 | 09435785 | 10/19/21 | |
| DelAmeB | Delhaize America FL-Butner | 82142 | 34,004.60 | | | | 34,004.60 | 09464214 | 10/20/21 | |
| DelAmeB | Delhaize America FL-Butner | 82143 | 35,370.50 | | | | 35,370.50 | 09464211 | 10/20/21 | |
| DelAmeB | Delhaize America FL-Butner | 82144 | 37,554.00 | | | | 37,554.00 | 09464219 | 10/20/21 | |
| DelAmeB | Delhaize America FL-Butner | 82145 | 37,554.00 | | | | 37,554.00 | 09464205 | 10/20/21 | |
| DelAmeB | Delhaize America FL-Butner | 82146 | 34,893.10 | | | | 34,893.10 | 09464218 | 10/20/21 | |
| DelAmeB | Delhaize America FL-Butner | 82147 | 35,146.65 | | | | 35,146.65 | 09464216 | 10/21/21 | |
| DelAmeB | Delhaize America FL-Butner | 82149 | 37,153.05 | | | | 37,153.05 | 09464208 | 10/21/21 | |
| DelAmeB | Delhaize America FL-Butner | 82150 | 34,864.50 | | | | 34,864.50 | 09464217 | 10/22/21 | |
| DelAmeB | Delhaize America FL-Butner | 82151 | 36,217.50 | | | | 36,217.50 | 09464209 | 10/22/21 | |
| DelAmeB | Delhaize America FL-Butner | 82152 | 16,273.40 | | | | 16,273.40 | 09450948 | 10/25/21 | |
| DelAmeB | Delhaize America FL-Butner | 82153 | 22,827.40 | | | | 22,827.40 | 09450972 | 10/25/21 | |
| DelAmeB | Delhaize America FL-Butner | 82155 | 18,286.95 | | | | 18,286.95 | 09450961 | 10/25/21 | |
| DelAmeB | Delhaize America FL-Butner | 82156 | 27,678.35 | | | | 27,678.35 | 09450968 | 10/25/21 | |
| DelAmeB | Delhaize America FL-Butner | 82157 | 35,280.00 | | | | 35,280.00 | 09473130 | 10/26/21 | |
| DelAmeB | Delhaize America FL-Butner | 82158 | 34,650.00 | | | | 34,650.00 | 09473132 | 10/26/21 | |
| DelAmeB | Delhaize America FL-Butner | 82164 | 37,554.00 | | | | 37,554.00 | 09450913 | 10/29/21 | |
| DelAmeB | Delhaize America FL-Butner | 82167 | 38,146.50 | | | | 38,146.50 | 09467978 | 10/30/21 | |
| DelAmeB | Delhaize America FL-Butner | 82168 | 36,212.35 | | | | 36,212.35 | 09467988 | 10/30/21 | |
| DelAmeB | Delhaize America FL-Butner | 82169 | 32,150.25 | | | | 32,150.25 | 09467992 | 10/30/21 | |
| | Delhaize America, LLC- 2110 Executive Dr Salisbury, NC 28147-9007 | | | D&B Business Directory | | | 704-633-8250 | | | |
| **DelAmeB** | **Delhaize America FL-Butner** | | **721,727.25** | | | | **721,727.25** | | | |
| | | | | | | | | | | |
| HarDis | Hardman Distribution | 82129 | 2,310.00 | | | | 2,310.00 | 9443 | 10/12/21 | |
| HarDis | Hardman Distribution | 82141 | 3,437.50 | | | | 3,437.50 | 9496 | 10/19/21 | |
| | Hardman Distribution, 2545 Ivy St E, Cumming, GA 30041 | | | | | | 678-240-0812 | | | |
| **HarDis** | **Hardman Distribution** | | **5,747.50** | | | | **5,747.50** | | | |
| | | | | | | | | | | |
| HarTee | Harris Teeter | 82117 | 57,765.00 | | | | 57,765.00 | 874787 | 10/14/21 | |
| HarTee | Harris Teeter | 82134 | 83,792.80 | | | | 83,792.80 | 874696 | 10/15/21 | |
| HarTee | Harris Teeter | 82154 | 40,140.74 | | | | 40,140.74 | 871374 | 10/25/21 | |
| HarTee | Harris Teeter | 82163 | 58,591.08 | | | | 58,591.08 | 885269 | 10/29/21 | |
| | Harris Teeter, 701 Crestdale Rd Matthews, NC 28105 | | | HQ | | | 704-844-3100 | | | |
| **HarTee** | **Harris Teeter** | | **240,289.62** | | | | **240,289.62** | | | |
| | | | | | | | | | | |
| JewFoo | Jewel Food Stores | 82159 | 37,085.60 | | | | 37,085.60 | 692965 | 10/27/21 | |
| | Jewel Food Stores, 343 W Irving Park Rd  Wood Dale, IL 60191 | | | | | | 630-773-4300 | | | |
| **JewFoo** | **Jewel Food Stores** | | **37,085.60** | | | | **37,085.60** | | | |
| | | | | | | | | | | |
| MDI | Merchants Distributors Inc. | 82131 | 17,282.76 | | | | 17,282.76 | 491977 | 10/13/21 | |
| MDI | Merchants Distributors Inc. | 82148 | 32,184.00 | | | | 32,184.00 | 494319 | 10/21/21 | |
| MDI | Merchants Distributors Inc. | 82160 | 23,046.15 | | | | 23,046.15 | 494317 | 10/27/21 | |
| | Merchants Dist Inc, 5005 Alex Lee Blvd Hickory NC 28603 | | | website | | | 828-725-4100 | | | |
| **MDI** | **Merchants Distributors Inc.** | | **72,512.91** | | | | **72,512.91** | | | |
| | | | | | | | | | | |
| PriCho | Price Chopper Golub | 82135 | 32,805.00 | | | | 32,805.00 | 60404 | 10/15/21 | |
| | Price Choppers, 461 Nott St  Schenectady, NY 12308 | | | | | | 518-355-5000 | | | |
| **PriCho** | **Price Chopper Golub** | | **32,805.00** | | | | **32,805.00** | | | |
| | | | | | | | | | | |
| Wal6042 | Wal-Mart | 81392 | | | | 17,790.00 | 17,790.00 | 0539665242 | 1/19/21 | Claim filed with Customer |
| **Wal6042** | **Wal-Mart 6042- Pauls Valley, OK** | | | | | **17,790.00** | **17,790.00** | | | |
| | | | | | | | | | | |
| Wal6055 | Sam's Club | 82171 | 62,092.80 | | | | 62,092.80 | 0613018892 | 10/30/21 | |
| **Wal6055** | **Wal-Mart 6055-Monroe, GA** | | **62,092.80** | | | | **62,092.80** | | | |
| | | | | | | | | | | |
| Wal6057 | Sam's Club | 82170 | 62,144.00 | | | | 62,144.00 | 0613018881 | 10/30/21 | |
| **Wal6057** | **Wal-Mart 6057-(Hammond) Robert,LA** | | **62,144.00** | | | | **62,144.00** | | | |
| | | | | | | | | | | |
| Wal6059 | Sam's Club | 82166 | 61,824.00 | | | | 61,824.00 | 0613018898 | 10/29/21 | |
| **Wal6059** | **Wal- Mart 6059-Olney, IL** | | **61,824.00** | | | | **61,824.00** | | | |
| | | | | | | | | | | |
| Wal6074 | Wal-Mart | 81689 | | | | 5,006.40 | 5,006.40 | 0566859842 | 5/3/21 | Claim filed with Customer |
| **Wal6074** | **Wal-Mart 6074- (Garrett) Auburn, IN** | | | | | **5,006.40** | **5,006.40** | | | |
| | | | | | | | | | | |
| Wal6085 | Wal-Mart | 81691 | | | | 6,734.88 | 6,734.88 | 0566859845 | 5/3/21 | Claim filed with Customer |
| **Wal6085** | **Wal- Mart  6085-Tomah, WI** | | | | | **6,734.88** | **6,734.88** | | | |
| | | | | | | | | | | |
| Wal6091 | Sam's Club | 82165 | 62,412.80 | | | | 62,412.80 | 0613018894 | 10/29/21 | |
| **Wal6091** | **Wal-Mart 6091-Henderson, NC** | | **62,412.80** | | | | **62,412.80** | | | |
| | | | | | | | | | | |
| Wal7024 | Wal-Mart | 81892 | | | | 8,466.24 | 8,466.24 | 0583351879 | 7/12/21 | Claim filed with Customer |
| **Wal7024** | **Wal- Mart 7024-Sterling, IL** | | | | | **8,466.24** | **8,466.24** | | | |
| | | | | | | | | | | |
| WAL8851 | Sam's Club | 82172 | 62,886.40 | | | | 62,886.40 | 0616740616 | 11/1/21 | |
| **WAL8851** | **Wal-Mart 8851-Cocoa, FL** | | **62,886.40** | | | | **62,886.40** | | | |
| | Walmart, 702 SW 8th St Bentonville, AR 72712 | | | HQ | | | 800-925-6278 | | | |
| WEGFOO-NY | Wegmans Food Market - Rochester NY | 82105 | | 50,110.56 | | | 50,110.56 | 9335267 | 9/30/21 | Check has been mailed |
| | Wegmans 1500 Brooks Ave Rochester NY 14624 | | | | | | 800-934-6287 | | | |
| **WEGFOO-NY** | **Wegmans Food Market - Rochester NY** | | | **50,110.56** | | | **50,110.56** | | | |
| | | | | | | | | | | |
| WeiMar | Weis Markets Inc | 82161 | 41,888.00 | | | | 41,888.00 | 651996 | 10/27/21 | |
| | Weis Markets, 1000 S 2nd St  Sunbury, PA 17801 | | | | | | 570-286-4571 | | | |
| **WeiMar** | **Weis Markets Inc** | | **41,888.00** | | | | **41,888.00** | | | |
| | | | | | | | | | | |
| **Report Total** | | | **1,543,750.87** | **50,110.56** | | **37,997.52** | **1,631,858.95** | | | |